UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ZHANG Jingrong, ZHOU Yanhua, ZHANG Peng, ZHANG Cuiping, WEI Min, LO Kitsuen, CAO, Lijun, HU Yang, GUO Xiaofang, GAO Jinying, CUI Lina, XU Ting, BIAN Hexiang, | **MEMORANDUM AND ORDER ON PLAINTIFFS', DEFENDANTS', AND COURT'S MOTIONS FOR SUMMARY JUDGMENT** |
| Plaintiffs, | 15-CV-1046 |
| – against – | |
| Chinese Anti-Cult World Alliance (CACWA), Michael CHU, LI Huahong, WAN Hongjuan, ZHU Zirou, and DOES 1-5 Inclusive, | |
| Defendants. | |

JACK B. WEINSTEIN, Senior United States District Judge

**Parties**

Zhang Jingrong,
Zhou Yanhua,
Zhang Peng,
Zhang Cuiping,
Wei Min,
Lo Kitsuen,
Cao, Lijun,
Hu Yang,
Guo Xiaofang,
Gao Jinying,
Cui Lina,
Xu Ting, and
Bian Hexiang

**Appearances**

**Terri Ellen Marsh**
Human Rights Law Foundation
1875 K Street NW Suite 400
Washington D.C. 20006
(202) 697-3858

**Joshua S. Moskovitz**
Bernstein Clarke & Moskovitz
PLLC
11 Park Place, Suite 914
New York, New York 10007
(212) 321-0087

**Jonathan C. Moore**
**Keith M. Szczepanski**
Beldock Levine & Hoffman LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400

Chinese Anti-Cult World
Alliance (CACWA),
Michael CHU,
Li Huahong,
Zhu Zirou

**Tom M. Fini**
**Jacques Catafago, Esq.**
Catafago Fini LLP
The Empire State Building
350 Fifth Avenue, Suite 7412
New York, NY 10118
212-239-9669

**Edmond W. Wong, Esq**.
Law Office of Edmond W. Wong
35-10 Farrington Street
Flushing, NY 11354
718-886-3188

Wan Hongjuan

**Edmond W. Wong, Esq**.
Law Office of Edmond W. Wong
35-10 Farrington Street
Flushing, NY 11354
718-886-3188

Table of Contents

I. Introduction ........................................................................................................... 4

  A. Background ...................................................................................................... 4

  B. Motions and Claims ........................................................................................ 7

II. Facts .................................................................................................................... 10

  A. Falun Gong...................................................................................................... 11

    1. Background and Tenets ............................................................................ 11

    2. Expert Testimony .................................................................................... 12

  B. Suppression of Falun Gong in China ............................................................. 20

  C. Conflict in Flushing New York ...................................................................... 22

    1. Plaintiffs' Accounts ................................................................................. 24

    2. Defendants' Accounts.............................................................................. 28

    D.  Procedural History ................................................................................ 29

III.  Law ............................................................................................................... 32

    A.  Summary Judgment Standard of Review .............................................. 32

    B.  Religion in American Law ...................................................................... 33

        1.  Historical Account ............................................................................ 33

        2.  Current Approaches to Defining Religion ....................................... 43

    C.  42 U.S.C. § 1985(3) .............................................................................. 46

        1.  Background on § 1985(3) Deprivation Clause ................................ 46

        2.  State Action under the Deprivation Clause ..................................... 47

        3.  Elements of a Deprivation Clause Claim ........................................ 51

        4.  Continuing Validity of Deprivation Clause Claims ........................ 53

        5.  Hindrance Clause ............................................................................. 54

    D.  18 U.S.C. § 248: Freedom of Access to Clinic Entrances Act ........... 55

        1.  Text and Legislative History ............................................................ 55

        2.  Meaning of "A Place of Religious Worship" .................................. 56

    E.  New York Civil Rights Law .................................................................. 59

    F.  Assault and Battery ............................................................................... 60

    G.  Intentional Infliction of Emotional Distress ......................................... 61

    H.  Negligence ............................................................................................. 62

    I.  Public Nuisance ..................................................................................... 62

    J.  Statute of Limitations: Continuing Violations Doctrine ...................... 63

    K.  Counterclaim Timeliness ...................................................................... 65

IV.  Application of Facts to Law ....................................................................... 66

    A.  Falun Gong Is a Religion in the United States for Purposes of this Litigation ................. 66

    B.  Statute of Limitations ............................................................................ 69

        1.  Plaintiffs' Claims: Continuing Violations Doctrine ....................... 69

        2.  Defendants' Claims: Counterclaim Relation Back and Equitable Recoupment ........ 70

    C.  Plaintiffs' Claims .................................................................................. 71

        1.  Assault and Battery .......................................................................... 71

        2.  New York Civil Rights Law ............................................................ 71

        3.  Deprivation Clause .......................................................................... 72

        4.  Hindrance Clause ............................................................................. 74

        5.  18 U.S.C. § 248: Freedom of Access to Clinic Entrances Act ...... 75

        6.  Negligence ....................................................................................... 76

7.    Intentional Infliction of Emotional Distress ............................................................... 76

8.    Public Nuisance ............................................................................................................. 76

D.  Defendants' Counterclaims ................................................................................................. 77

1.    Assault and Battery ....................................................................................................... 77

2.    Intentional Infliction of Emotional Distress ............................................................... 78

3.    Negligence ..................................................................................................................... 78

4.    New York Civil Rights Law ......................................................................................... 78

V.   Conclusion ............................................................................................................................. 78

VI.  Appendix A: Map of Sites of the Alleged Incidents ............................................................. 81

VII. Appendix B: Pictures of Sites of the Alleged Incidents ....................................................... 82

I.      Introduction

A.    Background

Plaintiffs are members of a group, Falun Gong, developed in the second half of the

twentieth century in China.  The People's Republic of China ("Chinese Government"), it is

alleged, has acted to suppress this group in both China and abroad, including in the United

States; it deems it a threat to the hegemony of the Chinese State and Communist Party.  *See, e.g.*,

Pitman B. Potter, *Belief in Control: Regulation of Religion in China*, 174 The China Q. 317, 323,

331-32 (2003); Fenggang Yang, *The Red, Black, and Gray Markets of Religion in China*, 47 The

Soc. Q. 93, 110-13 (2006).

Adherents of Falun Gong live in the United States.  Some are citizens of this country.  It

is contended by them as plaintiffs that the Chinese Government has conspired with individuals to

harm followers and suppress Falun Gong in the United States by organizing and encouraging the

Chinese Anti-Cult World Alliance ("CACWA") and individuals to inflict injuries on those who

follow Falun Gong.

Defendants oppose Falun Gong in Flushing, Queens, New York, and elsewhere.  They

deny that Falun Gong is a religion.  Following the position of the Chinese Government, their

opposition is based upon characterizing Falun Gong as a "cult" indoctrinating its followers with beliefs that are dangerous, unscientific, and offensive.

Plaintiffs' claims require a showing, for the purposes of this litigation, that Falun Gong is a religion and that defendants obstructed the right of its adherents to practice this religion at places of religious worship.

In China, and in the United States, anti-Falun Gongists define Falun Gong as a "cult" that challenges the authority of the ruling Communist Party and Chinese Government. *See* Anne S. Y. Cheung, *In Search of a Theory of Cult and Freedom of Religion in China: The Case of Falun Gong*, 13 Pac. Rim L. & Pol'y J. 1 (2004).

The history and tradition in American constitutional law and the beliefs of most of the population of the United States mandates a finding that Falun Gong is a religion for only purposes of standing and applicable substantive law in the present case. "Heresy trials are foreign to our Constitution." *United States v. Ballard*, 322 U.S. 78, 86 (1944).

The court defines Falun Gong as a religion for purposes of this litigation. *See infra* Sections III(B), IV(A). The court makes no ruling on the religious nature of Falun Gong for general theological purposes. The parties' post-summary judgment hearing submissions seeking a definition of Falun Gong as a religion or non-religion for purposes outside this litigation are not persuasive. *See* Plts.' Post-Hr'g Br. at 1-10, ECF No. 145; Defs.' Post Hr'g Br. at 1-3, 7-10, ECF No. 146.

Plaintiffs proselytize their religion and protest the Chinese Government's opposition to it on Main Street in Flushing, Queens, near what they consider to be one of their temples. *See* Appendixes A & B (map and pictures of area). The Federal Freedom of Access to Clinic Entrances Act protects plaintiffs "lawfully exercising . . . [their] First Amendment right of

religious freedom *at a place of religious worship*."  18 U.S.C. § 248(a)(2) (emphasis added).

This statute is inclusive of all lawful religious practices and of all places it is practiced.  Any

place a religion is practiced—be it in underneath a tree, in a meadow, or at a folding table on the

streets of a busy city—is protected by this and other statutes and the First Amendment to the

Federal Constitution.  A contrary reading would render the Freedom of Access to Clinic

Entrances Act unconstitutional since it would discriminate between religions that use formal

temples and those that do not.

Plaintiffs set up their tables in a heavily pedestrian-traveled area in Queens.  *See*

Summary Judgment Hearing Transcript ("Hr'g Tr.") 251:5-253:10 (April 4, 2018 & April 11,

2018).  There they proselytize for the Falun Gong, also known as Falun Dafa.  *See id.*  As noted

above, for purposes of this litigation, Falun Gong is properly characterized as a religion under

the Federal Constitution and federal and state statutes and cases.  *See infra* Sections III(B),

IV(A).  Its adherents verbally and with hand-outs, signs, and literature attacked the Chinese

Government politically for, among other things, harvesting human organs.  Hr'g Tr. 265:15-

266:6.

Defendants, following the Chinese Government's position, allegedly verbally and

physically attacked plaintiffs at their tables, and referred to Falun Gong as a "cult," dangerous to

its adherents and others.  *See infra* Section II(C).  Defendants claim plaintiffs attacked them

physically.

At times the debates became loud, spirited, and robust, with occasional striking out and

hitting, but with no appreciable physical harm to any person.  *Id.*  Since the instant case was

brought, physical confrontations have subsided.  *See* Hr'g Tr. 156:24-157:10.  The parties appear

to have reached a *modus vivendi*. The New York police are well in control of the situation. *See id*.

> B.    Motions and Claims

A motion to dismiss on the pleadings has been denied. *See Zhang Jingrong v. Chinese Anti-Cult World All.*, No. 15-CV-1046, 2018 WL 1326387 --F.Supp.--  (E.D.N.Y. Mar. 14, 2018).

Both parties now move for summary judgment.  Plaintiffs seek dismissal of defendants' counterclaims.  Defendants seek dismissal of several of plaintiffs' causes of action.  The court *sua sponte* moved for partial summary judgment after providing notice in accordance with Federal Rule of Civil Procedure 56(f). *See* Mar. 26, 2018 Order, ECF No. 130.

The court does not contemplate granting injunctive relief because the violence has abated and the police are in control. *See supra* Section I(A).  An injunction might complicate appropriate police action.  The case will proceed to a jury trial on the issues of liability and damages.

A full evidentiary hearing was provided on the motions for summary judgment. *See* Hr'g Tr.  The motions for summary judgment are decided as follows:

> (1) Assault and battery: this is a simple New York State common law based claim.  It is amply supported by the allegations and evidence.  It will be tried by a jury.

> (2) Bias related violence and intimidation (New York Civil Rights Law § 79-n): this statute is applicable by its language to plaintiffs' complaint.  It will be tried by a jury.

> (3) Conspiracy to violate civil rights (42 U.S.C. § 1985(3)): the magistrate judge's report and recommendation approved by the late Judge Sandra Townes denied defendants' motion to dismiss this claim. *Zhang Jingrong v. Chinese Anti-Cult World All.*, No.

15-CV-1046, 2018 WL 1326387 --F.Supp.--  (E.D.N.Y. Mar. 14, 2018); Order
Adopting Report and Recommendation, ECF No. 38.

This court is dubious about the application of this statute.  The latest decisions on the subject by the Supreme Court implicitly overrule Second Circuit Court of Appeals' decisions, which might have been read as approving plaintiffs' legal theory supporting the instant claim.  *Compare Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (denying claims under § 1985(3) based on the right to interstate travel), *with Spencer v. Casavilla*, 903 F.2d 171 (2d Cir. 1990) (approving § 1985(3) claim based on the right to intrastate travel); *cf. Spencer v. Casavilla*, 839 F. Supp. 1014, 1017 (S.D.N.Y. 1993), *aff'd in part, appeal dismissed in part*, 44 F.3d 74 (2d Cir. 1994) (expressing doubt about "the Second Circuit Court of Appeals' position that the right to intrastate travel is on a constitutional par with the right to interstate travel"); *Upper Hudson Planned Parenthood, Inc. v. Doe*, 836 F. Supp. 939, 947 (N.D.N.Y. 1993) (expressing "serious reservations" about the extent of the right to intrastate travel after *Bray*).

There is no indication that the conduct alleged here goes beyond a narrow religious and political dispute between two relatively small groups.  The history of 42 U.S.C. § 1985(3), the Ku Klux Klan Act, adopted in 1871, does not bear on such minor disputes as those before the court.  This local dispute is in no way comparable to those in 1871, when the Ku Klux Klan was a powerful national and local entity, in effect laying siege to state and local government in the South in order to deny African Americans their post-slavery rights.  The Ku Klux Klan's operations could be analogized to "color of state action."  The instant dispute is not in that class.

8

This claim is dismissed.  Trying the case under 42 U.S.C § 1985(3) would enhance the possibility of a mistrial or reversal.  That unfortunate result after a full trial can be avoided by substituting (2) above and (5) below for their equivalent (3).  Attorneys' fees may be awarded under (2) and (5), as well as (3).

(4) Conspiracy to prevent authorities from providing full, free, and equal access to public spaces (42 U.S.C. § 1985(3)): this theory has no support in the record.  The police have done, and are doing, their job well in protecting access to public spaces.  The evidence shows that police were taking adequate steps to protect defendants and plaintiffs; there is no basis for this claim or reason to bring alleged police failures into the case.

(5) Interference with religious freedom (18 U.S.C. § 248):  this claim will be tried by jury.  The statute allows claims based on denial of access to places of worship.  It has application to plaintiffs' claims; the evidence will largely overlap with that for (2) above.

(6) Negligence: there is no basis in either state or federal law on the facts to find negligence.  The activities at issue are intentional.  The gravamen of this case is alleged deliberate action by a conspiracy of defendants to harm a religion practiced by plaintiffs in this country, and push back by plaintiffs.  Political as well as religious differences divide the parties.

(7) Intentional infliction of emotional distress: this issue will be treated under plaintiffs' claim for assault and battery, which can support both physical and psychic injury.  It is not an independent claim.

(8) Public nuisance: there is no need to fall back on a nuisance claim in the present case since it is essentially founded on the common law theory of assault and battery. *See N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 447 (E.D.N.Y. 2003) (rejecting public nuisance claim).

Defendants raise counterclaims and seek relief on the following grounds:

(9) Assault and battery: this counterclaim will go forward in a jury trial. *See* (1) above.

(10) Intentional infliction of emotional distress: this counterclaim will be treated in the same way as plaintiffs' claim. *See* (7) above. It is not an independent claim.

(11) Negligence: this counterclaim is dismissed for the same reasons as plaintiffs' negligence claim. *See* (6) above.

(12) New York Civil Rights Law § 79-n: this claim will proceed to trial. The statute is written to cover disputes such as the present one.

The present case involves issues of free speech, freedom of religion, religious rights, and political disputes in China and the United States. It will be tried on the theory that defendants committed violent acts against plaintiffs because of religious and political differences, and vice versa.

II.    Facts

Sufficient evidence has been adduced to support the pleadings' allegations. What follows is based upon evidence from court hearings, background materials, media reports, academic studies, and submissions of the parties.

A.    Falun Gong

    1.    Background and Tenets

Li Hongzhi founded Falun Gong in 1992.  Plts.' Affirmative 56.1 Statement (Plts.' 56.1

Stm't) at ¶ 1, ECF No. 106, Ex. 2.  He wrote the main corpus of Falun Gong beliefs, Zhuan

Falun.  *Id*. at ¶¶ 1-3.  Falun Gong literally translates to "the practice of the wheel of the Dharma."

Anne S. Y. Cheung, *In Search of a Theory of Cult and Freedom of Religion in China: The Case

of Falun Gong*, 13 Pac. Rim L. & Pol'y J. 1, 21 (2004).  It combines the practice of *qigong*,

breathing exercises, with traditions of Buddhism and Taoism.  *Id*.  It also goes by the name

"Falun Dafa."  *Id*.

    The founder did not call Falun Gong a religion.  Defs.' Counterstatement of Additional

Facts ("Defs.' Counterstatement") at ¶ 1, ECF No. 108.  Some adherents deny that it is a religion.

Cheung, *supra*, at 21.  These statements are based on an understanding of religion different from

that under American law; for the purposes of the present suit, Falun Gong is a religion.

    Falun Gong speaks of a divine creator, known as DAFA/the Buddha FA, who created

time and space.  Plts.' 56.1 Stm't at ¶ 5.  The purpose of life, according to its tenets, is to return

to one's original self, achieve enlightenment, and attain salvation.  *Id*. at ¶ 7.  Practitioners

undergo a process known as "cultivation," requiring adherence to a detailed ethical code.  *Id*. at ¶

8.  Truth, tolerance, and respect for family and elders, are essential parts of its ethics.  *Id*. at ¶¶

12-18.  Following its path leads to virtue.  *Id*. at ¶¶ 18-19.  Jealousy, deception, bullying, lust,

and arguing decrease virtue.  *Id*. at ¶ 20.

    Falun Gong teaches of separate dimensions where the divine creator lives.  *Id*. at ¶¶ 21-

23.  Those living in the human dimension cannot experience other dimensions as can great

enlightened beings.  *Id.* at ¶ 24.  One's true self lives in a miniature dimension.  *Id*.

Reincarnation transcends these dimensions as a person's spirit adopts "skin," the physical form of the dimension in which he or she is reincarnated.  *Id.*

Practitioners of Falun Gong exercise physically five times per day and pray at six-hour intervals.  *Id.* at ¶ 25.  They study daily and proselytize.  *Id.*  Adherents avoid uncooked meat and alcohol, celebrate holidays, such as Falun Dafa Day, and venerate sacred images and symbols such as a law wheel or Falun, Buddhas, Taos, Bodhisattvas, and Celestial maidens.  *Id.* at ¶ 26.

Falun Gong has a number of controversial teachings.  Its leader has stated that mixed-race children are inferior, aliens have visited earth, and homosexuality and women's liberation cause societal harm.  Defs.' Counterstatement at ¶¶ 7-10.  Adherents avoid western medicine.  Plts.' 56.1 Stm't at ¶ 50.

2.   Expert Testimony

Three experts testified at the summary judgment hearing:  Caylan Ford and Dr. Arthur Waldron for the plaintiffs, and Dr. Xia Ming, for the defendants.

a.     Caylan Ford

Ford received a Bachelor of Arts degree in Chinese History from the University of Calgary, a Masters in International Affairs from the George Washington University, and a Masters in International Human Rights Law from the University of Oxford.  Hr'g Tr. 39:7-14.  She has studied and written learned articles about Falun Gong.  *Id.* 39:7-41:11.  She practices Falun Gong.  *Id.* 44:1-5.

She explained the genesis and basic teachings of Falun Gong:

Falun Gong was first publicly taught in China in 1992 by a man named Li Hongzhi who is referred in the practice as the master or teacher . . . .

Li described Falun Gong, which is also sometimes called Falun Dafa. It's described as a practice stemming from the Buddhist school and it's stated essential teachings principles, and practice methods have been transmitted orally to him through a long

lineage of masters and disciples . . . . as is quite typical of Asiatic or spiritual disciplines and traditions. After being passed on to him, he reorganized some of these practice methods to make them suitable for popularization and he compiled the essential teachings in the book Zhuan Falun . . . .

[I]t was originally classified as a system of Qigong. And Qigong is an umbrella term, it's a system of categorization that's fairly new in China that captures sort of a wide variety of meditation-regulated breathing practices. And they were classified in contemporary China as forms of Chinese medicine meant to effect better health. But Li Hongzhi made clear that Falun Dafa, Falun Gong, the purpose of it was not limited to obtaining better health. Instead, it was presented as a path to transcendence, spiritual salvation.

Emphasis was put on spiritual and moral rectitude, and the ultimate goal is to achieve a kind of reconciliation with the divine. And this is actually much more reflective of the traditional function that these kinds of meditation and exercises had in antiquity.

But a lot of these were more philosophical or theological components . . . lost within the political climate of communist China. So, in effect, Li Hongzhi was reviving the kind of religious origins of this type of Qigong discipline.

*Id.* 45:10-47:3.

Ford further explained the relationship between Falun Gong and the meditation and breathing exercise practice, known as Qigong.

Well, Qigong is not a discrete single thing. So Falun Gong shouldn't be understood as a branch of Qigong or a sect, for instance. Rather, Qigong is a modern system of a classification that was devised in the political climate of the Peoples Republic of China under Communism.

So, for centuries, Qigong-like techniques of meditation, regulated breathing, specific movements and exercises, these have been employed for centuries, if not millennia, by Daoist practitioners, by some Buddhist groups, as a sort of ancillary means of achieving spiritual transformation. And many of these types of practices were transmitted orally through lineage systems in private, and they were sort of rediscovered early in the Maoist era. In order to survive in that political climate, they had to cast off their theistic beliefs or their religious beliefs.

So, to survive, Qigong practices were essentially reclassified as systems of Chinese medicine and stripped of their more overtly religious content. And it's that trend, as I said earlier, that Falun Gong in a sense reversed . . . .

Qigong is not necessarily religious, or the practices that are described as Qigong practices, rather, are not necessarily unreligious. Some of them are. I suppose, in a way, it's analogous to . . . Yogic practices. In both China and India, there are these similar traditions of . . . focused movements that are in to assist a person in their quest for transcendence and moksha and enlightenment, and comprised part of spiritual and religious practice. That doesn't mean that everyone practicing [] yoga in New York is engaged in a religious practice, but neither does it mean that there are no religious applications or religious practices that involve yoga . . . .

So some Qigong practices, I think, could rightly be classified as having religious elements, and some having been divorced from their religious roots no longer have that claim.

*Id.* 49:9-50:24.

Buddhism and Falun Gong are related to one another.

[T]here is the Buddhist religion founded by Buddha Shakyamuni, the historical Buddha, but then there is the Buddhist school Falun Gong calls Fojiao . . . . And the Falun Gong understand the name of this is that the Buddhism founded by Buddha Shakyamuni, the religious Buddhism is but one branch of a much broader school. And so the relationship between Falun Gong and religious Buddhism is of two different sort of denominations within a very vast system or school of teachings. As opposed to Falun Gong being a sect of religious Buddhism as founded by Buddha Shakyamuni.

*Id.* 103:23-104:9.

In Ford's expert opinion, Falun Gong is a religion by Western standards. She described

the features of Falun Gong that led to this conclusion.

Falun Gong elaborates a very complete cosmology or sacred order. It places ethical and moral demands on its practitioners and grounds these demands within a metaphysical framework.

The ultimate goal of the practice is the attainment of spiritual salvation, enlightenment, transcendence of this mortal realm in the context of Eastern religions. They talk of reincarnation, a cycle of samsara. And the goal is ultimately to extricate one's self from this cycle of reincarnation and achieve reconciliation for the divine. It involves an extensive body of scripture, a moral code. Teachings deal with ultimate questions of the purpose of life, the afterlife, the source of suffering, the means of salvation. It discusses metaphysical, or other worldly realms that are beyond our human perception or beyond this material world, planes inhabited by deities or gods.

In terms of its function in the lives of its practitioners with the caveat that religion can mean different things to different people and can be embraced with varying levels of commitment for the vast majority of Falun Gong practitioners that I know, they engage daily with the study of Falun Gong [teachings], Falun Gong meditation and exercise, and they certainly would see it as, you know, sort of playing a parallel role to what belief in God plays in established in orthodox faiths. And it's an essential component to their self-identity.

So, in all these ways, yes, I believe that Falun Gong would qualify as a religion based on our Western conceptions of religion, and certainly, based under U.S. law.

*Id.* 51:7-52:11

Falun Gong teaches of a divine creator:

So its teachings articulate a belief in a divine creator, and the ultimate kind of manifestation is found in the principles of Chinese of Zhen, Shan, Ren . . . . But this translates roughly as truth or truthfulness; compassion, benevolence; and something akin to forbearance. Endurance, patience, et cetera.

And this quality is described as the great law of the universe, the Dafa. It represents the fundamental or the ultimate nature of the universe. The ultimate manifestation of the Dao or the Buddhist law. It's seen as the source of order that animates and gives rise to all life and all things. And It's the sole criteria by which Falun Gong measures what's good and bad, right and wrong. So it's unchangeable and immutable, and it's . . . the source or the divine ground of being.

*Id.* 52:16-53:8.

Unlike some other religions, Falun Gong generally does not issue strict prohibitions; instead, it offers its followers general principles.

[Li Hongzhi's] approach . . . is typically to explain the principles of why a particular thing is good or bad. Why it may not be compatible with the ends of practice. And then it's up to the individual student, him or herself, to apply these principles in her life.

So, as an example, Buddhist practices have just a hard-and-fast prohibition on eating meat. Falun Gong would explain that the practitioner shouldn't be attached to eating meat, that negative karma may be accrued in the process of eating meat. But it doesn't forbid it outright. So this is a little bit of . . . how to understand the sort of Li's approach to these types of ethical teachings.

*Id.* 53:12-54:22.

It is a "revealed religion" shown to Li's followers through his speeches and writings. *Id.* 57:23-58:5. Much "is left to the individual practitioner to understand and interpret in their life and their own manner." *Id.*

The daily practice of Falun Gong includes five exercises:

> These include four slow-moving meditative standing exercises and one seated meditation. In addition, there's a daily short meditation ritual that's performed . . . multiple times a day where possible, and it's kind of akin to a prayer. These are the main sort of outward manifestations of ritual in that sense.

*Id.* 54:23-55:6.

Although Falun Gong's founder has stated that it is not a religion, Ford explained that this teaching is based on a Chinese concept of religion that differs from religion in the Western sense. *Id.* 59:1-60:4. Li has stated the Falun Gong is not a "Zong Jiao," a Chinese concept that is often translated as "religion" in English.

> Zong Jiao is actually a neologism that was invented in China in the 19th century. It generally is translated into English as religion, but I would say that a more accurate translation is institutional religion or organized religion because what the term Zong Jiao encompasses is much narrower than what the English term is understood to mean i.e., Zong Jiao refers to highly institutionalized religion that [has] churches or temples, clergy or some kind of monastic order; systems of membership, tithing, et cetera. . . .

> [A]t various points, Li has said that Falun Gong is not a, he said it's not a Zong Jiao because it doesn't have these kinds of institutionalized features. . . .

> The fact that the Li Hongzhi has said in Chinese that Falun Gong is not a Zong Jiao religion, to me, has no bearing on the question of whether it should be understood as a religion under U.S. law. I think it's perfectly irrelevant for the United States who, as I understand it, has their own criteria . . . that are independent of this kind of question.

*Id.* 59:1-62:8.

Falun Gong does not have many formal physical or organizational structures. In the 1990s, it had no temples or clergy. *Id.* 89:18-23. There is now a Falun Gong Temple located in

upstate New York, and several more formal Falun Gong gathering places, including those in

Flushing, Queens. *Id.* 89:18-90:13. In Flushing, Falun Gong practitioners gather at a spiritual

center on Main Street to meditate, exercise, and study in groups. *Id*. 114:19-24.

But, in most places, Falun Gong remains a decentralized religion.

> [G]roup meditation sites or places where practitioners congregate for the purpose
> of studying the teachings or exchanging ideas, in most places around the world this
> occurs in wherever they can get free real estate. So, typically, public parks and
> schools, universities, community centers and these tend to be ad hoc and informal.

*Id.* 89:18-90:13.

Falun Gong practitioners set up tables throughout the world on public streets, including

those in Flushing, Queens. *Id*. 94:14-95:1, 97:24-98:12. One purpose of their tables is to

criticize the Chinese Government. *Id*. In Flushing, Falun Gong practitioners "disseminate

literature and speak with passersby about the nature of their religious practice, and [its]

persecution in China. And they also sometimes will encourage people to . . . make symbolic

renunciations of their ties to the Communist Party." *Id*. 114:4-15.

> b.       Arthur Waldron

Arthur Waldron is the Lauder professor of International Relations in the History

Department at the University of Pennsylvania. Hr'g Tr. 120:17-121:6. He received a B.A. from

Harvard College and a Ph.D. from Harvard University in Chinese History. *Id*. He has studied,

written in learned journals, and taught about religion in China. *Id*. 121:13-123:1.

Waldron concluded, in his expert opinion, that Falun Gong is a religion by Western

standards. *Id*. 123:24-124:6. He had two primary bases for his conclusion:

> Well, the first conclusion, the first basis, would be that Falun Gong describes itself
> as one of the 84,000 Buddhisms. And Buddhism is recognized, I think, in America
> as being a religion. If Buddhism is not a religion, then it's very hard to say what is
> a religion.

The second point is that like most religions, Falun Gong is not about worldly things or even about one's self, it is about advancing through a path of spiritual exercise to higher and higher levels of understanding of the nature, the origins, the moral dimensions and so forth of the universe and I think it shares this characteristic with every religion that I can think of.

*Id.* 124:7-21.

He explained the relationship between Falun Gong and Buddhism:

I would say [Falun Gong] is probably one-third composed of analogies and quotations from the Daoist and Buddhist masters. The story, of course, is that Li Hongzhi [Falun Gong's founder] as a very young boy was recognized as having certain spiritual gifts and, therefore, during the Cultural Revolution, he was taken from monastery to monastery in China where there were great sages. And each of these sages would teach him the essence and the best of what that sage knew and this was his education.

So you can say that his education was eclectic in the sense that he studied with many masters of many different Chinese religions and then he put together a synthesis that he had arrived at, but which was a synthesis of what was already there in the others. And, therefore, it was kith and kin. It was in no way different. It was in certain respects novel you might say, but it represents in many ways, also, a development of trans-Buddhist thought which you can follow all the way back to the time of Buddha.

*Id.* 130:13-131:7.

c.     Xia Ming

Xia Ming is a professor of political science at the City University of New York Graduate Center and the College of Staten Island. Hr'g Tr. 163:9-20. He has researched and written learned articles about Falun Gong. *Id.* 166:9-167:15.

Dr. Xia did not offer a concrete opinion that Falun Gong is not a religion as defined by United States law. He did express hesitation about calling it a religion. *Id.* 171:3-172:2. Some of the aspects that give Dr. Xia pause include: (1) a lack of a God and savior figure, *id.* 173:11-15; (2) Falun Gong's founder's statements that it is not a religion, *id.* 173:23-174:3; and (3)

Falun Gong's lack of interfaith tolerance, *id*. 174:3-175:18. None of these are dispositive factors in the American tradition.

The political aspects of modern Falun Gong practice, associated with anti-Chinese Government statements and propaganda, also add to Dr. Xia's hesitation in calling it a religion. But, as shown from the following colloquy with the court, when the political dimension is severed from the spiritual, he agrees that there are clear religious aspects to Falun Gong:

> Court: So, for the Court, it is necessary in approaching the problem to put aside the political aspects of the entity. You agree, do you not?
>
> Dr. Xia: In order to understand the Falun Gong, whether it is a religion or not, I think we should do that. But unfortunately, for the context of this case, and in the court, and I think—and the reason—the primary course for the controversy in which led to confrontation and conflicts, and I believe they were more political than religious.
>
> Court: But putting aside the political aspects, is there a residual spiritual aspect in the Buddhist tradition, which I understand may have literally thousands of subreligions, correct?
>
> Dr. Xia: Yes, different sects, yes.
>
> Court: Sects. But they are each a religion, correct?
>
> Dr. Xia: Yes.
>
> Court : If we strain out the political for our analysis, is there left a residual spiritual value which under the United States' very broad religious definition could be characterized as religious?
>
> Dr. Xia: Excuse me. I believe it has a spiritual aspect. It has religious aspects, sure . . . .
>
> Court: But you do understand that today, even with respect to the so called Abrahamic religions, Catholicism, Protestantism, Judaism, et cetera, there are political aspects which we see in various civil and other wars in other parts of the world, correct?
>
> Dr. Xia: Yes.

Court: But the problem for the Court is whether when we put that aside, is there this—what we have referred to as spiritual, but you understand is very broad under the American law—residual aspect that can be characterized for litigation purposes under the Constitution as religious in its aspects.

Dr. Xia: If we think without reference to the context of this case, and if there was no litigation going on over this issue, and I can say we can identify the religion or spiritual aspect of the Falun Gong.

*Id*. 176:3-177:22.

The court does not construe this witness's testimony as demonstrating in his view that Falun Gong is not a religion. His testimony tends to support plaintiffs' experts' position that Falun Gong should be characterized as a religion in the United States.

    B.    Suppression of Falun Gong in China

Shortly after its beginnings in 1992, the People's Republic of China ("Chinese Government") began attacking Falun Gong and its adherents. Amnesty International, *China: The Crackdown On Falun Gong And Other So-Called "Heretical Organizations"* 4 (Mar. 23, 2000). To protest police harassment, Falun Gong practitioners held a demonstration in Beijing on April 25, 1999. *Id*. Ten thousand practitioners stood in front of the Communist Party's compound from dawn until late in the night. *Id*.

 Falun Gong was soon after branded as a threat to social stability by the Chinese Government. *Id*. In the summer of 1999 it was outlawed. Plaintiffs' 56.1 Statement in Opposition to Defendants' Motion for Summary Judgment, Plaintiffs' Supplemental Material Facts ("Plts.' Supp. Facts") at ¶ 1, ECF No. 115, Ex. 1. This measure was followed by a legislative ban on all "heretical organizations," including Falun Gong, in October of 1999. Amnesty International, *supra*, at 1.

Shortly after the ban, tens of thousands of Falun Gong practitioners were detained by the police and pressured to abandon their beliefs. *Id*. at 1-2. Many Falun Gong leaders were charged with crimes. *Id*. at 6. There was a presumption of guilt at trial. *Id*.

The Chinese Government created the "6-10 Office" in June of 1999 to "formulate and execute policies against Falun Gong." Anne S. Y. Cheung, *In Search of a Theory of Cult and Freedom of Religion in China: The Case of Falun Gong*, 13 Pac. Rim L. & Pol'y J. 1, 23 (2004). This governmental unit is above the courts, prosecutors, and general security apparatus. *Id.* at 23-24.

Along with the ban came a sustained propaganda campaign. The Chinese Government portrayed Falun Gong practitioners as mentally unstable cult members. Plts.' Supp. Facts at ¶ 2-5. The 6-10 Office led a "douzheng" campaign, a violent suppression. *Id.* "Ye Xiaowen, Director of The Bureau of Religious Affairs of the State Council (government), said that 'Falun Gong had brainwashed and bilked [double-crossed] followers, caused more than 1,400 deaths, and threatened both social and political stability.'" Amnesty International, *supra*, at 4. The Chinese Government sought to publicize statements from those it claimed to be former Falun Gong practitioners denouncing Falun Gong's leaders and practices. *Id.*

Violent suppression of Falun Gong continued after the initial crackdown. In 2008, for example, nine Falun Gong practitioners died in police custody. Congressional-Executive Commission on China, *2008 Annual Report*, *available at* https://www.cecc.gov/publications/annual-reports/2008-annual-report (last visited Mar. 23, 2018).

The 6-10 Office coordinates a network in China of Anti-Cult Associations ("CACAs"). *Id.* The local associations are a "prominent information channel for the [Chinese] government's

campaign against Falun Gong, as they widely disseminate anti-Falun Gong propaganda by holding study sessions and other community activities to raise 'anti-cult awareness.'" *Id.* Although technically independent of the government, these associations are supported and funded by the 6-10 Office.

Reports of the imprisonment and torture of Falun Gong practitioners and defenders are repetitive and continuing. *See, e.g.*, Didi Kirsten Tatlow*, 11 Detained After Protesting 'Black Jail' in China*, N.Y. Times (April 1, 2014) (reporting the jailing of 11 individuals, including four human rights lawyers, who were allegedly supporting Falun Gong); Edward Wong, *2 Chinese Lawyers Are Facing Disbarment for Defending Falun Gong*, N.Y. Times (April 21, 2011); Austin Ramzy, *Family of Dissident Lawyer Fears for His Health After Prison*, N.Y. Times (August 14, 2014) (reporting on a lawyer, who represented Falun Gong clients, being tortured in prison).

C.    Conflict in Flushing New York

Many of the plaintiffs had been subject to the Chinese Government's campaign of violent suppression while living in China. Plts.' Supp. Facts at ¶¶ 6, 31. They came to the United States, often as refugees and asylees after being tortured or detained. *Id.* Eleven of the thirteen plaintiffs have expressed a sincere belief in Falun Gong. *Id.* at ¶¶ 27-39.

In the United States, plaintiffs were physically and verbally harassed; they allege, as a result of their practice of Falun Gong at the direction of the Defendant Chinese Anti-Cult World Alliance ("CACWA"), an international offshoot of CACA. *Id.* at ¶ 14. Formed in connection with the Chinese extrajudicial security apparatus, the 6-10 Office, *see supra* Section II(B), CACA operates in China as a network of "anti-cult associations," founded with the purpose of eradicating Falun Gong. *Id.* at ¶ 9.

CACWA activities include: (i) disseminating propaganda calling for the *douzheng* (violent suppression) and *zhuanhua* (forced conversion through torture) of Falun Gong believers; (ii) disseminating pamphlets that degrade and dehumanize believers; and (iii) perpetuating physical violence and other attacks against known or suspected Falun Gong believers, including plaintiffs. *Id*. at ¶ 16. CACWA's organizational certificate explains that its purpose is to "educate society about the dangers of the Falun Gong cult and its anti-human and anti-society" practices and "warn the society about emerging anti-society cults and so called 'spiritual' practices that distort human psyche." *Id*. at ¶ 22.

Individual defendants have collaborated with CACWA. *Id*. at ¶¶ 24-29. There have been violent incidents on the streets in Queens, New York. *Id*. at ¶ 28 ("[T]he individual Defendants have engaged in verbal and physical confrontations with Plaintiffs in concert with one or more of the other Defendants, or have actively supported, endorsed, and ratified such conduct."); *id*. at ¶ 29 ("Many of these attacks have involved physical violence . . . while many have included death threats."); *id*. at ¶ 37 ("During the attacks themselves, Defendants spoke of the 'elimination' of Falun Gong from Flushing as the purpose of their attacks on Plaintiffs.").

Defendants Chu and Li produce the CACWA Newsletter, which characterizes Falun Gong believers as "malignant tumors," the "scum of humanity," "dogs' legs," "parasites," and subhumans. *Id*. at ¶ 25. The newsletters call for the violent suppression of Falun Gong. *Id*. at ¶¶ 26, 58 ("All of the Plaintiffs were attacked by Defendants in close proximity to the CACWA table and the spot where Defendants Chu and Wan distribute the CACWA Newsletter.").

In July 2011, the individual defendants began verbally and physically confronting plaintiffs in close proximity to Falun Gong places of religious worship, such as the Falun Gong Spiritual Center ("Spiritual Center"), located at 40-46 Main Street in Flushing, Queens.

Complaint ("Compl.") ¶ 5, ECF No. 2.  Plaintiffs proselytize at five designated Falun Gong table

sites, which have been authorized for this use by the police.  Compl. at ¶ 6.  These sites are

viewed as extensions of the Spiritual Center and are within walking distance of each other.

Compl. at ¶ 6; Hr'g Tr. 251:21-254:9 (director of Falun Gong Spiritual Center in Queens

explaining that the tables are used for proselytizing, protesting the Chinese Communist Party,

and praying).  They are located at: 136-06 Roosevelt Avenue, 41-17 Main Street, 41-65 Main

Street, 41-28 Main Street, and 41-70 Main Street.  Compl. at ¶ 7; *see also* Appendixes A & B.

Verbal and physical confrontations between plaintiffs and defendants occurred at these

sites.  Compl. at ¶¶ 20-31; *see* Plts.' Supp. Facts at ¶ 35 ("Defendants attacked Plaintiffs in

public as they traveled (for the most part) to proselytize in the vicinity of their designated

Spiritual Center sites . . . A few of these attacks have taken place as Plaintiffs were coming or

going from those locations and/or traveling past Defendants' CACWA tables and/or banners.").

1.    Plaintiffs' Accounts

a.    Plaintiff Gao Jinying and Plaintiff Cui Lina

In April 2011, walking on Main Street in Flushing near the Spiritual Center, Plaintiff Gao

Jinying ("Plaintiff Gao") was threatened by Defendant Li Huahong ("Defendant Li").  She said

to her:  "[T]he United States cannot protect you. We can make you disappear in the United

States. The Chinese Embassy has a blacklist of all of you."  Compl. at ¶ 26.

On July 21, 2014, Plaintiff Gao saw Defendant Wan Hongjuan ("Defendant Wan") attack

Plaintiff Hu Yang ("Plaintiff Hu"), a Falun Gong adherent on Main Street in front of the 136-06

Roosevelt Avenue site.  Compl. at ¶ 26.  When distributing flyers at the same location with

Plaintiff Cui Lina ("Plaintiff Cui"), Defendant Wan threatened both of them with extermination

and strangulation.  Compl. at ¶ 26; Plts.' Supp. Facts at ¶ 37 ("During a . . . verbal attack against

Gao Jinying and Cui Lina . . . Defendant Wan made [known] her intent to eliminate Falun Gong believers by strangling or in other ways disappearing them."); Plts.' Supp. Facts at ¶ 40 (noting that Defendant Wan said, "You are worse than a dog and I will take out your heart, your liver, and your lungs. I will choke you to death. We will destroy you. We will destroy everyone. Somebody will be here to kill you.").

    b.  Plaintiff Zhou Yanhua

  While distributing fliers near a Falun Gong table in April 2011, Plaintiff Zhou Yanhua ("Plaintiff Zhou") was threatened by Defendant Li, who informed him that he and other Falun Gong believers were on a "blacklist" maintained by the Chinese Embassy. Compl. at ¶ 21. Plaintiff Zhou was in the same location distributing fliers when Defendant Zhu Zirou ("Defendant Zhu") approached him, cursed at him, tore down display boards, and struck him several times. Compl. at ¶ 21.

  On January 16, 2015, again in the same location on Main Street, Plaintiff Zhou observed Defendant Wan knock Falun Gong materials off a table and shout loudly, "[y]ou can call the police. We have people in the police station. I am going to eradicate all of you within three months." Compl. at ¶ 21; Plts.' Supp. Facts at ¶ 40.

    c.  Plaintiff Li Xiurong and Plaintiff Cao Lijun

  In July 2011, while Plaintiff Li Xiurong ("Plaintiff Li") walked with Plaintiff Cao Lijun ("Plaintiff Cao") near the 41-70 Main Street table, they were physically attacked by Defendant Li, who was accompanied by Defendant Zhu. Compl. at ¶ 29. At Defendant Li's direction, a "backup" mob of twenty to thirty people arrived at the scene and surrounded plaintiffs. *Id*. During the incident, Defendant Zhu grabbed Plaintiff Li's shoulder bag, while the crowd yelled out "[g]rab her and hold her," "[k]ill her," and "[b]eat her to death." *Id*.; Plts.' Supp. Facts at ¶

39 ("[W]hile Plaintiff Li was held captive by Defendants Li, Zhu and an angry mob, Defendants'
associates surrounded her repeatedly threatened to kill or eradicate her.").  The violence lasted
about thirty minutes until police arrived.  Compl. at ¶ 29.

        d.      Plaintiff Zhang Peng

After being detained for his practice of Falun Gong while living in China, Plaintiff Zhang
Peng ("Plaintiff Zhang") was physically assaulted on July 14, 2014, by Defendant Wan as he
walked up and down Main Street in front of 136-06 Roosevelt Avenue.  Compl. at ¶ 28.

        e.      Plaintiff Lo Kitsuen

On February 8, 2014, Plaintiff Lo Kitsuen ("Plaintiff Lo"), while participating in a
Chinese New Year's parade, was confronted by a group of CACWA supporters, Chinese
Communist Party loyalists, and others who violently intimidated him and shouted "[d]own with
the evil cult."  Compl. at ¶ 22.  On December 17, 2014, while working at the 136-06 Roosevelt
Avenue table, Plaintiff Lo was physically attacked and verbally abused by Defendant Li.  *Id.*

        f.      Plaintiff Hu Yang

On July 21, 2014, Plaintiff Hu Yang ("Plaintiff Hu") was aggressively shoved and kicked
by Defendant Wan in an alleged attempt to steal his cell phone as he walked near the 136-06
Roosevelt Avenue table.  Compl. at ¶ 25.  Three days later, Defendant Wan confronted Plaintiff
Hu at the same location, saying "[y]ou are even worse than dogs. I'm going to round you all up
and exterminate all of you within three months. I'll strangle all of you to death."  *Id.*; Plts.' Supp.
Facts at ¶ 37 ("During a physical attack of Hu Yang . . . Defendant Wan made her intent to
eliminate Falun Gong believers by strangling or in other ways disappearing them."); Plts.' Supp.
Facts at ¶ 40 (noting that Defendant Wan said, "You guys are less than dogs. I am going to chose

you guys to death. I am going to eliminate you all.").  Plaintiff Gao witnessed both incidents.

Compl. at ¶ 26.

g.      Plaintiff Zhang Jingrong

On January 16, 2015, Plaintiff Zhang Jingrong ("Plaintiff Zhang Jingrong"), while

staffing the 41-70 Main Street table, was approached by Defendant Wan, who knocked religious

materials off of the table and held a piece of paper that said, "I will eradicate you all from the

United States. I have a list of all of your names on my paper. It is of no use if you call the

police."  Compl. at ¶ 20; Plts.' Supp. Facts at ¶ 40 (noting that Defendant Wan said, "I will chase

you to the end of the world and I will kill all of you" and "I will kill you all. Here is a list of all

your names. It's no use for you to call the police.").

h.      Plaintiff Zhang Cuiping and Plaintiff Bian Hexiang

Both Plaintiff Zhang Cuiping and Plaintiff Bian Hexiang were targeted because of

defendants' mistaken belief that they were Falun Gong practitioners.  Compl. at ¶ 32.  On

January 3, 2015, Defendant Wan attempted to steal Plaintiff Zhang Cuiping's camera.  He made

death threats, telling her, "[y]ou don't know how you will die. I won't kill you, but someone else

will."  *Id*. at ¶ 33; Plts.' Supp. Facts at ¶ 40 (noting "[Wan] [t]hreaten[s] me if she doesn't kill me

someone kill me; on many occasions, she said that.").  On March 9, 2009, Defendants Li and

Zhu attacked Plaintiff Bian Hexiang.  Compl. at ¶ 33; Plts.' Supp. Facts at ¶ 38 ("As Defendants

Chu, Li and an angry mob chased and grabbed at him, they spoke repeatedly of eliminating . . .

[him].").

### 2.     Defendants' Accounts

Defendants offer a starkly different account of relevant events. They claim that they were non-violently opposing plaintiffs' political beliefs orally when they were attacked by plaintiffs.

#### a.     Defendant Zhu Zirou

Defendant Zhu was confronted by plaintiffs several times on Main Street in Flushing. Plaintiffs harassed Zhu about his disability—he uses a wheel chair—and threatened him. Defs.' Counterstatement at ¶¶ 20-21 (noting that Zhu testified: "And then [Plaintiff Xu Ting] start to say something about karma, something—something that tried to transform my thinking. She said even something bad, like, you have to go die. And then she try to say something really bad, for example, about I—I should go to die, something like that.").

Plaintiff Bian assaulted Defendant Zhu in March 2009, knocking him out of his wheel chair and pushing him to the ground. *Id*. at ¶ 23. The verbal attacks based on Defendant Zhu's disability were upsetting to him. *Id*. at ¶ 22.

#### b.     Defendant Li Huahong

Defendant Li has been harassed by plaintiffs many times on Main Street in Flushing. *Id*. at ¶ 24. Plaintiffs have provoked and assaulted her, on occasion throwing rocks or sharp objects. *Id*. at ¶¶ 25-26. Many of the confrontations occurred on the dates that plaintiffs alleged in the complaint they were victims. *Id*. at ¶ 27.

#### c.     Defendant Wan Hongjuan

Plaintiff Zhang used to follow Defendant Wan around Flushing. *Id*. at ¶ 31. Zhang would threaten her, by telling her that "Falun Gong is a very strong, very big organization." *Id*. On one occasion, Zhang physically confronted Wan; she hit her and grabbed her hair. *Id*.

D.    Procedural History

Thirteen plaintiffs, Zhang Jingrong, Zhou Yanhua, Zhang Peng, Zhang Cuiping, Wei Min, Lo Kitsuen, Li Xiurong, Cao Lijun, Hu Yang, Gao Jinying, Cui Lina, Xu Ting, and Bian Hexiang ("Plaintiffs"), sued defendants: the Chinese Anti-Cult World Alliance (CACWA), Michael Chu, Li Huahong, Wan Hongjuan, Zhu Zirou, and five unnamed individuals on March 2, 2015.

Plaintiffs seek damages, a declaratory judgment, and injunctive relief.  *See* Compl. at ¶ 1. The court's view of which claims can be tried are sketched in Part I(B), *supra*.  The pleadings can be summarized as follows:

| COMPLAINT | | |
|---|---|---|
| **Cause of Action** | **Plaintiffs** | **Defendants** |
| **1** Assault & Battery | Zhang Jingrong; Zhou Yanhua; Zhang Peng; Zhang Cuiping; Wei Min; Lo Kitsuen; Hu Yang; Gao Jinying; Cui Lina; Xu Ting | All Defendants |
| **2** Bias Related Violence & Intimidation (New York Civil Rights Law § 79-n) | All Plaintiffs | All Defendants |
| **3** Conspiracy to Violate Civil Rights (42 U.S.C. § 1985(3)) (Deprivation Clause) | Zhang Jingrong; Zhou Yanhua; Zhang Cuiping; Lo Kitsuen; Wei Min; Hu Yang; Gao Jinying; Cui Lina; Zhang Peng; Li Xiurong; Cao Lijun; Bian Hexiang | All Defendants |
| **4** Conspiracy to Prevent Authorities from Providing Full, Free, Equal Access to Public Spaces (42 U.S.C. § 1985(3)) (Hindering Clause) | Li Xiurong; Cao Lijun; Zhou Yuanhua*; Min Wei; Lo Kitsuen; Zhang Jingrong; Zhou Yuanhua; Hu Yang; Cui Lina; Gao Jinying; Zhang Peng | All Defendants |
| **5** Interference with Religious Freedom (18 U.S.C. § 248) (Clinic Access Statute) | Zhang Jingrong; Zhou Yanhua; Lo Kitsuen; Wei Min; Hu Yang; Gao Jinying; Cui Lina; Zhang Peng; Li Xiurong; Cao Lijun | All Defendants |
| **6** Negligence | Zheng Jingrong; Zhou Yanhua; Lo Kitsuen; Xu Ting; Min Wei; Hu Yang; Gao Jinying; Cui Lina; Zhang Peng; Zhang Cuiping | CACWA; Chu; Li |

| 7 | Intentional Infliction of Emotional Distress | Zheng Jingrong; Zhou Yanhua; Lo Kitsuen; Xu Ting; Min Wei; Hu Yang; Gao Jinying; Cui Lina; Zhang Peng; Zhang Cuiping | All Defendants |
|---|---|---|---|
| 8 | Public Nuisance | Zheng Jingrong; Zhou Yanhua; Lo Kitsuen; Xu Ting; Min Wei; Hu Yang; Gao Jinying; Cui Lina; Zhang Peng; Zhang Cuiping | All Defendants |

Defendants moved to dismiss plaintiffs' complaint. Mem. in Supp. of Defs.' Mot. to Dismiss, ECF No. 18, Ex. 1. The magistrate judge recommended denial. R. & R., ECF No. 35. The late Judge Sandra Townes, then presiding, adopted the recommendation. *See* Order Adopting R. & R., ECF No. 38.

Defendants answered, asserting a counterclaim, and amended their answers to include additional counterclaims. The court's present view of these counterclaims is summarized in Part I(B), *supra*. The counterclaims are:

| | ANSWER | | |
|---|---|---|---|
| | **Counterclaim** | **Defendants** | **Plaintiffs** |
| **1.** | Assault & Battery | Wan Hongjuan | Unspecified |
| **2.** | Assault & Battery | Huahong; Zirou | Unspecified |
| | **FIRST AMENDED ANSWER** | | |
| | Assault & Battery | Wan Hongjuan | Unspecified |
| | Assault & Battery | CACWA; Chu; Huahong; Zirou | Unspecified |
| | **SECOND AMENDED ANSWER** | | |
| | Assault & Battery | Wan Hongjuan | Unspecified |
| **3.** | Intentional Infliction of Emotional Distress | Wan Hongjuan | Unspecified |
| **4.** | Negligence | Wan Hongjuan | Unspecified |
| | Assault & Battery | Huahong; Zirou | Unspecified |
| **5.** | New York Civil Rights Law § 79-n | Zirou | Bian Hexiang; Zhou Yanhua; Li Xiurong; Xu Ting |
| **6.** | Intentional Infliction of Emotional Distress | Zirou | Bian Hexiang; Zhou Yanhua; Li Xiurong; Xu Ting |
| **7.** | Negligence | CACWA; Chu; Huahong; Zirou | Unspecified |

The parties cross-moved for summary judgment. The presiding district judge, Sandra Townes, died while the motions were pending. The case was then reassigned to the judge presently presiding.

Plaintiffs and defendants have aggregated hundreds of individual claims. Thirteen plaintiffs brought eight causes of action against five individual defendants. The counterclaims are also numerous.

The court gave notice to the parties that it was considering summary judgment on all claims and counterclaims because of the dubious nature of some claims and unmanageability of a jury trial that would necessitate hundreds of unanimous decisions. Mar. 26, 2018 Order, ECF No. 130; Hr'g Tr. 18:4-13. As now construed, the jury would have to make some 234 decisions. They are as follows:

| Plaintiffs' Claims | | | |
|---|---|---|---|
| **Cause of Action** | **Plaintiffs** | **Defendants** | **Number of Issues to be decided** |
| Assault & Battery | Zhang Jingrong; Zhou Yanhua; Zhang Peng; Zhang Cuiping; Wei Min; Lo Kitsuen; Hu Yang; Gao Jinying; Cui Lina; Xu Ting | All Defendants | 50 |
| Bias Related Violence & Intimidation (New York Civil Rights Law § 79-n) | All Plaintiffs | All Defendants | 65 |
| Interference with Religious Freedom (18 U.S.C. § 248) (Clinic Access Statute) | Zhang Jingrong; Zhou Yanhua; Lo Kitsuen; Wei Min; Hu Yang; Gao Jinying; Cui Lina; Zhang Peng; Li Xiurong; Cao Lijun | All Defendants | 50 |

| Defendants' Counterclaims | | | |
|---|---|---|---|
| **Cause of Action** | **Defendants** | **Plaintiffs** | **Number of Issues to be decided** |
| Assault & Battery | All Defendants | All plaintiffs | 65 |
| New York Civil Rights Law § 79-n | Zirou | Bian Hexiang; Zhou Yanhua; Li Xiurong; Xu Ting | 4 |

Pursuant to present claims and parties the total number of factual issues a jury must decide unanimously is 234.

III.     Law

A.     Summary Judgment Standard of Review

Summary judgement is appropriate when, "after construing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, there is no genuine issue as to any material fact." *Sledge v. Kooi,* 564 F.3d 105, 108 (2d Cir. 2009). The non-moving party must provide "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (internal quotation omitted).

Under Federal Rule of Civil Procedure 56(f), after giving notice and a time to respond, a district court may "grant summary judgment for a nonmovant" or "grant the motion on grounds not raised by a party."

The Supreme Court has directed district courts to actively engage with cases at early procedural stages using their "judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 679 (2009)*; cf.* Fed. R. Civ. P. 1 ("[The Federal Rules of Civil Procedure] should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). It is this court's practice—and has been for some years—to provide parties an opportunity to be heard early in a litigation. *See* Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits:*

*Reflections on the Deformation of Federal Procedure,* 88 N.Y.U. L. Rev. 286, 344 n.214 (2013) (noting this court's approach of meeting with the parties before ruling on a motion to dismiss in order to get "a sense of the litigation").

When a dispositive motion is filed, the court requires the parties and their attorneys to appear for a hearing. These hearings, a mixture of attorney argument and witness testimony, allow the court to assess the case and provide litigants with a chance to articulate their position in the lawsuit in a way relying on the papers and arguments of counsel alone cannot achieve. Outstanding factual questions can be directed to the litigants, allowing the court to efficiently decide motions on a more accurate factual record. These hearings also reassure the parties that it is the court itself—not a clerk—that is deciding the case after listening to them.

### B. Religion in American Law

Plaintiffs' claims under 18 U.S.C. § 248 and New York Civil Rights Law § 79-n require a showing of religious discrimination. The court holds as a matter of law that Falun Gong is a religion for purposes of the present litigation. American constitutional concerns underlie the legal meaning of religion.

### 1. Historical Account

### a. First Amendment Drafting History

Writing several years before the passage of the Bill of Rights, James Madison—the principle author of the First Amendment—described his inclusive, broad view of religion:

> Because we hold it for a fundamental and undeniable truth, "that Religion or the duty which we owe to our Creator and the manner of discharging it, can be directed only by reason and conviction, not by force or violence." [Virginia Declaration of Rights, art. 16.] The Religion then of every man *must be left to the conviction and conscience of every man*; *and it is the right of every man to exercise it as these may dictate*. This right is in its nature an unalienable right. It is unalienable, because the opinions of men, depending only on the evidence contemplated by their own minds cannot follow the dictates of other men: It is unalienable also, because what is here

a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage and such only as he believes to be acceptable to him. This duty is precedent, both in order of time and in degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governour of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the General Authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no man's right is abridged by the institution of Civil Society and that Religion is wholly exempt from its cognizance. True it is, that no other rule exists, by which any question which may divide a Society, can be ultimately determined, but the will of the majority; but it is also true that the majority may trespass on the rights of the minority.

James Madison, *Memorial and Remonstrance Against Religious Assessments* (June 20, 1785) (emphasis added).  In Madison's view, the "conviction and conscience of everyman" was the touchstone of religion.  *Id*.  No longer was it the Established Church of England.

Prior to the enactment of the Bill of Rights, religion was mostly left out of the United States Constitution.  *See* Frank Lambert, *The Founding Fathers and the Place of Religion in America* 14 (2003) ("For the delegates at the Constitutional Convention in 1787, religion was a divisive issue that threatened the union they were trying to forge.  Fractured by pluralism and enflamed by sectarianism, Americans were unlikely to agree upon any federal establishment, no matter how broadly stated.  Thus the delegates opted to avoid conflict by making no mention whatever of religion in the proposed Constitution except in the ban against all religious tests.  Thereby, they gave legal standing to the free religious market place.").

The idea of equating religion with "conscience" became part of First Amendment history.  What is now part of the First Amendment to the United States Constitution, in its initial draft by Madison read:  "The civil rights of none shall be abridged on account of [1] religious *belief or worship*, [2] nor shall any national religion be established, [3] nor shall the full and equal rights of *conscience* be in any manner, or on any pretext, infringed."  1 Annals of Cong. 434 (1789)

(emphasis added). "Throughout the summer of 1789, the three clauses rotated in and out of the text." Burt Neuborne, *Madison's Music: On Reading the First Amendment* 133 (2015). Many saw the clauses as overlapping. *Id.* The version that was passed by the House of Representatives and sent to the Senate contained the three clauses. *Id.*

On the Senate's initiative, the final version dropped the third clause. As adopted it states: "Congress shall make no law [1] respecting an establishment of religion, or [2] prohibiting the free exercise thereof." U.S. Const. Amend. I. It was combined with the free speech, assembly, and petition clauses outlawing: "abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." *Id.*

Senate deliberations were secret. Neuborne, *supra*, at 133. It is not known why the third clause was removed. *Id.*

b.      Early Supreme Court Cases

In an early Supreme Court case, *Reynolds v. United States*, 98 U.S. 145, 162 (1878), religion was defined narrowly. The Court noted, "[t]he word 'religion' is not defined in the Constitution." *Id.* at 162. It looked to history to determine whether a Mormon man had a constitutional right under the free exercise clause to take multiple wives, as allowed by his religion. The Court wrote:

> Polygamy has always been odious among the northern and western nations of Europe, and, until the establishment of the Mormon Church, was almost exclusively a feature of the life of Asiatic and of African people. At common law, the second marriage was always void, and from the earliest history of England polygamy has been treated as an offence against society. After the establishment of the ecclesiastical courts, and until the time of James I., it was punished through the instrumentality of those tribunals, not merely because ecclesiastical rights had been violated, but because upon the separation of the ecclesiastical courts from the civil the ecclesiastical were supposed to be the most appropriate for the trial of

matrimonial causes and offences against the rights of marriage, just as they were for testamentary causes and the settlement of the estates of deceased persons.

*Id.* at 164-65 (internal citations omitted).

With this Abrahamic worldview in mind, the Court considered "whether those who make polygamy a part of their religion are excepted from the operation" of a statute outlawing polygamy. *Id*. at 166. The Court concluded that "while [laws] cannot interfere with mere religious belief and opinions, they may with practices," such as polygamy. *Id*.

Even in early Supreme Court cases less protective of religious freedom, the idea of conscience appeared.

The first amendment to the constitution, in declaring that congress shall make no law respecting the establishment of religion or forbidding the free exercise thereof, was intended to allow every one under the jurisdiction of the United States to entertain such notions respecting his relations to his Maker and the duties they impose *as may be approved by his judgment and conscience*, and to exhibit his sentiments in such form of worship as he may think proper, not injurious to the equal rights of others, and to prohibit legislation for the support of any religious tenets, or the modes of worship of any sect.

*Davis v. Beason*, 133 U.S. 333, 342 (1890) (emphasis added), *abrogated by Romer v. Evans*, 517 U.S. 620 (1996) (finding unconstitutional under the United States Constitution a state constitutional provision discriminating based on sexual orientation). But, despite the use of broad language, the Court, in upholding an Idaho statute prohibiting Mormon polygamists from voting, expressed a limited view of religion: "[t]o call [Mormon] advocacy [of polygamy] a tenet of religion is to offend the common sense of mankind." *Id*. at 341-42.

c.      Later Supreme Court Cases

During World War II, the Supreme Court began to speak of religion in terms of freedom of thought and speech. In *West Virginia State Board. of Education. v. Barnette*, 319 U.S. 624 (1943), the Court addressed the issue of whether a child could be made to salute the American

flag contrary to his religious belief.  The Court was protective of this non-mainstream religious

practice, holding that "compelling the flag salute and pledge transcends constitutional

limitations."  *Id*. at 642.  Justice Jackson concluded with one of the most well-known statements

of principle in constitutional law:

> If there is any fixed star in our constitutional constellation, it is that no official, high
> or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or
> other matters of opinion or force citizens to confess by word or act their faith
> therein. If there are any circumstances which permit an exception, they do not now
> occur to us.

*Id*.

    *Barnette's* idea of free thought buttressed *United States v. Ballard*, 322 U.S. 78, 86-87

(1944) (internal citations omitted):

> Freedom of thought, which includes freedom of religious belief, is basic in a society
> of free men. It embraces the right to maintain theories of life and of death and of
> the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials
> are foreign to our Constitution. Men may believe what they cannot prove. They
> may not be put to the proof of their religious doctrines or beliefs. Religious
> experiences which are as real as life to some may be incomprehensible to others.
> Yet the fact that they may be beyond the ken of mortals does not mean that they
> can be made suspect before the law.

*Ballard*, 322 U.S. at 86-87 (internal citations omitted).

    The "conscientious objector" cases during the Vietnam War required an expanded

meaning of religion.  In *United States v. Seeger*, 380 U.S. 163 (1965) the Supreme Court

interpreted broadly an act of Congress that exempted those with religious objections from service

in the armed forces.

> Congress, in using the expression 'Supreme Being' rather than the designation
> 'God,' was merely clarifying the meaning of religious training and belief so as to
> embrace all religions and to exclude essentially political, sociological, or
> philosophical views. We believe that under this construction, the test of belief 'in a
> relation to a Supreme Being' is *whether a given belief that is sincere and
> meaningful occupies a place in the life of its possessor parallel to that filled by the
> orthodox belief in God of one who clearly qualifies for the exemption*. Where such

beliefs have parallel positions in the lives of their respective holders we cannot say that one is 'in a relation to a Supreme Being' and the other is not.

*Id*. at 165-66 (emphasis added).

The Court essentially put back into the First Amendment the third, conscience clause, in Madison's draft. *Id.* To avoid a constitutional issue, the Supreme Court transformed Congress' language—requiring belief in a "Supreme Being"—to include all systems of belief "parallel to that filled by the orthodox belief in God." *Id*; *see also* Kent Greenawalt, *Religion and the Constitution: Free Exercise and Fairness* 155 n.96 (2006) ("[T]hat the deepest held moral convictions of nonbelievers can qualify as religious leads to the conclusion that some moral convictions of believers that are not connected to their religious beliefs might also qualify as religious.").

The *Seeger* Court referred to freedom of conscience:

[P]utting aside dogmas with their particular conceptions of deity, *freedom of conscience* itself implies respect for an innate conviction of paramount duty. The battle for religious liberty has been fought and won with respect to religious beliefs and practices, which are not in conflict with good order, upon the very ground of the supremacy of conscience within its proper field.

*Id*. at 176 (quoting *United States v. Macintosh*, 283 U.S. 605, 634 (1931) (emphasis added)).

In *Welsh v. United States*, 398 U.S. 333 (1970) the Supreme Court reaffirmed its broad definition of religion. Welsh sought exemption from service. Initially he denied that his opposition to the war was based on his religion. *Id*. at 341. The government argued that his opposition was purely political. *Id*. The Court rejected the government's view holding that the religious objector statute "exempts from military service all those *whose consciences, spurred by deeply held moral, ethical, or religious beliefs*, would give them no rest or peace if they allowed themselves to become a part of an instrument of war." *Id*. at 344 (emphasis added). The Court

again relied on the Madisonian concept of conscience to support its conclusion, while deciding

the case on statutory grounds. *Id*. at 340.

Justice Harlan concurred in *Welsh*, and addressed the constitutional question of "whether

a statute that defers to the individual's conscience only when his views emanate from adherence

to theistic religious beliefs is within the power of Congress." *Id*. at 356. The statute, which

required belief in a "supreme being" for a draft exemption was, in Justice Harlan's view,

unconstitutional.

> The 'radius' of this legislation is the conscientiousness with which an individual opposes war in general, yet the statute, as I think it must be construed, excludes from its 'scope' individuals motivated by teachings of nontheistic religions, and individuals guided by an inner ethical voice that bespeaks secular and not 'religious' reflection. It not only accords a preference to the 'religious' *but also disadvantages adherents of religions that do not worship a Supreme Being*. The constitutional infirmity cannot be cured, moreover, even by an impermissible construction that eliminates the theistic requirement and simply draws the line between religious and nonreligious. This is my view offends the Establishment Clause and is that kind of classification that this Court has condemned.

*Id*. at 357-58 (emphasis added).

Resurrection by judicial decision of the conscience clause was, in Professor Neuborne's

view, what Madison intended through the structure of the Bill of Rights. Neuborne, *supra*, at

134. Professor Neuborne relied in part on the Ninth and Tenth Amendments, recognizing that

not all rights are precisely and specifically enumerated in the Bill of Rights. *Id*. at 29. These two

amendments—protecting rights "retained by the people" and "reserving rights to the States" not

specifically covered in the Constitution—espoused the idea of "equity of the statute." *Id*. at 29-

30. The Amendments encourage the courts to "expand laws beyond their literal wording to

closely related, analogous settings." *Id.* The *Seeger* and *Welsh* decisions' protection of

nontheistic conscience affected the purpose of the religion clauses, as Madison viewed the

matter.

d.      Interpretive Approaches

History has been used to support multiple interpretations of the First Amendment.  Some scholars have advocated for an originalist position "that 'religion,' in 1791, meant at least what we would think of today as a traditional theistic belief in a God with concomitant duties, which imply a future state of rewards and punishments."  Lee J. Strang, *The Meaning of "Religion" in the First Amendment*, 40 Duq. L. Rev. 181, 182 (2002).  Madison's proposed initial third "conscience clause," it can be argued, shows that there is a distinction between "religion" and "conscience."  *Id.* at 233-35.  By rejecting the conscience clause, arguably the Senate privileged theistic belief over nontheistic systems of thought.  *Id.*  But, the Supreme Court put "conscience" back in as a nontheistic religious belief.

The Senate's secret deliberations make an accurate historical account impossible.  Neuborne, *supra*, at 133.  Other scholars have opined, relying on the views of only Madison and Jefferson can lead to "bad history."  Mark David Hall, *Jeffersonian Walls and Madisonian Lines: The Supreme Court's Use of History in Religion Clause Cases*, 85 Or. L. Rev. 563, 605 (2006).  "The First Amendment did not spring fully clothed from Madison's mind . . . . Madison's proposals were revised significantly in the House of Representatives, changed by the Senate and Conference Committee, agreed to by Congress, and ratified (initially) by nine state legislatures."  *Id.*; *cf.* Martha C. Nussbaum, *Liberty of Conscience: In Defense of America's Tradition of Religious Equality* 75 (2008) ("If the seventeenth century was the century that forged our Free Exercise Clause, it was the eighteenth century whose politics forged our Establishment Clause.").

Professor Strang focuses on the meaning of "religion" at the time of the First Amendment's ratification.  Strang, *supra*.  This approach is vulnerable to the general criticism of

originalism and the particular difficulty of understanding First Amendment history since records of the debates on the Amendment are "notoriously scanty." Hall, *supra*, at 605; *see also* Essay, *The Role of Judges in a Government Of, By, and For the People*, 30 Cardozo L.Rev. 1, 34 (2008) ("Justice Breyer's nuanced view of the need for flexibility in interpreting the Constitution makes him a 'member' of the American Metaphysical Club, allowing for a more pragmatic and effective administration of justice than a stiff and abstract approach." (citing Stephen Breyer, *Active Liberty: Interpreting our Democratic Constitution* (2006))); Kent Greenawalt, *Religion and the Constitution: Free Exercise and Fairness* 11 (2006) ("That we can learn from history is a truism. Historical Investigation rarely, if ever, tells us how to respond to modern problems, but it can teach us about our society's values and lines of division, and it can illumine pitfalls and possibilities.").

The Supreme Court has construed religion pliantly, increasing its scope. *See supra* Section III(B)(1)-(2). "Any judicial test of what counts as 'religious' is worrisome; it is intrinsically difficult to apply and creates the danger that judges will favor the familiar over the unorthodox." Greenawalt, *supra*, at 125. As current Supreme Court precedent emphasizes, a belief in God is not the hallmark of religion. Congress cannot "constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can [it] aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." *Torcaso v. Watkins*, 367 U.S. 488, 495 (1961).

*Torcaso* passingly mentioned several "religions in this country which do not teach what would generally be considered a belief in the existence of God [including] Buddhism, Taoism, Ethical Culture, Secular Humanism and others." *Id.* at 495 n.11. The religion at issue in the present suit, Falun Gong, can be characterized as a form of Buddhism. Hr'g Tr. 124:7-21,

130:13-131:7 (plaintiffs' expert, Arthur Waldron, testifying that Falun Gong is a variant of Buddhism).

Flexibility in interpretation—the equity of the Constitution—is particularly important in construing the First Amendment, where changing demographics, mores, and values can affect the concept of religion. "The United States is not only one of the most religious nations in the developed world, but it is also the most diverse, with some 3,000 religious groups." Bruce T. Murray, *Religious Liberty in America: The First Amendment in Historical and Contemporary Perspective* 10 (2008). An example of this religious diversity is reflected in the United States Military. A survey of military personnel made by the Army in 1979 revealed the following religious preferences among enlisted personnel:

| | |
|---|---|
| Protestant | 38.5% |
| Catholic | 22.5% |
| Mormon | 2.5% |
| Eastern Orthodox | 0.5% |
| Moslem | 1.0% |
| Jewish | 0.7% |
| Buddhist | 0.7% |
| Other religions not listed | 19.3% |
| No religious preference | 14.3% |

*Katcoff v. Marsh*, 755 F.2d 223, 226-27 & n.1 (2d Cir. 1985).

As Professor Neuborne reminds us, "the modern Free Exercise Clause, as tweaked by the Supreme Court, requires us to tolerate conscientiously driven private behavior to the outer limits of a free society's capacity for such tolerance." Neuborne, *supra*, at 132. Madison understood that "religion has a dark side capable of inciting true believers to inflict unspeakable cruelties on nonbelievers." *Id*. at 138. His initial draft of the First Amendment—now embraced by the

Supreme Court—implicitly rebukes religious violence by protecting secular and religious

conscience equally.

    2.    Current Approaches to Defining Religion

    a.    Second Circuit Approach

The Second Circuit's approach to defining religion is faithful to the modern Supreme

Court cases.  Relying on *Seeger*, *see supra* Section III(B)(1)(c), the Court of Appeals for the

Second Circuit has explained:

> The test for identifying an individual's belief "in a relation to a Supreme Being,"
> the [Supreme] Court noted, is "whether a given belief that is sincere and meaningful
> occupies a place in the life of its possessor parallel to that filled by the orthodox
> belief in God of one who clearly qualifies for the (statutory conscientious objector)
> exemption." The *Seeger* Court cited with approval the use of a functional,
> phenomenological investigation of an individual's "religion" advocated by liberal
> theologian Paul Tillich.  In the absence of a requirement of "God," this approach
> treats an individual's "ultimate concern" whatever that concern be as his "religion."
> A concern is "ultimate" when it is more than "intellectual."

*Int'l Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 440 (2d Cir. 1981).  A belief

in a God is not required.  *Id.*

Before the Supreme Court's jurisprudential shift, Judge Hand offered a functional,

nontheistic account of religion:

> It is unnecessary to attempt a definition of religion; the content of the term is found
> in the history of the human race and is incapable of compression into a few words.
> Religious belief arises from a sense of the inadequacy of reason as a means of
> relating the individual to his fellow-men in the most primitive and in the most
> highly civilized societies. It accepts the aid of logic but refuses to be limited by it.
> It is a belief finding expression in a conscience which categorically requires the
> believer to disregard elementary self-interest and to accept martyrdom in preference
> to transgressing its tenets.

*United States v. Kauten*, 133 F.2d 703, 708 (2d Cir. 1943).

In *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286

(2d Cir. 1992) the Court of Appeals for the Second Circuit briefly addressed the issue of whether

Jews for Jesus was a bona fide religious organization in a § 1985(3) suit. The defendants in the case argued that "[Jews for Jesus ("JFJ")] is not a religion and that, in any event, [defendants'] actions were not based on JFJ's espousal of evangelical Christianity." *Jews for Jesus*, 968 F.2d at 291. The court disagreed. "On the basis of the present record, [it could not] discern whether JFJ qualifie[d] as [a] bona fide religious organization or whether the alleged discrimination was based on religious creed or on practices unrelated to such creed." *Id*.

The opinion in *Jews for Jesus* is too cryptic to provide a useful test for what qualifies as a religion. It provided no indication of what was contained in the record, and why that was insufficient to find that JFJ was a religion. The test stated in *Int'l Soc. For Krishna Consciousness v. Barber* appears to better express the Court of Appeals' view. *Cf. Equal Opportunity Emp. Comm'n v. United Health Programs of Am., Inc.*, 213 F. Supp. 3d 377, 402 (E.D.N.Y. 2016) (citing *Barber* and finding that "Onionhead" is a religion in a Title VII employment discrimination case).

b.      Other Circuits

Other Circuit Courts of Appeals approaches are instructive. According to the Court of Appeals for the Third Circuit in reviewing a religion claim under § 1983 "[a] court's task is to decide whether the beliefs avowed are (1) sincerely held, and (2) religious in nature, in the claimant's scheme of things." *DeHart v. Horn*, 227 F.3d 47, 51 (3d Cir. 2000) (en banc) (quoting *Africa v. Pennsylvania*, 662 F.2d 1025, 1029-30 (3d Cir. 1981)).

The Court of the Appeals for the Tenth Circuit adopted a five-factor test developed by a district court:

> 1.  Ultimate Ideas: Religious beliefs often address fundamental questions about life, purpose, and death . . . . These matters may include existential matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe.

2.  Metaphysical Beliefs: Religious beliefs often are "metaphysical," that is, they address a reality which transcends the physical and immediately apparent world. Adherents to many religions believe that there is another dimension, place, mode, or temporality, and they often believe that these places are inhabited by spirits, souls, forces, deities, and other sorts of inchoate or intangible entities.

3.  Moral or Ethical System: Religious beliefs often prescribe a particular manner of acting, or way of life, that is "moral" or "ethical." . . . A moral or ethical belief structure also may create duties—duties often imposed by some higher power, force, or spirit—that require the believer to abnegate elemental self-interest.

4.  Comprehensiveness of Beliefs: Another hallmark of "religious" ideas is that they are comprehensive. More often than not, such beliefs provide a telos, an overreaching array of beliefs that coalesce to provide the believer with answers to many, if not most, of the problems and concerns that confront humans . . . .

5.  Accoutrements of Religion: By analogy to many of the established or recognized religions, the presence of [certain] external signs may indicate that a particular set of beliefs is "religious."

*United States v. Meyers*, 95 F.3d 1475, 1483-84 (10th Cir. 1996).

The accoutrements of religion, according to *Meyers*, include Founder, Prophet, or Teacher; Important Writings; Gathering Places; Keepers of Knowledge; Ceremonies and Rituals; Structure or Organization; Holidays; Appearance and Clothing; and Propagation. *Id*; *see also* Leslie C. Griffin, Law and Religion: Cases and Materials 30-35 (2007) (explaining Professor Ninian Smart's approach to analyzing religion in seven dimensions: (1) "the practical and ritual dimension"; (2) "the experiential and emotional dimension"; (3) "the narrative or mythic dimension"; (4) the doctrinal and philosophical dimensions"; (5) "the ethical and legal dimensions"; (6) "the social and institutional dimensions"; (7) the material dimensions").

The Court of Appeals for the Seventh Circuit has stated principles similar to that of the Court of Appeals for the Second Circuit, finding that atheism can qualify as a religion.

[W]hether atheism is a "religion" for First Amendment purposes is a somewhat different question than whether its adherents believe in a supreme being, or attend regular devotional services, or have a sacred Scripture. The Supreme Court has said that a religion, for purposes of the First Amendment, is distinct from a "way of life," even if that way of life is inspired by philosophical beliefs or other secular concerns. A religion need not be based on a belief in the existence of a supreme being (or beings, for polytheistic faiths), nor must it be a mainstream faith.

*Kaufman v. McCaughtry*, 419 F.3d 678, 681 (7th Cir. 2005) (internal citations omitted).

    C.    42 U.S.C. § 1985(3)

        1.    Background on § 1985(3) Deprivation Clause

Section 1985(3) of Title 42 of the United States Code traces its origins to the post-Civil War Civil Rights Act of 1871, known as the Ku Klux Klan Act. *See Griffin v. Breckenridge*, 403 U.S. 88, 98 (1971). The portion known as the deprivation clause reads:

If two or more persons in any State . . . conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . [and] do or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damage occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

During debate on the bill, President Grant wrote to Congress urging it to extend the power to provide federal assistance in Southern United States protecting the civil rights of the newly freed slaves. Alfred Avins, *The Ku Klux Klan Act of 1871: Some Reflected Light in State Action and the Fourteenth Amendment*, 11 St. Louis U. L.J. 331, 332 (1967). The President acknowledged a virtual breakdown in local governments' ability to protect rights of some portions of the population:

A condition of affairs now exists in some of the States of the Union rendering life and property insecure, and the carrying of the mails and the collection of the revenue dangerous. The proof that such a condition of affairs exists in some

> localities is now before the Senate. That the power to correct these evils is beyond the control of the State authorities I do not doubt; that the power of the Executive of the United States, acting within the limits of existing laws, is sufficient for present emergencies is not clear. Therefore I urgently recommend such legislation as in the judgment of Congress shall effectually secure life, liberty, and property, and the enforcement of law in all parts of the United States.

*Id*. at 332 n.10. Is the interference by an organized small group of individuals with the right of another small group to travel or to exercise their religious beliefs a form of taking over protections by local government? It is too much of a stretch to so find.

Passage of the Ku Klux Klan Act reflected the reality that private actors working with or without the state could deprive large groups of African Americans of their constitutional rights. *Id*. Some at the time viewed the Ku Klux Klan as a quasi-governmental entity—"an auxiliary of the Democratic Party." *Id*. at 334. It was a broad, multi-state conspiracy combined with intrastate and local conspiracies responsible for innumerable acts of racial and political violence. *Id*. at 343-45. By contrast, alleged Chinese Government support of a few individuals trying to prevent travel or the exercise of religious beliefs by a small group of mainly non-citizen residents of the United States is hardly the equivalent of the almost total takeover of local government and the need for protection of African American rights post-Civil War.

Section 1985(3) is not a general hate-crime statute. Congress passed such a criminal statute in 2009. *See* 18 U.S.C. § 249. And New York State has passed its own bias-motivated violence statute. *See infra* Section III(E).

### 2. State Action under the Deprivation Clause

In *Collins v. Hardyman*, 341 U.S. 651 (1951) the Supreme Court held—seemingly to avoid a constitutional question—that state action was required for all claims under § 1985(3). "Private discrimination is not inequality before the law unless there is some manipulation of the law or its agencies to give sanction or sanctuary for doing so." *Id*. at 661. *Collins* did, however,

leave open the possibility that a "conspiracy by private individuals could be of such *magnitude and effect* as to work a deprivation of equal protection of the laws, or of equal privileges and immunities under laws." *Id.* at 662 (emphasis added).

*Collins'* core holding was relatively short lived. *Griffin v. Breckenridge*, 403 U.S. 88 (1971) overturned *Collins* recognizing that "[t]he approach of [the Supreme Court] to other Reconstruction civil rights statutes in the years since *Collins* has been to 'accord (them) a sweep as broad as (their) language.'" *Griffin*, 403 U.S. at 97. The language of § 1985(3), the Court declared, "speaks simply of 'two or more persons in any State or Territory' who 'conspire or go in disguise on the highway or on the premises of another.'" *Id.* at 96. Nothing in § 1985(3) requires state action.

In the place of state action, *Griffin* "added the 'class-based animus' requirement in order to prevent § 1985(3) from being broadly—and erroneously—interpreted as providing a federal remedy for 'all tortious, conspiratorial interferences with the rights of others.'" *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286, 291 (2d Cir. 1992) (citing *Griffin*, 403 U.S. at 98). In effect, the Court traded one non-textual requirement for another—"state action" for "class based animus."

The Court identified three possible forms of state action under § 1985(3):

that there must be [1] action under color of state law, that there must be [2] interference with or influence upon state authorities, *or* that there must be [3] *a private conspiracy so massive and effective that it supplants those authorities and thus satisfies the state action requirement*.

*Griffin*, 403 U.S. at 98 (emphasis added).

The Court recognized that literal state action is not required:

The Congress that passed the Civil Rights Act of 1871, . . . which is the parent of § 1985(3), dealt with each of these three situations in explicit terms in other parts of the same Act. An element of the cause of action established by the first section,

now 42 U.S.C. § 1983, is that the deprivation complained of must have been inflicted under color of state law. *To read any such requirement into § 1985(3) would thus deprive that section of all independent effect*. As for interference with State officials, § 1985(3) itself contains another clause dealing explicitly with that situation. And § 3 of the 1871 Act provided for military action at the command of the President should massive private lawlessness render state authorities powerless to protect the federal rights of classes of citizens, such a situation being defined by the Act as constituting a state denial of equal protection. Given the existence of these three provisions, it is almost impossible to believe that Congress intended, in the dissimilar language of the portion of § 1985(3) now before us, simply to duplicate the coverage of one or more of them.

*Id*. at 98-99 (internal citations omitted).

The Court relied upon legislative history for its interpretation:

The final area of inquiry into the meaning of § 1985[3] lies in its legislative history. As originally introduced in the 42d Congress, the section was solely a criminal provision outlawing certain conspiratorial acts done with intent 'to do any act in violation of the rights, privileges, or immunities of another person.' Introducing the bill, the House sponsor, Representative Shellabarger stressed that 'the United States always has assumed to enforce, as against the States, and also persons, every one of the provisions of the Constitution.' The enormous sweep of the original language led to pressures for amendment, in the course of which the present civil remedy was added. The explanations of the added *language centered entirely on the animus or motivation that would be required, and there was no suggestion whatever that liability would not be imposed for purely private conspiracies*. Representative Willard, draftsman of the limiting amendment, said that his version 'provid(ed) that the essence of the crime should consist in the intent to deprive a person of the equal protection of the laws and of equal privileges and immunities under the laws; in other words, that the Constitution secured, and was only intended to secure, equality of rights and immunities, and that we could only punish by United States laws a denial of that equality.'. Representative Shellabarger's explanation of the amendment was very similar: 'The object of the amendment is to confine the authority of this law to the prevention of deprivations which shall attack the equality of rights of American citizens; that any violation of the right, the animus and effect of which is to strike down the citizen, to the end that he may not enjoy equality of rights as contrasted with his and other citizens' rights, shall be within the scope of the remedies of this section.'

Other supporters of the bill were even more explicit in their insistence upon coverage of private action. Shortly before the amendment was introduced, Representative Shanks urged, 'I do not want to see (this measure) so amended that there shall be taken out of it frank assertion of the power of the national Government to protect life, liberty, and property, *irrespective of the act of the State*.' At about the same time, Representative Coburn asked: 'Shall we deal with

individuals, or with the State as a State? If we can deal with individuals, that is a less radical course, and works less interference with local governments. It would seem more accordant with reason that the easier, more direct, and more certain method of dealing with individual criminals was preferable, and that the more thorough method of superseding State authority should only be resorted to when the deprivation of rights and the condition of outlawry was so general as to prevail in all quarters in defiance of or by permission of the local government.' After the amendment had been proposed in the House, Senator Pool insisted in support of the bill during Senate debate that 'Congress must deal with individuals, not States. It must punish the offender against the rights of the citizen.'

*Id.* (internal citations omitted) (emphasis added).

*Griffin* did not address the issue of *which constitutional rights* are protectable against private conspiracies under § 1985(3).  Many constitutional rights are designed to protect a citizen against government.  As the Court recognized, "[a] century of Fourteenth Amendment adjudication . . . ma[kes] it understandably difficult to conceive of what might constitute a deprivation of the equal protection of the laws by private persons.  Yet there is nothing inherent in [§ 1985(3)] that requires the action working the deprivation to come from the State."  *Griffin*, 403 U.S. at 97.

A decade after *Griffin*, the Supreme Court revisited the state action requirement.  In *United Brotherhood of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825 (1983) ("*Scott*") the Court held that if the claimed constitutional deprivation ordinarily requires state action, then state action is necessary under § 1985(3).  "*Griffin* did not hold that even when the alleged conspiracy is aimed at a right that is *by definition a right only against state interference* the plaintiff in a § 1985(3) suit nevertheless need not prove that the conspiracy contemplated state involvement of some sort."  *Id*. at 833 (emphasis added).  The Court specifically held—an issue relevant in the instant litigation—that "a conspiracy to violate First Amendment rights is not made out without proof of state involvement."  *Id*. at 832.

The Court confirmed this view of state involvement in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993): "The statute does not apply . . . to private conspiracies that are 'aimed at a right that is by definition a *right only against state interference*.'" *Id.* at 278 (1993) (quoting *Scott*, 463 U.S. at 833). It only reaches private conspiracies "aimed at interfering with rights . . . protected against private, as well as official, encroachment." *Id.*

*Griffin* apparently exchanged the strict state action requirement for a class-based animus element. The reintroduction of some aspect of the state action requirement curtails § 1985(3)'s reach. Not all constitutional rights are protectable against private actors; some rights are protected only against government action.

The claim here—discrimination by a small private group, CACWA, against another small group, Falun Gongists, based on religion—is cutoff by the state action requirement of *Scott* and *Bray*. First Amendment claims require state action or its equivalent, as by the Ku Klux Klan effectively taking over and superseding state and local governmental authority. Plaintiffs rely on interference with the right to intrastate travel to support their § 1985(3) claim. That reliance does not support a cause of action in the present case. *See infra* Section IV(C)(3).

3.    Elements of a Deprivation Clause Claim

"To state a civil rights conspiracy under § 1985(3), a plaintiff must allege: 1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and 3) an act in furtherance of the conspiracy; 4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Britt v. Garcia*, 457 F.3d 264, 270 (2d Cir. 2006) (quoting *Gray v. Town of Darien*, 927 F.2d 69, 73 (2d Cir. 1991)).

A private conspiracy claim under the deprivation clause of § 1985(3) requires "[1] interfere[nce] with [a plaintiff's] constitutional rights, [and] [2] some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of New York, Inc.*, 968 F.2d 286, 290-91 (2d Cir. 1992) (quoting *Colombrito v. Kelly*, 764 F.2d 122, 130 (2d Cir.1985)). The deprivation of the constitutional right must "be a conscious objective of the enterprise." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 275 (1993) (quoting *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 833, (1983)). A conspirator must "do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must *act at least in part for the very purpose of producing it*." *Bray*, 506 U.S. at 276 (emphasis added).

A conspiracy under the deprivation clause *does not require state action* if, and only if, the constitutional right impinged does not require state action. *Griffin v. Breckenridge*, 403 U.S. 88 (1971). "The statute does not apply . . . to private conspiracies that are 'aimed at a right that is by definition a *right only against state interference*.'" *Bray*, 506 U.S. at 278.

"[D]iscrimination based on religion," according to the Court of Appeals for the Second Circuit, is recognized as class-based animus under § 1985(3). *Jews for Jesus*, 968 F.2d at 290-91. "[T]he right freely to move about, to adopt [one's] own life-style, and to practice the religion [one] chose[s], . . . is the very core of the First and Fourteenth Amendments." *Colombrito*, 764 F.2d at 131. In many instances, the demarcation between racial and religious discrimination is impossible to mark. *Cf. Jews for Jesus*, 968 F.2d at 291 ("[T]he Supreme Court has defined racial discrimination as discrimination based solely on a person's 'ancestry or ethnic characteristics' . . . Jews have been considered a race for purposes of § 1982.").

#### 4.    Continuing Validity of Deprivation Clause Claims

The magistrate judge in the present case wrote a well-reasoned opinion on the motion to dismiss the complaint.  *See* R & R on Mot. to Dismiss, ECF No. 35.  It was adopted by the late District Judge, Sandra Townes.  Order Adopting R & R, ECF No. 38.  It provides the law of the case.  *See Zhang Jingrong v. Chinese Anti-Cult World All*., No. 15-CV-1046, 2018 WL 1326387 --F.Supp.--  (E.D.N.Y. Mar. 14, 2018).

The district judge and magistrate judge held that the Court of Appeals for the Second Circuit recognizes the right to intrastate travel protected through 42 U.S.C. § 1985(3).  *Id*. at *5.  The decision was based primarily on *Spencer v. Casavilla*, 903 F.2d 171 (2d Cir. 1990).  Shortly after *Spencer*, the Supreme Court decided *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993).  *See supra* Section IV(C)(2)-(3).  *Bray* weakened the § 1985(3) plaintiffs' deprivation clause claims by significantly limiting claims based on the right to *interstate* travel—by analogy, weakening the right to *intrastate* travel.

The two constitutional claims—interstate and intrastate travel—may be analytically distinct, but are related.  The Court of Appeals for the Second Circuit has not withdrawn its recognition of the right to intrastate travel after the *Bray* decision when state action is present.  *See, e.g*., *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 100 (2d Cir. 2009) ("Contrary to the District Court's holding in this case, we have recognized the Constitution's protection of a right to intrastate as well as interstate travel."); *Williams v. Town of Greenburgh*, 535 F.3d 71, 75 (2d Cir. 2008) ("[Second Circuit] precedent[] stand[s] for the proposition that individuals possess a fundamental right to travel *within a state*. While *the parameters of that right have not been sharply defined by our Court*, it is clear that the right protects *movement between places* and has no bearing on access to a particular place.") (emphasis added).

There is a question about the continuing validity of the Second Circuit's view. *Cf. Spencer v. Casavilla*, 839 F. Supp. 1014, 1017 (S.D.N.Y. 1993), *aff'd in part, appeal dismissed in part*, 44 F.3d 74 (2d Cir. 1994) (expressing doubt about "the Second Circuit Court of Appeals' position that the right to intrastate travel is on a constitutional par with the right to interstate travel"); *Upper Hudson Planned Parenthood, Inc. v. Doe*, 836 F. Supp. 939, 947 (N.D.N.Y. 1993) (expressing "serious reservations" about the extent of the protection of the right to intrastate travel after *Bray*). It is reasonable to conclude that the majority in *Bray* might preclude recovery in the instant case under § 1985(3).

As a scholar recently noted about the religious liberty jurisprudence of Justice Scalia in cases such as the instant one:

> It is at the state level where most conflicts between law and religion occur . . . . Justice Scalia . . . generally rejected constitutionally mandated judicial exemptions but simultaneously embraced legislative accommodations.

Ronald J. Colombo, *The Religious Liberty Jurisprudence of Justice Antonin Scalia* 46 Hofstra L. Rev. 433, 443 (2017). Although the federal deprivation clause claim may not be available in the present case, New York State has passed a statute prohibiting religiously motivated violence. *See infra* Section III(E).

In the wake of *Bray*, rather than amend the historic deprivation clause, Congress passed a separate statute, applicable here. *See infra* Section III(D).

### 5. Hindrance Clause

The Hindrance Clause of § 1985(3) provides:

> [i]f two or more persons in any State or Territory conspire . . . for the purposes of . . . preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons with in such State or Territory the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages.

42 U.S.C. § 1985(3).

As stated in the magistrate judge's report and recommendation on the motion to dismiss, three elements are necessary for a claim under the hindrance clause: (1) "the purpose [of the conspiracy] must be to interfere with state law enforcement, not just to interfere with the persons seeking to exercise their legal rights;" (2) the conspiracy must be "directed at a protected class;" and (3) the conspiracy must implicate "a constitutional right." *Zhang Jingrong v. Chinese Anti-Cult World All.*, No. 15-CV-1046, 2018 WL 1326387, at *6 --F.Supp.--  (E.D.N.Y. Mar. 14, 2018).

    D.    18 U.S.C. § 248: Freedom of Access to Clinic Entrances Act

       1.   Text and Legislative History

In what appears to have been an attempt to soften *Bray*, *see supra* Section III(C), Congress passed the Freedom of Access to Clinic Entrances Act of 1994 ("FACEA").  Kathleen M. Sullivan and Noah Feldman, *Constitutional Law* 883 (19th Ed. 2016); H.R. Conf. Rep No. 103-488, at 7-8, *reprinted in* 1994 U.S.C.C.A.N. 724, 724-25 (May 2, 1994) ("Prior to the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic*, 113 S. Ct. 753 (1993), the conduct described in [the FACEA] was frequently enjoined by federal courts in actions brought under 42 U.S.C. 1985(3), but in that case the Court denied a remedy under such section to persons injured by the obstruction of access to abortion-related services.").

The FACEA contains a provision about religious freedom:

> Whoever . . . [1] *by force or threat of force* or by physical obstruction, [2] intentionally injures, *intimidates or interferes* with or *attempts to injure*, intimidate or interfere with [3] *any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom* [4] *at a place of religious worship* shall be subject to the penalties provided in . . . the civil remedies provided in subsection (c).

18 U.S.C. § 248(a)(2) (emphasis added).

The FACEA allows plaintiffs to obtain "appropriate *relief, including temporary, preliminary or permanent injunctive relief and compensatory and punitive damages*, as well as the costs of suit and reasonable fees for attorneys and expert witnesses." 18 U.S.C. § 248(c)(1)(B) (emphasis added). A plaintiff may choose, "in lieu of actual damages, an award of statutory damages in the amount of $5,000 per violation." *Id.*

The magistrate judge's report and recommendation on the motion to dismiss concluded that "the plain language of [§ 248] dictates that it provides protection to those seeking to exercise their First Amendment right of religious freedom at a place of religious worship. *Zhang Jingrong v. Chinese Anti-Cult World All.*, No. 15-CV-1046, 2018 WL 1326387, at *12 -- F.Supp.-- (E.D.N.Y. Mar. 14, 2018). Although the statute's history and name suggests a connection to abortion clinic access, legislative history support the conclusion that practicing religion at a religious site is protected by the FACEA:

> This provision, much like the one found at 18 U.S.C. 247, is a reflection of the profound concern of the Congress over *private intrusions on religious worship*, and the judgment of the Congress that the exercise of the right to religious liberty deserves federal protection . . . . [I]t covers only conduct occurring *at or in the immediate vicinity of a place of religious worship*, such as a church, synagogue or other *structure or place used primarily for worship*. Examples of conduct that would be prohibited and would give rise to a civil cause of action under this Act would be physically blocking access to a church or pouring glue in the locks of a synagogue.

H.R. Conf. Rep No. 103-488, at 9, *reprinted in* 1994 U.S.C.C.A.N. 724, 726 (May 2, 1994) (emphasis added).

### 2. Meaning of "A Place of Religious Worship"

Little has been written explicating the meaning of "a place of religious worship." The cannon of constitutional avoidance and the statute's text require a flexible interpretation of this phrase.

Religious worship and the places it occurs come in numerous forms. The Establishment Clause of the First Amendment requires that religious belief and worship of different form and doctrine be treated on equal footing. *See supra* Section III(B); *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15 (1947) ("The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, *or prefer one religion over another*.") (emphasis added); *Welsh v. United States*, 398 U.S. 333, 357-58 (1970) (Harlan, J. Concurring) (noting the constitutional issue with privileging one religion over another).

Insofar as this statute may be read to protect religions differently based on whether the religion has fixed temples or prayer takes place in transitory locations, it would be unconstitutional. Any place a religion is practiced is protected by a constitutional construction of this statute.

"Religious worship," too, must be broadly defined. Traditional prayer in communal houses of worship does not have a monopoly on worship. *See e.g.*, Susannah Heschel, *Their Feet Were Praying: Remembering the inspiration Heschel and King drew from each other*, The N.Y. Jewish Week (Jan. 10, 2012) (noting Rabbi Abraham Joshua Heschel's words that when he marched in Selma, Alabama during the civil rights movement "[he] felt [his] legs were praying"); Hr'g Tr. 55:16-56:3 (plaintiffs' expert explaining that most Falun Gong practitioners meditate as a form of prayer in public parks); Madhyama-devi dasi, *Why And How To Chant Hare Krsna*, www.krishna.com (last accessed April 6, 2018) (explaining the Hare Krishna practice of chanting in public venues); Spencer Wilking & Lauren Effron, *Snake-Handling Pentecostal Pastor Dies From Snake Bite*, abcnewsgo.com (Feb. 17, 2014) (describing the Christian practice of snake handling). The religion clauses "as tweaked by the Supreme Court,

require[] us to tolerate conscientiously driven private behavior to the outer limits of a free society's capacity for such tolerance."  Neuborne, *supra*, at 132.

Proselytizing, central to the instant dispute, is a recognized religious practice. "[S]preading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types."  *Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 110 (1943).

Defendants argue that "a place of religious worship" should be construed narrowly to avoid opening too wide the gates to litigation.  They contend that the congressional report's language—"structure or place used *primarily* for worship"—counsels in favor of finding that religious worship must be the *primary* use of a site for it to garner protection.  H.R. Conf. Rep No. 103-488, at 9, *reprinted in* 1994 U.S.C.C.A.N. 724, 726 (May 2, 1994) (emphasis added). But this concept is not in the text of the FACEA—only specifying that First Amendment activity must take place at "*a* place of religious worship."  As Judge Lohier recently pointed out, "[t]ime and time again, the Supreme Court has told us that the cart of legislative history is pulled by the plain text, not the other way around."  *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 137 (2d Cir. 2018) (Lohier, J. Concurring).  The reading proposed by defendants is unwarranted.

The FACEA's language counsels for an expansive interpretation.  Congress used the word "place," meaning a "physical environment" or "space."  Webster's Third New International Dictionary 1727 (1993).  By contrast, in 18 U.S.C. § 247, referenced in the FACEA's legislative history, Congress used starkly different language in describing religious sites.  It outlaws "intentionally defac[ing], damage[ing], or destroy[ing] any *religious real property*." 18 U.S.C. § 247 (emphasis added).  And "religious real property" is defined as "any church, synagogue,

mosque, religious cemetery, or other religious real property, including fixtures or religious objects contained within a place of religious worship." *Id.* The difference—between "a place of religious worship" and "religious real property"—suggests congressional intent to protect *all* places of religious worship and not just fixed structures in the FACEA.

E.  New York Civil Rights Law

The New York Civil Rights law provides a remedy for those affected by bias-related violence. It states:

> Any person who intentionally *selects a person or property for harm* or causes damage to the property of another or causes physical injury or death to another in whole or in substantial part *because of a belief or perception regarding* the race, color, national origin, ancestry, gender, *religion, religious practice*, age, disability or sexual orientation of a person, regardless of whether the belief or perception is correct, shall be liable, in a civil action or proceeding maintained by such individual or *group of individuals, for injunctive relief, damages, or any other appropriate relie*f in law or equity. If it shall appear to the satisfaction of the court or justice that the respondent has, in fact, violated this section, an injunction may be issued by such court or justice, enjoining and restraining any further violation, without requiring proof that any person has, in fact, been injured or damaged thereby.
>
> In any such action or proceeding, the court, in its discretion, may allow the party commencing such action or proceeding, if such party prevails, reasonable attorneys' fees as part of the costs.

N.Y. Civ. Rights Law § 79-n. This is a broad and powerful new statute that has not been fully analyzed by the courts.

Legislative history is sparse. The summary accompanying the law stated: "It establishes a *civil remedy for victims of bias-related violence or intimidation for deprivation of a civil liberty*, property damage, injury or death motivated by race, *religion*, national origin, sex, disability, age or sexual orientation to recover actual damages, injunctive relief or other appropriate remedy; includes attorneys fees." New York Assembly Bill Summary, 2009 A.B. 529 (April 29, 2009) (emphasis added).

The bill was passed with religiously motivated violence in mind. *See* New York Sponsors Memorandum, 2009 A.B. 529 (April 7, 2009) ("In the last few years, the Anti-Defamation League of B'nai B'rith reported 1,685 anti-Semitic incidents, the highest total in 12 years.").

Several elements are discernable from the text. To be liable a defendant must (1) intentionally commit, (2) damage to a person or property, (3) "because of a belief or perception regarding [that person's] . . . religion [or] religious practice . . . disability or sexual orientation." N.Y. Civ. Rights Law § 79-n. Available remedies include monetary damages, injunctive relief, and attorneys' fees and costs.

F. Assault and Battery

Assault and battery are rooted in the common law. "To plead a cause of action to recover damages for assault, a plaintiff must allege intentional physical conduct placing the plaintiff in imminent apprehension of harmful contact." *Thaw v. N. Shore Univ. Hosp.*, 129 A.D.3d 937, 938–39 (N.Y. App. Div. 2015). Battery requires a plaintiff to "prove that there was bodily contact, made with intent, and offensive in nature." *Id.*

A routine oral argument, with minimal contact, is not an assault. *See Okoli v. Paul Hastings LLP*, 117 A.D.3d 539, 540 (N.Y. App. Div. 2014) ("The physical conduct alleged by plaintiff, which amounts to finger pointing and generalized yelling in the context of a heated deposition, is inappropriate behavior, not to be condoned, but, without more, is not the type of menacing conduct that may give rise to a reasonable apprehension of imminent harmful conduct needed to state an actionable claim of assault.").

G.    Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress requires: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and injury; and (iv) severe emotional distress" *Chanko v. Am. Broad. Companies Inc.*, 27 N.Y.3d 46 (N.Y. 2016) (quoting *Howell v New York Post Co.*, 81 N.Y.2d 115, 121 (N.Y. 1993)).  The conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*.

There appears to be a split in the New York Appellate Divisions about whether medical evidence is necessary for an intentional infliction of emotional distress claim.  "The overwhelming weight of authority from the First, Second, and Third Departments favors a requirement of objective medical evidence separate and apart from a plaintiff's self-serving testimony." *Samtani v. Cherukuri*, No. 11-CV-02159, 2015 WL 64671, at *15 (E.D.N.Y. Jan. 5, 2015).  Fourth Department cases have reached the opposite conclusion.  *See Zane v. Corbett*, 82 A.D.3d 1603 (4th Dep't 2011); *Cavallaro v. Pozzi*, 28 A.D.3d 1075 (4th Dep't 2006).

The New York Court of Appeals has apparently never squarely addressed this issue. Dicta in a negligent infliction of emotional distress claim sheds light on that Court's view of discretion:  "where supporting medical evidence is lacking a trial court *might* well preclude a plaintiff from pursuing recovery for that component of psychic distress." *Ornstein v. New York City Health & Hosps. Corp.*, 10 N.Y.3d 1, 6-7 (N.Y. 2008) (emphasis added).

Plaintiffs advocate for the minority position, that special medical evidence is not necessary because, a "contrary rule would prevent people, like some of the Plaintiffs, who would

not normally seek medical attention unless it was a matter of life-or-death, from pursuing a legitimate IIED claim." Plts.' Br. Opp'n at 27, ECF No. 115. But a soft push rather than a hard shove is hardly the material for a serious constitutionally based claim.

H.    Negligence

Both plaintiffs and defendants allege negligence claims as an alternative to their intentional tort claims. These two theories are incompatible. "Various federal courts within this circuit have held . . . that under New York State law, when a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Tatum v. City of New York*, No. 06CV4290 (BSJ)(GWG), 2009 WL 124881, at *10 (S.D.N.Y. Jan. 20, 2009) (quoting *Clayton v. City of Poughkeepsie*, No. 06 CIV. 4881 SCR, 2007 WL 2154196, at *6 (S.D.N.Y. June 21, 2007).

I.    Public Nuisance

"The term 'public nuisance' means the private interference with the exercise of a public right." *N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 448 (E.D.N.Y. 2003). There are three elements:

> 1. the existence of a public nuisance—a substantial interference with a right common to the public;
> 2. negligent or intentional conduct or omissions by a defendant that create, contribute to, or maintain that public nuisance; and
> 3. particular harm suffered by plaintiff different in kind from that suffered by the community at large as a result of that public nuisance.

*Id.*

A public right is interfered with when "the health, safety, or comfort of a considerable number of persons in New York is endangered or injured, or the use by the public of a public place is hindered." *Id*.; *see also 532 Madison Ave. Gourmet Foods, Inc. v. Finlandia Ctr., Inc.*, 96 N.Y.2d 280, 292 (2001) ("A public nuisance exists for conduct that amounts to a substantial

interference with the exercise of a common right of the public, thereby offending public morals, interfering with the use by the public of a public place or endangering or injuring the property, health, safety or comfort of a considerable number of persons.").

This is not a public nuisance case. It is limited to two relatively small groups that oppose each other.

J.      Statute of Limitations: Continuing Violations Doctrine

There are two distinct strands of the continuing violations doctrine: the first aggregates multiple acts so that the limitations period begins to run when a defendant's wrongful conduct ceases; the second divides one continuous wrong into severable acts, one of which accrues within the statute of limitations. Kyle Graham, *The Continuing Violations Doctrine*, 43 Gonz. L. Rev. 271, 275 (2008). The claim here is of the first kind; there are many alleged assaults and continuous harassment taking place over a period of years.

The statutes of limitation, accrual rules, and tolling provisions in the present litigation come from both federal and state law. The federal and state continuing violations doctrines function similarly. As the Court of Appeals for the Second Circuit has explained: "[w]hen a plaintiff experiences a 'continuous practice and policy of discrimination,' [ ] 'the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'" *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994).

The doctrine has been held to reach a number of different civil rights actions in the federal courts. *See, e.g.*, *Shomo v. City of New York*, 579 F.3d 176, 182 (2d Cir. 2009) ("We agree that the continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs."); *Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 134-35 (E.D.N.Y. 2000) (applying the

continuing violations doctrine in a case where plaintiffs asserted claims under international law related to a conspiracy to steal property from Jewish families, suffering at the hands of the Nazis, during World War II).

The continuing violations doctrine can apply to a claim under 18 U.S.C. § 248(a)(2) when there is a pattern and practice of one group blocking another from accessing its places of worship. That the remedies provided for by Congress specifically contemplate continuous conduct buttresses this conclusion. *See* 18 U.S.C. § 248(c)(1)(B) (providing for "permanent injunctive relief" and "statutory damages in the amount of $5,000 *per violation*") (emphasis added).

New York Courts have applied the continuing violations doctrine when there is a continuous pattern or practice of harassment and assaults. *See Estreicher v. Oner*, 148 A.D.3d 867, 867-68 (N.Y. App. Div. 2017) (applying continuing violations doctrine to a "concerted campaign of harassment"); *Mintz & Gold, LLP v. Zimmerman*, 71 A.D.3d 600, 601 (N.Y. App. Div. 2010) (applying the doctrine to a claim for malicious prosecution under New York Civil Rights Law § 70); *Shannon v. MTA Metro-N. R.R.*, 269 A.D.2d 218, 219 (N.Y. App. Div. 2000) (applying the doctrine where there was a "pattern of harassment, intimidation, humiliation and abuse").

*Estreicher* controls the instant dispute. In that case, the Appellate Division, Second Department held that events that would be time barred without application of the continuing violations doctrine were timely.

> The counterclaim was supported by factual allegations that the plaintiff engaged in a continuing and concerted campaign of harassment and intimidation of the defendant that progressed from, among other things, calling the defendant, his family, and guests ethnic and racial epithets and throwing items onto his property to eventually making threats of violence, making false criminal accusations, committing assault and battery against the defendant, and continuing to engage in

threatening and intimidating conduct nearly two months after the physical confrontation that is the subject of the plaintiff's complaint.

*Estreicher*, 148 A.D.3d at 867-68.

### K.    Counterclaim Timeliness

A counterclaim "is not barred if it was not barred at the time the claims asserted in the complaint were interposed."  N.Y. CPLR 203(d).  If the counterclaim "arose from the transactions, occurrences, or series of transactions or occurrences, upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint."  *Id.*

N.Y. CPLR 203(d) allows "a defendant to assert an otherwise untimely claim" arising "out of the same transactions alleged in the complaint . . . as a shield for recoupment purposes[; it] does not permit the defendant to obtain affirmative relief."  *DeMille v. DeMille*, 5 A.D.3d 428, 429 (N.Y. App. Div. 2004).  Some authority holds that the "claim-saving benefit" of N.Y. CPLR 203(d) does *not* apply to counterclaims asserted for the first time in an amended answer.  *AMEX, LLC v. Mopex, Inc.*, 230 F.Supp.2d 333, 335 (S.D.N.Y. 2002).

N.Y. CPLR 203(f) provides a relation back rule for amended answers.  A claim asserted in an amended answer relates back to the pleading it amends "unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading."  N.Y. CPLR 203(f).  It "permits the amended pleading to 'relate back,' for Statute of Limitations purposes, to the time when the original pleading was served, provided the initial pleading gave notice of the transaction or occurrence from which the amended claim arose."  *Hager v. Hager*, 177 A.D.2d 401, 402 (N.Y. App. Div. 1991).

Factual similarities between counterclaims in the amended pleading and the original pleading puts the other side on notice of the claim.  1-2 Korn & Miller, et. al., CPLR Manual §

2.09 (2017) (noting that the "relate-back" test is functional: "relation back does not depend on similarity of the legal theories underlying the two claims"). General denials will not suffice. *Hager*, 177 A.D.2d at 402.

N.Y. CPLR 203(d) and (f) can work together. *See* Claim in Amended Pleading, Siegel's N.Y. Prac. § 49 (6th ed.) ("With a counterclaim, a triple relation back can sometimes be seen. If an amended answer adds a counterclaim arising out of an occurrence mentioned in the original answer, it relates back to the original answer; the original answer then relates back to the complaint's claim; and the complaint relates back to the commencement of the action.").

IV.    Application of Facts to Law

A.    Falun Gong Is a Religion in the United States for Purposes of this Litigation

The Constitution constrains a court's review of whether a particular system of belief is "religious." The test is "whether a given belief that is sincere and meaningful occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *Int'l Soc. For Krishna Consciousness, Inc. v. Barber*, 650 F.2d 430, 440 (2d Cir. 1981) (quoting *United States v. Seeger*, 380 U.S. 163 (1965)). "In the absence of a requirement of 'God,' this approach treats an individual's 'ultimate concern' whatever that concern be as his 'religion.'" *Id.*

Eleven plaintiffs have expressed a sincere belief in Falun Gong. Plts.' 56.1 Stm't at ¶¶ 27-39. Falun Gong has many traditional hallmarks of a religion: (1) a leader, (2) foundational texts, (3) a path to salvation, (4) holidays, (5) belief in a higher being, and (6) dietary restrictions. *See supra* Section II(A)(1); *cf. United States v. Meyers*, 95 F.3d 1475, 1483–84 (10th Cir. 1996) (noting that many religions offer "ultimate ideas," "metaphysical beliefs," "moral or ethical systems," are comprehensive beliefs for their followers, as well as possess founders, important writings, rituals, and holidays, among other attributes).

Falun Gong is closely related to, and can be considered a sect of, Buddhism. *See supra* Section II(A)(2)(b) (examining plaintiffs' expert's, Arthur Waldron, testimony that Falun Gong is a branch of Buddhism). Buddhism is generally recognized as a religion in the United States. *Torcaso v. Watkins*, 367 U.S. 488, 495 n.11 (1961) ("*Among religions in this country* which do not teach what would generally be considered a belief in the existence of God are *Buddhism,* Taoism, Ethical Culture, Secular Humanism and others.") (emphasis added); Kent Greenawalt, *Religion and the Constitution: Free Exercise and Fairness* 11 (2006) ("No one is our society doubts that Roman Catholicism, Greek Orthodoxy, Lutheranism, Orthodox Judaism, Islam, Hinduism, and *Buddhism (at least in many forms)* are religions.") (emphasis added).

Many of its practitioners dedicate a significant portion of time to Falun Gong's physical requirements: exercising five times daily and praying at six-hour intervals. Plts.' 56.1 Stm't at ¶ 25. Many have martyred themselves for Falun Gong; others have faced torture, detainment, and abuse. *See supra section* II(B).

The fact that Falun Gong's founder does not call it a religion and many practitioners deny it is a religion is not decisive in the present case. Defs.' Counterstatement at ¶ 1; Anne S. Y. Cheung, *In Search of a Theory of Cult and Freedom of Religion in China: The Case of Falun Gong*, 13 Pac. Rim L. & Pol'y J. 1, 21 (2004). Self-definition is not dispositive. *Welsh v. United States*, 398 U.S. 333, 341 (1970) (holding that a contentious objection to the Vietnam War was religiously based despite Welsh's initial statement that his objection to the war was not religious in nature).

Plaintiffs' experts explained that Falun Gong's founder's claim that it is not a religion is based on differing concepts of religion in China and the United States. In China, religion is often defined by formalities, such as state recognition, fixed places of worship, and clergy. Falun

Gong is mostly practiced individually, without the characteristics associated with religious practice in China. *See supra* Section II(A)(2)(a).

Defendants argue that summary judgment is inappropriate because their disagreements with Falun Gong adherents are political and not religious. *See* Defs.' Opp'n Br. at 7-14, ECF No. 107. This argument speaks to a separate issue. Plaintiffs do not ask the court to hold that defendants' actions were motivated by religious animosity; that issue is one for a jury trial. *See* Plts.' Reply Br., ECF No. 109. The question now is limited to whether Falun Gong is a religion in the United States for constitutional and statutory purposes in the present case, a threshold issue to several of plaintiffs' claims.

Defendants argue that they oppose the quasi-scientific views of Falun Gong as non-religious. *See* Defs.' Opp'n Br. at 12-13. The soundness of the tenets of Falun Gong is not relevant to whether it is to be deemed a religion for particular litigation purposes. *See United States v. Ballard*, 322 U.S. 78, 86-87 (1944) ("Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others. Yet the fact that they may be beyond the ken of mortals does not mean that they can be made suspect before the law.").

Expert testimony showed that Falun Gong is at its center concerned with ultimate questions of life and the universe. Dr. Waldron explained his view that Falun Gong is derived from Buddhism and other ancient Chinese religions. There is no genuine dispute for purposes of this case: Falun Gong "occupies a place in the life of its possessor parallel to that filled by the orthodox belief in God." *Int'l Soc. For Krishna Consciousness,* 650 F.2d at 440 (2d Cir. 1981).

Falun Gong is a religion for purposes of the instant litigation. The jury will be so instructed.

B.     Statute of Limitations

1.     Plaintiffs' Claims: Continuing Violations Doctrine

Plaintiffs' three surviving causes of action, assault and battery, New York Civil Rights Law, and Freedom of Access to Clinic Entrances Act, are governed by statutes of limitations of one, three, and four years, respectively.  N.Y. CPLR 215; N.Y. CPLR 214; 28 U.S.C. § 1658. Incidents alleged in the complaint took place from 2009 to 2015, shortly before the case was filed.  The continuing violations doctrine applies to all of these claims.

Plaintiffs have alleged, and factually supported, a claim of a conspiracy to harass, assault, and intimidate Falun Gong adherents by defendants.  *See supra* Section II(C).  They recount more than a dozen incidents over a number of years where defendants used violence and intimidation to block their practice of religion, sometimes at religious sites.  *See supra* Section II(C)(1).  The individual defendants have organized under the umbrella of CACWA, a defendant in the action, to distribute anti-Falun Gong religious materials.

Some of the alleged incidents took place within the applicable statute of limitations.  *See, e.g.*, Plts.' Supp. Facts at ¶ 40 (on January 16, 2015, Defendant Wan confronted and made death threats to Plaintiff Zhang at a Falun Gong table); Compl. at ¶ 22 ("Plaintiff Lo was physically attacked and verbally abused by Defendant Li on December 17, 2014 at the 136-06 Roosevelt Avenue table.").

Based on the pleadings and evidence already presented, plaintiffs have stated a continuing conspiracy and continuing violation of their statutory, constitutional, and common law rights.  There has been a continuous practice of discrimination and harassment.  *See Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994) ("When a plaintiff experiences a 'continuous practice and policy of discrimination,' [ ] 'the commencement of the statute of

limitations period may be delayed until the last discriminatory act in furtherance of it.'"); *Estreicher v. Oner*, 148 A.D.3d 867, 867-68 (N.Y. App. Div. 2017) (applying continuing violations doctrine to a "concerted campaign of harassment"). That some of the disputes may have involved political disagreements does not detract from the fact that the essential disagreement between the parties involved serious diverse religious contentions.

2. Defendants' Claims: Counterclaim Relation Back and Equitable Recoupment

Defendants' counterclaims arise from the same events that led to plaintiffs' complaint. The various counterclaims, although legally separate from one another, are based on the same premises and practices—it was plaintiffs, defendants contend, who initiated the harassment, verbal assaults, and abuse. Under N.Y. CPLR 203, defendants could bring these claims for recoupment, even if they were time bared when the pleading containing them was filed. Plaintiffs concede as much in their reply brief. *See* Plts.' Reply Br. at 10 ("Finally, while the provisions of CPLR 203(d) allow a defendant to assert an otherwise untimely claim which arose out of the same transactions alleged in the complaint, that is only as a shield for recoupment purposes, and does not permit the defendant to obtain affirmative relief. Thus, even if Defendants' counterclaims proceed, which they cannot for the [substantive] reasons explained above, those claims are limited to an offset on Plaintiffs' claims, if they prevail on them.") (internal citations, quotations, and alteration omitted).

Defendants' original answers and counterclaims put plaintiffs on notice of the counterclaims in the amended answer. They were detailed statements of the defendants' version of events, and the new counterclaims share the same facts with the originally asserted counterclaims. They derive from simple assault and battery claims. They would relate back under N.Y. CPLR 203(f) even if they did not under N.Y. CPLR 203(d). *See* N.Y. CPLR 203(f)

70

(providing that a claim asserted in an amended answer relates back to the pleading it amends "unless the original pleading does not give notice of the transactions, occurrences, or series of transactions or occurrences, to be proved pursuant to the amended pleading").

### C. Plaintiffs' Claims

#### 1. Assault and Battery

Plaintiffs have shown through admissible evidence that they have been in physical altercations with defendants on numerous occasions. *See supra* Section II(C). There are issues of fact as to who attacked whom during the scuffles between the parties, and the reasons for the conflict. This claim will be resolved by the jury.

#### 2. New York Civil Rights Law

The New York Civil Rights Law functions as a civil hate crime statute. Plaintiffs must prove three elements: defendants (1) intentionally committed, (2) damage to a person or property, (3) "because of a belief or perception regarding . . . religion [or] religious practice." N.Y. Civ. Rights Law § 79-n. Plaintiffs have recounted numerous incidents where they were verbally and physically attacked by defendants. *See supra* Section II(C). Intent can be inferred.

Eleven of the plaintiffs practice Falun Gong; two do not. The alleged violence occurred at or around the Falun Gong spiritual center or at tables where plaintiffs were proselytizing. *See supra* Section II(C). Inflammatory rhetoric aimed at Falun Gong was used during many of the attacks, according to plaintiffs. *See, e.g.*, Plts.' Supp. Facts at ¶ 37 ("During a . . . verbal attack against Gao Jinying and Cui Lina . . . Defendant Wan made her intent to eliminate Falun Gong believers by strangling or in other ways disappearing them."); *id.* at ¶ 40 (Defendant Wan said, "You are worse than a dog and I will take out your heart, your liver, and your lungs. I will choke you to death. We will destroy you. We will destroy everyone. Somebody will be here to kill

you."); *id*. at ¶ 40 (Defendant Wan said, "You can call the police; however, we have people working in the police station. So even though you try to tell them it is a waste of time. Within three months we will kill all of you.").  This evidence supports an inference that the attacks were motivated by plaintiffs' belief in Falun Gong.

The New York State Civil Rights Law also protects those who are *perceived* as members of a religion.  The plaintiffs who do not practice Falun Gong have a viable claim as perceived members of Falun Gong.  There are issues of fact to be tried before the jury including, (1) whether the defendants caused damage to the plaintiffs and (2) whether the defendants did so because of plaintiffs' perceived or actual religious beliefs.

### 3.  Deprivation Clause

The court is dubious that a claim of this kind under the deprivation clause is cognizable after the Supreme Court's decision in *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993).  *See supra* Section III(C)(4).

There is no state action or its equivalent.  No state actor is alleged as part of the conspiracy, there is no showing of undue "influence upon state authorities," *see infra* Section IV(C)(4), and the conspiracy is not of such scope and effect that it has supplanted state action. This is a dispute between two small groups.  The police have been able to keep order in the streets.  There is no indication of such a breakdown in government control as was contemplated at the time of the passage of the Ku Klux Klan Act.  Plaintiffs have no claim to a First Amendment violation protectable under the statute.  *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825 (1983) (holding that state action is required to state a claim for a violation of the First Amendment under the deprivation clause).

Plaintiffs rely on a violation of the right to intrastate travel. Their deposition testimony shows that disruptions in travel were minimal, and only of short durations. Plaintiffs have adduced no evidence to show that their right to intrastate travel—if it exists and if it was violated, two dubious propositions—was an aim of the conspiracy. The deprivation of the constitutional right must "be a conscious objective of the enterprise." *Bray*, 506 U.S. at 275. But plaintiffs have alleged, and strongly supported, the claim that defendants have carried out acts of intimidation and violence in opposition to their religion, Falun Gong. This is the basis of plaintiffs' statutory claims. *See supra* Section IV(C)(2), *infra* Section IV(C)(5). Defendants counter that the dispute is political.

*Bray* precludes this claim. In *Bray*, women traveled from out of state seeking abortions; some of them were stopped by protesters outside of the clinic. *Id.* at 266, 275-76. The Court rejected the claim that the protesters were intentionally interfering with the right to travel:

> Our discussion in *Carpenters* makes clear that it does not suffice for application of § 1985(3) that a protected right be incidentally affected. A conspiracy is not "for the purpose" of denying equal protection simply because it has an effect upon a protected right. The right must be "*aimed at*"; its impairment must be a conscious objective of the enterprise. Just as the "invidiously discriminatory animus" requirement, discussed above, requires that the defendant have taken his action "at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," so also the "intent to deprive of a right" requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it. *That was not shown to be the case here, and is on its face implausible. Petitioners oppose abortion, and it is irrelevant to their opposition whether the abortion is performed after interstate travel.*

*Id.* (internal citations removed) (emphasis added).

There is nothing in the record to indicate that defendants' actions were motivated by a desire to stop plaintiffs from traveling. Such a claim is inconsistent with the gravamen of plaintiffs' claim—that discrimination was based on religion. *Cf. Spencer v. Casavilla*, 839 F.

Supp. 1014, 1017 (S.D.N.Y. 1993), *aff'd in part, appeal dismissed in part*, 44 F.3d 74 (2d Cir. 1994) (dismissing deprivation clause claim where the evidence showed that any disruptions in travel were based on racial discrimination and not an intent to deprive the party of his right to travel).

### 4. Hindrance Clause

There is no evidence to support a claim under the hindrance clause of 42 U.S.C. § 1985(3). Plaintiffs do not claim there is state action; the litigation is based on a private conspiracy of a relatively small group against another. The claim appears to be premised on the constitutional right to intrastate travel, a claim the court doubts exists under the present circumstances. *See supra* Section III(C)(4).

Plaintiffs rely on a few isolated incidents of claimed false arrests, prompted by defendants, and defendants' claims of undue influence over the New York City Police Department ("NYPD") to support their claim. *See* Plts.' Supp. Facts at ¶¶ 76-85. Even assuming that plaintiffs could, as a matter of law, state a claim under the hindrance clause for a private conspiracy to violate their right to intrastate travel, it is not sufficiently factually supported. That the police were called on several occasions is not surprising given the competing allegations of some violence.

There was no evidence of undue influence over the NYPD or that the NYPD acted improperly. Several plaintiffs testified that the police helped Falun Gong members on occasion. *See* Defs.' 56.1 Stm't at ¶¶ 54-60. Any claim of influence over the police is dismissed.

### 5. 18 U.S.C. § 248: Freedom of Access to Clinic Entrances Act

The FACEA functions somewhat similarly to the New York Civil Rights Law. It prohibits violent interference with religious practice. *See supra* Section IV(C)(2). There are four statutory elements:

> Whoever . . . [1] by force or threat of force or by physical obstruction, [2] intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with [3] any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom [4] at a place of religious worship [may be found liable].

18 U.S.C. § 248(a)(2).

Falun Gong is a religion for the purposes of the instant case. *See supra* IV(A). Many of the incidents of violence and intimidation took place at or around the Falun Gong Temple in Flushing, Queens and at the tables plaintiffs use to proselytize for Falun Gong. *See supra* Section II(C). Both are places of religious worship for purposes of the present case. *See supra* Section III(D). The statute protects temporary structures. *Id.*

Plaintiffs and others proselytize and meditate—both recognized forms of worship—at these tables. Hr'g Tr. 210:5-17 (defendants' expert explaining that the Falun Gong tables contain materials explaining the practice of Falun Gong); *id.* 213:19-214:19 (defendants' expert explaining that he has observed Falun Gong practitioners meditating at the tables); *id.* 251:21-254:9 (director of Falun Gong Spiritual Center in Queens explaining that the tables are used for proselytizing, protesting the Chinese Communist Party, and praying); *see also Murdock v. Com. of Pennsylvania*, 319 U.S. 105, 110 (1943) ("[S]preading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types.").

Disputed factual issues remain about who was responsible for any attacks and whether the defendants' conduct was intended to interfere with religious practice or a respectful political dispute. This claim under 18 U.S.C. § 248 will proceed to trial.

### 6. Negligence

This is an intentional tort case, not one based on negligence. Nothing in the record could support an inference that defendants' conduct was negligent, if the jury believes, in whole or in part, either plaintiffs', or defendants', version of events. *Cf. Tatum v. City of New York*, No. 06CV.4290(BSJ)(GWG), 2009 WL 124881, at *10 (S.D.N.Y. Jan. 20, 2009) ("Under New York State law, when a plaintiff brings excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie."). The negligence claim is dismissed.

### 7. Intentional Infliction of Emotional Distress

The weight of authority is that medical evidence is required for an intentional infliction of emotional distress claim. *See supra* III(f). Plaintiffs have produced no medical evidence. They will be permitted to claim damages based on emotional problems resulting from other claims.

### 8. Public Nuisance

Plaintiffs' public nuisance claim is dismissed. As an element of a public nuisance claim, plaintiffs must show violation of a public right. *See supra* Section III(I). No such violations have been alleged.

Plaintiffs' claim is premised on defendants' violation of their individual rights—i.e. to practice their religion free from violence and intimidation. This does not implicate a right held by the public. *See N.A.A.C.P. v. AcuSport, Inc.*, 271 F. Supp. 2d 435, 448 (E.D.N.Y. 2003) (stating that a public right is interfered with when "the health, safety, or comfort of a

considerable number of persons in New York is endangered or injured, or the use by the public of a public place is hindered").

     D.    Defendants' Counterclaims

        1.   Assault and Battery

Defendants' counterclaim for assault and battery may proceed. Defendants have alleged that plaintiffs struck them, Defs.' Counterstatement at ¶¶ 23, threw rocks and sharp objects, *Id*. at ¶¶ 25-26, and grabbed their hair, *Id*. at ¶ 31. These physical acts were allegedly accompanied by threatening remarks.

Plaintiffs argue that defendants' deposition testimony was vague and that they only asserted the counterclaims because the plaintiffs asserted affirmative claims. While some of defendants' testimony may be short on details, several of the claims—hitting and throwing rocks—are clear. They support an assault and battery claim.

Plaintiffs' argument boils down to the fact that they do not think defendants claims are credible. It is the providence of the jury, the Court of Appeals for the Second Circuit emphasizes, not the trial court on summary judgment, to decide whether defendants are telling the truth. *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) ("In reviewing the evidence and the inferences that may reasonably be drawn, the court "*may not make credibility determinations or weigh the evidence…. 'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'*") (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (emphasis in original).

2.  Intentional Infliction of Emotional Distress

Defendant Zhu Zirou's claim for intentional infliction of emotional distress is dismissed. It is based on his testimony that he was bullied because of his disability. This conduct does not meet the exacting standard of a claim for intentional infliction of emotional distress. It is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Chanko v. Am. Broad. Cos. Inc.*, 27 N.Y.3d 46 (N.Y. 2016) (quoting *Howell v New York Post Co.*, 81 NY2d 115, 121 (N.Y. 1993)). It is also subsumed within the assault and battery claim. Emotional distress may be claimed as an element of damages on that claim.

3.  Negligence

This claim is dismissed. A theory of negligence is inconsistent with the intentional torts alleged. *See supra* Section IV(C)(6).

4.  New York Civil Rights Law

Defendant Zhu Zirou's claim for a violation of the New York Civil Rights Law may proceed to trial. Defendant Zhu claims that during assaults plaintiffs mocked his disability. Defs.' Counterstatement at ¶ 21.

The Civil Rights Law prohibits violent action taken because of disability. N.Y. Civ. Rights Law § 79-n. Discriminatory statements made during or before an attack permit an inference that the attack was discriminatory. *See supra* Section IV(C)(2). Summary judgment on this claim is denied.

V.  Conclusion

As stated above, plaintiffs' motion for summary judgment is granted in part and denied in part; the motion for summary judgment brought by defendants is granted in part and denied in

part.  The claims to be tried are stated in Section I(B) & Part IV, *supra*.  The court does not intend to issue an injunction, which is unnecessary.  *See supra* Part I.

Trial shall commence on August 6, 2018 in Courtroom 10 B South at 2:00 p.m.  Jury selection shall be that morning by a magistrate judge.

A hearing on motions *in limine* shall be held on July 31, 2018, at 10:30 a.m. in Courtroom 10 B South.  The parties shall exchange and file with the court by July 17, 2018, the following: (1) motions *in limine*; (2) lists of pre-marked exhibits proposed for use at the trial, together with copies of the exhibits, and any stipulations regarding admissibility and authenticity; (3) lists of proposed witnesses together with brief summaries of their proposed testimony; (4) stipulations with respect to undisputed facts; and (5) a full proposed charge to the jury and full jury findings sheets.  The parties shall provide the court with courtesy copies of all electronically filed documents.

If self-defense will be raised, it shall be included in the jury finding sheet and included in the proposed charge, accompanied by a brief.

There are serious language issues and a serious problem each plaintiff and defendant have with an understanding of how the American legal system works.  To ensure meaningful participation, all individual plaintiffs and defendants shall be present at every session of the court while the case is being tried.

Each party is responsible for providing a certified interpreter at all times at his or her expense when the court is in session.  Interpreters can and should be shared to reduce costs.  Any document in a foreign language introduced into evidence or filed shall be produced with a properly certified translation into English.

The parties shall attempt to settle the case with the help of the magistrate judge. They shall bear in mind the court's estimate that as presently ordered by the parties, the jury will need to make hundreds of decisions, seriously complicated by interpretation and translator problems. Time to try the case is estimated at more than two months. Whether a jury can be assembled to hear and decide such a case is doubtful.

The parties shall agree on a briefing schedule. If they cannot agree, the magistrate judge shall decide.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   April 23, 2018
        Brooklyn, New York

VI.    Appendix A: Map of Sites of the Alleged Incidents

This map was introduced into evidence at the summary judgment hearing



Ex. H

## VII.    Appendix B: Pictures of Sites of the Alleged Incidents

The following pictures were introduced into evidence at the summary judgment hearing.



Ex. C



Ex. C



Ex. D