**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

———————————————————————— X
:
ZHANG Jingrong, ZHOU Yanhua, ZHANG Peng,   :
ZHANG Cuiping, WEI Min, LO Kitsuen, CAO    :
Lijun, HU Yang, GUO Xiaofang, GAO Jinying, :
CUI Lina, XU Ting, BIAN Hexiang,            :
                                            :
            Plaintiffs,                     :          15 CV 1046 (JBW) (VMS)
                                            :
                  v.                        :
                                            :
Chinese Anti-Cult World Alliance (CACWA),   :
Michael CHU, LI Huahong, WAN Hongjuan,      :
ZHU Zirou, and DOES 1-5 Inclusive,          :
                                            :
            Defendants.                     :
———————————————————————— X

## DEFENDANTS' BRIEF ON THE
## UNCONSTITUTIONALITY OF 18 U.S.C. § 248(a)(2)

Pursuant to this Court's order directing the parties to brief the issue of whether 18 U.S.C. § 248(a)(2) is unconstitutional, Defendants Chinese Anti-Cult World Alliance, Michael Chu, Li Huahong, Zhu Zirou and Wan Hongjuan (the "Defendants") hereby respectfully submit this supplemental brief.

## PRELIMINARY STATEMENT

This action presents the Court with a critical legal issue that has not yet been squarely addressed by any court in the nation:  whether the section of the Free Access to Clinic Entrances Act ("FACE") at issue in this case -- 18 U.S.C. § 248(a)(2), which purports to criminalize *intimidation at places of worship* – represents an unconstitutional exercise of Congressional power.

1

This is not merely an academic legal issue to fill pages of the Federal Reporter, but goes to the heart of our Founders' profound belief in the separation of powers.   What is at stake is not just the claims or parties in this case, but the notion that individual liberty is protected when the independent judiciary enforces the limitations of enumerated powers granted to Congress in the Constitution.

The well-established principles regarding the limitations of Congress' power under the Commerce Clause were clarified and reiterated in a key Supreme Court decision which struck down the Violence Against Women's Act.  *United States v. Morrison*, 529 U.S. 598 (2000).  Under the reasoning of *Morrison*, 18 U.S.C. § 248(a)(2) clearly exceeds the power granted to Congress under the Commerce Clause.

First, this provision does not involve regulation of economic activity.  Instead, this provision purports to outlaw violence or intimidation at places of religious worship.  Acts of violence or intimidation at places of worship are not economic activity, and are plainly analogous to the acts of violence covered by the Violence Against Women Act that the Supreme Court expressly held in *Morrison* cannot properly be considered economic activity.  Indeed, in *Morrison*, the Supreme Court made clear that "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity *only where that activity is economic in nature*."

Second, as in *Morrison*, there is no jurisdictional element in 18 U.S.C. § 248(a)(2).  That is, there is no requirement that, in order to establish a violation of this provision, it be demonstrated that the activity at issue took place in or affects interstate commerce.  This stands in stark contrast to 18 U.S.C. § 247(b), which protects religious liberty while including a jurisdictional element.  It is noteworthy that the Department of Justice has admitted that it principally relies on Section 247 to protect religious liberty – presumably because the government is keenly aware that Section 247

contains the necessary jurisdictional element that Section 248(a)(2) glaringly omits.

Third, in passing Section 248(a)(2), Congress made no findings concerning *any* effect that intimidation or threats at places of religious worship had on interstate commerce, and certainly did not make any findings that such non-economic activity had substantial effects on interstate commerce.  Of course, even if Congress had bothered to do so, such findings would not survive constitutional review for the same reasons that the Supreme Court rejected such findings by Congress as to violence against women: such a theory of aggregating the effect of local crimes would allow Congress to exercise virtually limitless power, by simply finding that the aggregate effect of local crime had a substantial effect on interstate commerce.

Fourth, as in *Morrison*, any arguable link between the activity purported to be criminalized – intimidation at places of religious worship -- and the effects on interstate commerce, is simply too attenuated to survive the standard clarified in *Morrison*.  In *Morrison*, the Court had before it a situation where Congress had made numerous findings that violence against women had a broad and substantial impact in interstate commerce.  And yet the Supreme Court rejected these findings because under such a theory of aggregating the impact of non-economic activity such as acts of violence, the Court pointed out that there would effectively be no meaningful limit to the Congress' power under the Commerce Clause.

Although Congress failed to make any findings to justify its constitutional power to pass Section 248(a)(2), the Plaintiffs will now try to justify the wholesale criminalization of intimidation of at places of religious worship.  However the Plaintiffs or the government may now strain to defend this wholesale criminalization of all such local activity, it is clear that all such after-the-fact justifications cannot possibly support such a far-reaching exercise of congressional power.

Section 248(a)(2) is also unconstitutional for an additional reason.  This Court held that if the statute were to apply only to worship that takes place at established religious locations (such as temples and churches), it would favor more established religions that have fixed buildings and would disfavor other religions, whose adherents may worship on a street corner or under a tree.  In so holding, this Court explained that if FACE were intended to protect only such established places of worship, it would violate the Establishment Clause.  Yet, it turns out that this problem is unavoidable.  Both the text of the FACE and the legislative history make clear that the only way to read "place of religious worship" is as an established place of worship, and was not meant to cover prayer on a street corner.  Thus, Section 248(a)(2) is also unconstitutional as it violates the Establishment Clause.

The bottom line is that Section 248(a)(2) was not well thought out, and was placed into FACE relatively late in the legislative process in obvious efforts to garner Republican votes.  This provision suffers from multiple constitutional infirmities and should be stricken down as facially unconstitutional.

## STATEMENT OF UNDISPUTED FACTS

### A.  Plaintiffs' Complaint Alleges Claims Under 18 U.S.C. § 248(a)(2)

The Plaintiffs in this action assert claims under Freedom of Access to Clinic Entrances Act of 1994 ("FACE"), 18 U.S.C. § 248(a)(2).  Complaint, Doc. 2, Fifth Cause of Action, at Paragraphs 169-175.  Section 248(a)(2) purports to regulate threats, intimidation and interference at places of worship, creating a cause of action against anyone who "by force or threat of force or by physical obstruction, intentionally interferes, intimidates or interferes with or attempts to injure, intimidate or interfere with any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship."  18 U.S.C. § 248(a)(2).

**B. All of the Alleged Incidents Occurred Locally on Main Street
and Did Not Involve Interstate Commerce**

Plaintiffs' Complaint alleges that all of the incidents occurred at the Falun Gong tables and center located on Main Street in Flushing, Queens. *See* Complaint ¶¶ 171-174. Plaintiffs' Complaint does not allege that any of the confrontations occurred while Plaintiffs or Defendants were crossing state lines. *See id.*

In addition to the Complaint, the undisputed facts and Plaintiffs' testimony confirm that all of the alleged confrontations involved local incidents on Main Street, Flushing, such as tussling over a camera or engaging in verbal altercations. *See* Defendants' Brief in Support of Summary Judgment, Doc. 112, at 6-7, 11-15. No interstate commerce is involved in these incidents.

**C. Legislative History of FACE**

For the Court's convenience, Defendants provide a brief overview of the legislative history of FACE. This legislative history is informative because the section of FACE under which Plaintiffs have asserted claims – dealing with interference at places of worship – was added relatively late in the process in order to gain some Republican votes. The genesis and focus of FACE, and all of the legislative history concerning the effects on interstate commerce, dealt with access to abortion clinics – not with intimidation at places of religious worship.

In 1992, a bill similar to the House of Representatives version of the enacted law was first introduced in Congress[1] The House Subcommittee on Crime and Criminal Justice conducted a hearing on the proposal on May 6, 1992, at which they heard testimony on the abortion clinic blockades and protests that had disrupted abortion services in the summer of 1991 and the spring

---

[1] Helen R. Franco, *Freedom of Access to Clinic Entrances Act of 1994: The Face of Things to Come?*, 19 NOVA L. REV. 1083, at 1098 (1995).

5

of 1992.  *Id.*  While the House did not have the opportunity to enact this bill in 1992, it paved the way for further action in the 103rd Congress.  *Id.*

While the House of Representatives introduced the next version of FACE on February 3, 1993, it was the Senate proposal, Senate Bill 636, which was ultimately presented to President Bill Clinton on May 17, 1994 and signed into law on May 26, 1994.  *Id.*  Senator Ted Kennedy introduced Senate Bill 636 on the Senate Floor on March 23, 1993.  *Id.*; *See* Ex. 4.[2]  In his remarks, Senator Kennedy detailed the history of violence against abortion clinics and the access thereto, explaining that "[g]reater protections under Federal law are needed before the toll from these nationwide extremist acts rises higher."  *Id.* at S3523.  Senator Kennedy argued that "[t]he Supreme Court's ruling in the *Bray* case last January makes clear that existing Federal laws are inadequate to deal with this challenge."  *Id.*  He went on to explain that Senate Bill 636 "is designed to fill that gap and provide effective remedies for women, physicians, nurses, and communities across the country."  *Id.*[3]

The text of the bill contained a section providing a Congressional Statement of Findings and Purpose.  Ex. 1.  These findings included a language stating that conduct that interferes with access to abortion clinics "burdens interstate commerce, including by interfering with business activities of medical clinics involved in interstate commerce and by forcing women to travel from States where their access to reproductive health services is obstructed to other States[.]"  *Id.* at 2-3.  This version of the bill did not include any language regarding interference with places of religious worship.

_____

[2] All references to "Ex." refer to the Exhibits to the Tom M. Fini Declaration dated May 21, 2018.

[3] *See also* Helen R. Franco, *Freedom of Access to Clinic Entrances Act of 1994: The Face of Things to Come?*, 19 Nova L. Rev. 1083, at 1099 (1995).

Indeed, it was not until November 16, 1993 and the third version of Senate Bill 636 that the language regarding the interference with places of religious worship was finally introduced. *See* Ex. 2. This language was introduced by Senator Orrin Hatch (the "Hatch Amendment") and "[i]n a coup for the Senate conferees, the oddly-placed prohibition against interference with religious worship remained a part of the final enactment." Helen R. Franco, *Freedom of Access to Clinic Entrances Act of 1994: The Face of Things to Come?*, 19 NOVA L. REV. 1083, at 1103 n. 132, 1109 (1995) ("Senator Hatch was one of four senators of the seventeen-member Senate Labor and Human Resources Committee to vote against adoption of the proposed Senate Bill 636 on June 23, 1993."); *See* Ex. 3.

Unlike the portion of the bill regarding access to abortion clinics, Congress did not identify the conduct in the Hatch Amendment as commercial **and there were no Congressional findings with respect to any impact that the conduct would have on interstate commerce**. *See* Ex. 2. In addition, the Hatch Amendment did not include as an element the requirement that the interference must be motivated by religious animus. *See id.* Indeed, during the House Consideration of the Conference Report, Representative Sensenbrenner pointed out that the Hatch Amendment did not constitute viewpoint discrimination since it punishes only conduct, not motivation. Ex. 7 at H3123.

The very little legislative history regarding the Hatch Amendment focused on the scope of "place of religious worship," and that this was not intended to include prayer on a sidewalk. Notably, during the November 16, 1993 Senate hearing on the amendment, Senator Hatch made absolutely clear that the "place of worship" language was ***not*** intended to cover anywhere someone was praying – such as the street or sidewalk – but, rather, only conduct that occurred at an established place of religious worship. Ex. 5 at S15660. Senator Kennedy was concerned that the

7

Hatch Amendment would actually create additional rights under FACE for abortion protestors because protestors could claim that they were engaged in worship outside of abortion clinics. Because of his concern, Senator Kennedy asked the following question:

> **Mr. KENNEDY**. **So, to be clear on this, the amendment would cover only conduct actually occurring at an established place of religious worship, a church or synagogue,** _**rather than any place where a person might pray, such as a sidewalk**_?
>
> **Mr. HATCH**. _**That is correct**_.

_Id._

Similarly, the Conference Report on Senate Bill 636 also addressed Senator Kennedy's concern stating that 18 U.S.C. § 248 "covers only conduct occurring at or in the immediate vicinity of a place of religious worship, such as a church, synagogue or other structure or place used primarily for worship."  Ex. 6 at H2919.   The report explained that it had modified the rules of construction to make clear that "this Act does not create any new remedies for interference with a person engaging, outside a facility that provides reproductive health services, in worship or other activities that are protected by either the free speech or free exercise clause of the First Amendment to the Constitution." _Id._

The enacted law included similar language stating that "[n]othing in this section shall be construed to create new remedies for interference with activities protected by...free exercise clause[] of the First Amendment to the Constitution, occurring outside a facility[.]"  18 U.S.C. § 248(d)(2).

Thus, what is abundantly clear is that the ambiguous phrase "place of religious worship" as used in the statute was not intended to be anywhere that an individual might pray, such as the street or sidewalk.

**D.  The Department of Justice Has Not Filed Any
<u>Criminal or Civil Actions under FACE</u>**

On June 29, 2016, the Attorney General's office confirmed in writing that "the Department [of Justice] has not filed any criminal or civil actions under the Face Act" regarding violence directed at houses of worship.  Instead, the Department of Justice uses Section 247 to protect religious freedom.  *See* Ex. 10 (copy of June 29, 2016 letter from Peter J. Kadzik, Assistant Attorney General, responding to request by Senators as to whether the government has ever sued under FACE to protect religious activity or property, to which the answer was no).

This highlights that the Department of Justice, aware of constitutional limitations, is wisely using Section 247 to protect places of religious worship and religious freedom, as it includes in one section the necessary element that the offense be in or affect interstate commerce (247(b)), and requires in another section the important requirement that the motivation for activity covered by the action is a discrimination based on race, color or ethnic characteristic religion (247(c)).

**E.  The Procedural History of the Defendants' Claim that
<u>18 U.S.C. § 248 (a)(2) is Unconstitutional</u>**

On April 21, 2018, the Defendants asserted that the section of FACE under which Plaintiffs assert claims, 18 U.S.C. § 248(a)(2), is unconstitutional because it represents an illegitimate exercise of Congressional power under the Commerce Clause of the United States Constitution. *See* Defendants' April 21, 2018 Letter filed in this action (Doc. 150).   Defendants argued that under the principles that the Supreme Court articulated in striking down the Violence Against Women Act, Section 248(a)(2) is plainly attempting to outlaw non-commercial, non-economic activity – threats and intimidation at places of religious worship and related non-commercial activity – which do not substantially affect interstate commerce.  *See United States v. Morrison*, 529 U.S. 598, 621–624 (2000).

On April 25, 2018 (Doc. 153), the Court issued an order ruling that the issue of the constitutionality of Section 248(a)(2) is "worthy of full discussion."  Doc. 153 at 2. The Court ordered that briefs on the issue be submitted by May 21, 2018, and that a hearing on the constitutional issue shall be heard on May 29, 2018. *Id.*

On April 27, 2018, the Court deemed the April 21, 2018 letter by the Defendants as a request to add the defense of unconstitutionality, and ordered the Defendants to amend their answers promptly to assert such defense. *See* Doc. 154.  In accordance with the Court's April 27, 2018 Order, the Defendants have filed amended answers that assert the unconstitutionality of Section 248(a)(2) as a defense. *See* Doc. Nos. 157 and 158.

## ARGUMENT

I.    **CONGRESS LACKED CONSTITUTIONAL POWER TO ENACT 18 U.S.C. § 248(a)(2)**

   A.  **The Commerce Clause Cannot Support 18 U.S.C. 248(a)(2)**

Under well-established case law addressing the limits of Congressional power under the Commerce Clause, it is clear that Congress lacked power to outlaw (and indeed, criminalize) the non-economic activity – violence and intimidation at places of religious worship -- that it purported to in passing 18 U.S.C. 248(a)(2). Thus, 18 U.S.C. 248(a)(2) is a facially unconstitutional exercise of Commerce Clause power.

Modern analysis of the limits of Congressional power under the Commerce Clause focuses on two Supreme Court decisions that clarified that the Commerce Clause power is indeed limited and cannot be used to regulate federalize local law enforcement issues, particularly where, as here, Congress purports to regulate non-economic activity.  The first decision was *United States v. Lopez*, 514 U.S. 549, 567 (1995), where the Court upheld a challenge to a federal statute criminalizing the possession of firearms in proximity to schools.  The second decision, and the one that is

analogous to the situation in this case, is *United States v. Morrison*, 529 U.S. 598, 621–624 (2000) which upheld a Commerce Clause challenge to the Violence Against Women Act ("VAWA").

In clarifying the limits of Congress' commerce powers, the *Lopez* Court identified the three categories of activity that Congress has authority to regulate under the Commerce Clause. *Id.* at 588. The Court held that Congress (1) may "regulate the use of the channels of interstate commerce;" (2) may "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce;" and (3) may "regulate those activities having a substantial relation to interstate commerce . . . *i.e.,* those activities that substantially affect interstate commerce." *Id.* at 558–59. Any exercise of Congress' commerce power must fall into one of these three Lopez categories or the regulation will be struck down as unconstitutional.

When members of Congress inserted – relatively late in the legislative process – the provision outlawing intimidation or violence at places of religious worship at issue here, they did not conduct any hearings or make any legislative findings whatsoever about how or why such activity involves the Commerce Clause. The only category of Commerce Clause activity that could conceivably be argued to be implicated by 18 U.S.C. 248(a)(2) is the third one identified in *Lopez*: that, somehow, intimidation or violence at places of religious worship "substantially affects" interstate commerce. However, it is impossible to justify regulation of such local, non-economic activity under the standard that the Supreme Court clarified in *United States v. Morrison*, 529 U.S. 598 (2000).

In *Morrison*, the Court further defined the boundaries of Congress' authority under *Lopez's* third category prong. The Court reaffirmed four "significant considerations" to consider in determining whether an activity substantially affects interstate commerce. *Id.* at 609. First, a court must examine whether the activity involves regulation of economic activity. *Id.* at 611.

Second, an express jurisdictional element may establish its connection with or effect on interstate commerce. *Id.* at 611–12.  Third, the statute or its legislative history may include express congressional findings of the activity's effects on interstate commerce. *Id.* at 612.  Fourth, the court must consider whether the link between the activity and a substantial effect on interstate commerce is too attenuated. *Id.*

In *Morrison,* the Court weighed these four considerations in striking down 42 U.S.C. § 13981, a statute which provided a civil remedy for victims of gender-motivated violence.  *Id.* at 619.  The Court found that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity," and noted that the statute "contained no express jurisdictional element." *Id.* at 611–13.  And although Congress there (unlike here) *did* make express findings that violence against women purportedly had a substantial effect on interstate commerce, the Court in *Morrison* did not defer to such findings, and held that the logic by which Congress made this determination would eviscerate any limiting principle on the use of Congressional power, since by that reasoning, the collective impact of any crime, however local, can be said to affect interstate commerce.

Under the four factors identified in *Morrison*, it becomes clear that the non-economic activity purportedly outlawed by 18 U.S.C. § 248(a)(2) cannot be regulated under the Commerce Clause.  First, this provision does not involve regulation of an economic activity.  Instead, this provision purports to outlaw violence or intimidation at places of religious worship.  Acts of violence or intimidation at places of worship are not economic activity, and are analogous to the acts of violence covered by the Violence Against Women Act that the Supreme Court expressly held in *Morrison* cannot properly be considered economic activity.  529 U.S. at 614.  The Supreme Court made clear that, under the third category identified in *Lopez* – regulation of activity that

substantially affects interstate commerce -- "thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity *only where that activity is economic in nature*." *Id.* (emphasis added).

Second, as in *Morrison*, there is no jurisdictional element in 18 U.S.C. 248(a)(2).  That is, there is no requirement that, in order to establish a violation of this provision, it be demonstrated that the activity at issue took place in or involved interstate commerce.

Third, in passing Section 248(a)(2), Congress made no findings concerning *any* effect that intimidation or threats at places of religious worship had on interstate commerce, and certainly did not make any findings that such non-economic activity had substantial effects on interstate commerce.  Of course, even if Congress had bothered to do so, such findings would not survive constitutional review for the same reasons that the Supreme Court rejected such findings by Congress as to violence against women: such a theory of aggregating the effect of local crimes would allow Congress to exercise virtually limitless power, by simply finding that the aggregate effect of local crime had a substantial effect on interstate commerce.

Fourth, as in *Morrison*, any arguable link between the activity purported to be criminalized – intimidation at places of religious worship -- and the effects on interstate commerce, is simply too attenuated to survive the standard clarified in *Morrison*.  In *Morrison*, the Court had before it a situation where Congress had painstakingly made numerous findings that violence against women had a broad and substantial impact in interstate commerce.  And yet the Supreme Court rejected these findings because under such a theory of aggregating the impact of non-economic activity such as acts of violence, the Court pointed out that there would effectively be no meaningful limit to the Congress' power under the Commerce Clause:

> In these cases, Congress' findings are substantially weakened by the fact that they
> rely so heavily on a method of reasoning that we have already rejected as

unworkable if we are to maintain the Constitution's enumeration of powers. Congress found that gender-motivated violence affects interstate commerce "by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; ... by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products." H.R. Conf. Rep. No. 103–711, at 385, U.S. Code Cong. & Admin. News 1994, pp. 1803, 1853.  Accord, S. Rep. No. 103–138, at 54.

Given these findings and petitioners' arguments, the concern that we expressed in *Lopez* that Congress might use the Commerce Clause to completely obliterate the Constitution's distinction between national and local authority seems well founded. See *Lopez, supra,* at 564, 115 S. Ct. 1624. The reasoning that petitioners advance seeks to follow the but-for causal chain from the initial occurrence of violent crime (the suppression of which has always been the prime object of the States' police power) to every attenuated effect upon interstate commerce. If accepted, petitioners' reasoning would allow Congress to regulate any crime as long as the nationwide, aggregated impact of that crime has substantial effects on employment, production, transit, or consumption. Indeed, if Congress may regulate gender-motivated violence, it would be able to regulate murder or any other type of violence since gender-motivated violence, as a subset of all violent crime, is certain to have lesser economic impacts than the larger class of which it is a part.

*Morrison*, 529 U.S. at 615.

The courts that have addressed the constitutionality of the FACE have thus far only addressed the portion of the statute that addressed access to abortion clinics, 18 U.S.C. 248(a)(1). In upholding regulation of access to abortion clinics as a constitutional exercise of Congressional power, these courts have stressed the fact that abortion services clearly involve *commerce* – doctors performing abortions for compensation, and women paying for abortions.  These cases also stressed that Congress made specific findings regarding the commercial aspects of abortion services and the effect of this commercial activity in interstate commerce.  *See United States v. Bird*, 124 F.3d 667, 678 (5th Cir. 1997) ("Congress made findings, supported by the testimony presented to the House and Senate committees charged with considering the Act, that there was an interstate commercial market for abortion services."); *Norton v. Ashcroft*, 298 F.3d 547, 558 (6th Cir. 2002) ("the legislative record indicates that there is a national market for abortion services. . . .

Owing to a national shortage in reproductive health services where only 17% of counties have an abortion provider . . . patients must often travel interstate to obtain reproductive health services."); *United States v. Gregg*, 226 F.3d 253, 262–63 (3d Cir. 2000) ("In contrast to gender-motivated crime, the activity regulated by FACE—the physical obstruction and destruction of reproductive health clinics and the intentional interference and intimidation of persons obtaining and providing reproductive health services—is activity with an effect that is economic in nature. Reproductive health clinics are income-generating businesses that employ physicians and other staff to provide services and goods to their patients."); *United States v. Weslin*, 156 F.3d 292, 296 (2d Cir. 1998) ("The legislative history of FACE shows that Congress specifically found that 'women travel interstate to obtain reproductive health services'…Similarly, and in part because of a shortage of doctors willing to perform abortions, doctors travel from state to state and often cover great distances to perform abortions. Congress also found that clinics purchase medical and other supplies in interstate commerce.").

The focus in the cases that upheld the abortion clinic access portion of FACE (18 U.S.C. 248(a)(1)) was on the indisputably commercial nature of abortion services, and preventing interference with doctors performing medical services for profit – commercial activities which clearly distinguished that aspect of FACE from the Violence Against Women's Act.  As noted, there were Congressional findings that women would be forced to cross state lines to obtain abortion services due to the ongoing organized blockading and intimidation at clinics.  The logic of these decisions highlight why the portion of FACE relevant here – the section that criminalizes ***intimidation at places of worship*** – is a far different matter.  That is, outlawing interference with abortion services clearly involve commerce, whereas the portion of FACE that purports to outlaw

15

the intimidation of those at places of worship no more affects commercial activity than did the Violence Against Women Act.

The reality is that the portion of FACE that purport to regulate intimidation at places of worship was included into the statute late in the game in a transparent effort to get some Republicans to vote in favor of the statute.  No meaningful Congressional findings were made to support this purported regulation of what is clearly local activity.

Importantly, in contrast to the section of FACE that is at issue in this case, 18 U.S.C. § 248(a)(2), in an analogous statute, Congress was careful to include *as an element* that the particular offense is in or affects interstate or foreign commerce.  Specifically, in protecting against threats to people exercising religious beliefs and protecting religious property, 18 U.S.C. § 247 specifically requires as an element that the "***offense is in or affects interstate or foreign commerce***."  18 U.S.C. § 247(b).  The legislative history of Section 247 also makes clear that Congress was aware of the need for regulation of such non-commercial activity to actually involve interstate commerce as an element in the wake of the Supreme Court's important decision in *United States v. Lopez*, 514 U.S. 549 (1995).[4]

In contrast to Section 247, Section 248(a)(2) – fatally – does not require that the offense be in or affect interstate commerce, and thus purports to improperly outlaw all local non-commercial activity in precisely the same way that the Supreme Court taught in *Morrison* is improper in

---

[4] House Report 104-621 ("The Committee is aware of the Supreme Court's ruling in *United States v. Lopez*, 115 S. Ct. 1624 (1995), in which it struck down as unconstitutional legislation which would have regulated the possession of firearms in a school zone.  In that case, the Court found that the conduct to be regulated did not have a substantial effect on interstate commerce, and was therefore not within the Federal government's reach under the interstate commerce clause of the Constitution.  H.R. 3525, by contrast, specifically limits its reach to conduct which can be shown to be in or to affect interstate commerce.  Thus, if in prosecuting a particular case, the government is unable to establish this interstate commerce connection to the act, section 247 will not apply to the offense.") (available at https://www.gpo.gov/fdsys/pkg/CRPT-104hrpt621/html/CRPT-104hrpt621.htm).

16

striking down the Violence Against Women Act.  If Section 248(a)(2) were permitted to stand, there would be no limiting principle to the power of Congress under the Commerce Clause, which the Supreme Court has held is not consistent with federalism and our constitutional structure.[5]

It is noteworthy that even if a jurisdictional element were somehow read into Section 248(a)(2) (requiring that the activity in question involved interstate commerce), then the statute would be unconstitutional as applied.  This is because, among other reasons, the alleged intimidation and assaults at issue all occurred locally on Main Street, Flushing.

### B. Congress Did Not Have Constitutional Authority Under the 13th Amendment to Pass 18 U.S.C. § 248(a)(2)

Plaintiffs cannot rely on Section 2 of the 13th Amendment ("Section 2") to argue that Congress had the authority to pass Section 248(a)(2).

Section 2 of the 13th Amendment "grants Congress the power to enforce the Amendment by appropriate legislation."  *U.S. v. Nelson*, 277 F.3d 164, 180 (2d Cir. 2002); U.S. Const. amend. XIII.  However, under the Second Circuit's important decision in *U.S. v. Nelson*, Section 248(a)(2) is missing a critical element that would be necessary to justify the exercise of power under Section 2: that the defendant have had a discriminatory motivation.  277 F.3d at 185.

In *Nelson*, the Second Circuit stressed that in order to tie the statute to the "badges of slavery," Congress typically must require "that the forceful injury, intimidation, or interference that the statute addresses be committed '*because*' of the victim's race or religion[.]"  *Nelson*, 277

---

[5] The section of the FACE that prohibits threats, intimidation or causing of injuries at places of religious worship also cannot be justified by claiming that Congress can invoke a power to protect religious liberty under the First or Fourteenth Amendment and outlaw activity of private actors.  This logic was squarely rejected by the Supreme Court in *Morrison*, where the government claimed that it had the power to enact VAWA under the Fourteenth Amendment in order to enforce the equal protection of women.  The Supreme Court aptly held that under the well-established "state action" doctrine, the protections afforded under the Fourteenth Amendment apply as to actions of state actors, not private citizens.  *Morrison*, 529 U.S. at 619-23.

at 185-86.   As the Second Circuit explained, if the activity being outlawed does not require discrimination *because of* or *motivated by* discrimination based on race or religion,[6] the statute would fall into the category of general tort statutes which the Supreme Court has stressed must be avoided.  Id. at 185.

Here, Section 248(a)(2) has no such requirement: there is absolutely no requirement that the defendant be motivated by discrimination against any race or religion.  Nor is there any requirement that the defendant have some animus against a race or religion.  All that is required is that the defendant intentionally engages in intimidation at a place of religious worship.   Thus, under Section 248(a)(2), a defendant could be held liable if it is found that he intentionally intimidated a plaintiff at a place of religious worship – even if it turned out that the motive for such intimidation was that the defendant disliked the plaintiff's political belief, and had absolutely no opinion about, or animus against, the plaintiff's religion.

This fact that Section 248 does not contain as an element a requirement of racial or religious discrimination is further highlighted when compared to Section 247(c), which punishes one who "intentionally defaces, damages, or destroys any religious real property ***because of*** the race, color, or ethnic characteristics of any individual associated with that religious property[.]"   Again, because Section 247 contains an important element to justify congressional action under Section 2 of the Thirteenth Amendment, it is no surprise that the DOJ principally relies on Section 247 to protect religious liberty.

---

[6] Defendants also reserve that under the Second Circuit precedent in *U.S. v. Nelson*, the use of the 13th Amendment also requires the animus to be directed at a specific race.  At the time of the passage of the 13th Amendment, Falun Gong was undisputedly not considered a race.

## II.     SECTION 248(a)(2) IS ALSO UNCONSTITUTIONAL BECAUSE IT VIOLATES THE ESTABLISHMENT CLAUSE

Section 248(a)(2) is unconstitutional for a second reason.  This Court held that if the statute were to apply only to worship that takes place at established religious locations (such as temples and churches), it would favor more established religions that have fixed buildings and would disfavor other religions, which may worship on a street corner or under a tree.  In so holding, this Court explained that if FACE were intended to protect only established places of worship, it would violate the Establishment Clause.

Yet, this problem is unavoidable.  Both the text of the 248(a)(2) and the legislative history make absolutely clear that the only way to read "place of religious worship" is as an established place of worship, and was not meant to cover prayer on a street corner.

The plain text of the statute makes clear that it was not intended to cover prayer or worship on a street corner.   That section states that: "Nothing in this section shall be construed to create new remedies for interference with activities protected by the free speech or free exercise clauses of the First Amendment to the Constitution, occurring outside a facility, regardless of the point of view expressed, or to limit any existing legal remedies for such interference."   18 U.S.C. § 248(d)(2).  Thus, the Court's holding that a place of religious worship could exist on the street or sidewalk outside of any building or facility clashes irreconcilably with this provision.

Because of this inconsistency, as well as the fact that the phrase "place of religious worship" is ambiguous, the Court may also look to the legislative history of FACE.  Upon further examination of the legislative history, it is clear that Congress did not intend "place of worship" to include the sidewalks.  Senator Ted Kennedy was concerned that Section 248(a)(2) would create additional rights under FACE for abortion protestors because protestors could claim that they were engaged in worship outside of abortion clinics.   Because of his concern, Senator Kennedy

specifically asked the sponsor of the amendment, Senator Orrin Hatch, whether the statute could cover prayer on a sidewalk, and the answer was an emphatic "no":

> **Mr. KENNEDY**. **So, to be clear on this, the amendment would cover only conduct actually occurring at an established place of religious worship, a church or synagogue, _rather than any place where a person might pray, such as a sidewalk_?**

> **Mr. HATCH**. _**That is correct**_.

Ex. 5 at S15660.  Thus, like the text of the statute, the legislative history of Section 248(a)(2) makes clear that a "place of religious worship" cannot cover any place that a person may pray, such as the street or on the sidewalk.

While the Court may attempt to read a statute so that it is constitutional, it may not rewrite a statute.  _Puerto Rico v. Franklin California Tax-Free Tr._, 136 S. Ct. 1938, 1949 (2016) ("[O]ur constitutional structure does not permit this Court to rewrite the statute that Congress has enacted.").  Given the clarity of the text and legislative history of Section 248(a)(2), the Court's reading of FACE to try to save it would improperly rewrite the statute.  The Court cannot attempt to save Section 248(a)(2) from violating the Constitution by broadly construing "place of religious worship" to include a sidewalk.  Section 248(a)(2) violates the Establishment Clause.

The reality is that Section 248(a)(2) was included late in the legislative process and was not well thought out.  It suffers from multiple constitutional infirmities.

### III.    18 U.S.C. § 248(a)(2) is Severable from FACE

Section 248(a)(2) is severable from FACE for multiple reasons.

First, Congress specifically included a section on severability in the enacted version of the bill, stating that: "If any provision of this Act, an amendment made by this Act, or the application of such provision or amendment to any person or circumstance is held to be unconstitutional, the

20

remainder of this Act, the amendments made by this Act, and the application of the provisions of such to any other person or circumstance shall not be affected thereby." Ex. 3, Section 5 at 4.

Second, Section 248(a)(2) is a completely separate section from Section 248(a)(1) and does not affect the provisions of FACE that concern the freedom of access to abortion clinics. There is no interdependency between the sections, and removing Section 248(a)(2) would have no effect on the rest of the act.

Finally, the overwhelming legislative history of FACE makes clear that the purpose of the act was to protect abortion clinics, and not the interference with places of worship. Indeed, the government has admitted that it perhaps never prosecuted any individuals under Section 248(a)(2) because 18 U.S.C. § 247 offers sufficient protection. *See* Ex. 10.

## **CONCLUSION**

For the foregoing reasons, this Court should find 18 U.S.C. § 248(a)(2) unconstitutional and dismiss Plaintiffs' claims asserted under this provision.


Dated: New York, New York
          May 21, 2018

                                        **CATAFAGO FINI LLP**

                                        By:  __/s/_Tom M. Fini___
                                        Tom M. Fini, Esq.
                                        Jacques Catafago, Esq.
                                        Sarah M. Dyer, Esq.
                                        The Empire State Building
                                        350 Fifth Avenue, Suite 7710
                                        New York, NY  10118
                                        Tel: 212-239-9669
                                        tom@catafagofini.com

                                        *Counsel for Defendants Chinese Anti-Cult*
                                        *World Alliance, Michael Chu, Li Huahong*
                                        *and Zhu Zirou*

**LAW OFFICE OF EDMOND W. WONG**

By: __/s/ Edmond W. Wong__
Edmond W. Wong, Esq.
118-21 Queens Boulevard, Suite 516
Forest Hills, NY  11375
Tel: 516-900-4088
edwonglaw@gmail.com

*Counsel for Defendants*