UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ZHANG Jingrong, ZHOU Yanhua, ZHANG Peng, ZHANG Cuiping, WEI Min, LO Kitsuen, CAO, Lijun, HU Yang, GUO Xiaofang, GAO Jinying, CUI Lina, XU Ting, BIAN Hexiang, | **MEMORANDUM AND ORDER DENYING CONSTITUTIONAL CHALLENGE AND CERTIFYING CASE FOR INTERLOCUTORY APPEAL** |
| Plaintiffs, | 15-CV-1046 |
| – against – | |
| Chinese Anti-Cult World Alliance (CACWA), Michael CHU, LI Huahong, WAN Hongjuan, ZHU Zirou, and DOES 1-5 Inclusive, | |
| Defendants. | |

**JACK B. WEINSTEIN, Senior United States District Judge**

| Parties | Appearances |
|---|---|
| Zhang Jingrong, Zhou Yanhua, Zhang Peng, Zhang Cuiping, Wei Min, Lo Kitsuen, Cao, Lijun, Hu Yang, Guo Xiaofang, Gao Jinying, Cui Lina, Xu Ting, and Bian Hexiang | **Terri Ellen Marsh** Human Rights Law Foundation 1875 K Street NW Suite 400 Washington D.C. 20006 (202) 697-3858 |
| | **Joshua S. Moskovitz** Bernstein Clarke & Moskovitz PLLC 11 Park Place, Suite 914 New York, New York 10007 (212) 321-0087 |
| | **Jonathan C. Moore** **Keith M. Szczepanski** Beldock Levine & Hoffman LLP 99 Park Avenue, PH/26th Floor New York, New York 10016 (212) 490-0400 |

Chinese Anti-Cult World Alliance
(CACWA),
Michael CHU,
Li Huahong, and
Zhu Zirou

**Tom M. Fini**
**Jacques Catafago, Esq.**
Catafago Fini LLP
The Empire State Building
350 Fifth Avenue, Suite 7412
New York, NY 10118
212-239-9669

**Edmond W. Wong, Esq**.
Law Office of Edmond W. Wong
35-10 Farrington Street
Flushing, NY 11354
718-886-3188

Wan Hongjuan

**Edmond W. Wong, Esq**.
Law Office of Edmond W. Wong
35-10 Farrington Street
Flushing, NY 11354
718-886-3188

**Table of Contents**

I.   Introduction ........................................................................................................... 3

II.  Factual Background ............................................................................................... 7

   A.   Case Background .............................................................................................. 7

   B.   Prior Opinion on FACEA .................................................................................. 8

   C.   Religion and Commerce .................................................................................... 9

III. Law ........................................................................................................................ 12

   A.   Timeliness of Constitutional Challenge ....................................................... 12

      1.   Pleading Constitutional Challenges ....................................................... 12

      2.   Leave to Amend ........................................................................................ 14

   B.   FACEA ............................................................................................................. 14

   C.   Commerce Clause ........................................................................................... 19

      1.      Supreme Court Commerce Clause Jurisprudence ...................................................... 19

      2.      FACEA Commerce Clause Decisions.................................................................... 23

      3.      Commerce Clause and Religion ........................................................................... 24

IV.  Application of Facts to Law...................................................................................... 28

    A.    Timeliness of Constitutional Challenge ...................................................... 28

    B.    Commerce Clause Analysis ......................................................................... 30

    C.    Distinguishing *Morrison* ............................................................................ 32

    D.    Legislative Findings and Jurisdictional Nexus............................................ 34

V.    Certification of Interlocutory Appeal........................................................................ 35

VI.  Conclusion ............................................................................................................... 38

I.       Introduction

This memorandum and order addresses a question raised by defendants: has Congress exceeded its authority granted by the Commerce Clause of the United States Constitution in passing the portion of the Freedom of Access to Clinic Entrances Act ("FACEA") that protects "place[s] of religious worship." 18 U.S.C. § 248(a)(2).

FACEA was adopted in 1994 primarily to protect women seeking access to abortion services. The abortion clinic part of FACEA has been upheld as constitutional by every circuit court of appeals that has considered the issue. Late in the legislative processes, FACEA was amended to protect "any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2). No court, so far as this court is aware, has considered whether this religion section is constitutional. This court now finds that FACEA is a constitutional exercise of congressional Commerce Clause power.

Nevertheless, the court is dubious about whether the Commerce Clause, U.S. Const. art. I, § 8, cl. 3. ("The Congress shall have Power . . . [t]o regulate Commerce . . . among the several

States"), permits government protection of religion by FACEA because the First Amendment, U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof"), requires a barrier between religion and government. A specific amendment to a statute or constitution should have more force than a generalized clause.

It is an anomaly of our religious jurisprudence that the basic structure of the relationship between government and religion requires government to keep its hands off religion. Yet, carrying out the disestablishment rule has not prevented a strong economic relationship between the two: religion and government. Local, state, and federal governments grant religious exemptions and aid with economic advantages, *see, e.g.*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) (holding that a for-profit corporation was exempt from generally applicable contraceptive insurance requirements because of religious belief avoiding a $475 million fine), supply assistance to religious schools, *see, e.g.*, *Zelman v. Simmons-Harris*, 536 U.S. 639 (2002) (upholding a school voucher program where the majority of students were enrolled in religious schools), Erica L. Green, *De Vos Pushes Federal Aid for Religious Universities*, N.Y. Times, May 10, 2018, at A16, and provide tax benefits, *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 680 (1970) (holding that tax exemptions for religious organizations do not violate the First Amendment); *see also infra* Section IV(B) (Commerce clause analysis), Section III(C)(3) (Commerce clause and religion).

Religion, even when non-profit, is deeply rooted in interstate commerce. It comprises a sizable portion of the United States economy. Houses of religious worship offer numerous valuable services to their congregates, support a large number of personnel, take in and expend considerable funds, own large tracts of land, and receive free municipal services, such as schooling assistance, roads, and police protection. Huge religious educational institutions

operating over the internet draw students and billions of dollars in revenue from all over the country. Religion substantially contributes to our gross national product. Congress could reasonably have concluded that violence and intimidation to keep people out of houses of worship would substantially adversely affect interstate commerce. FACEA is constitutional in its design to protect that national commerce.

This case arises out of a religious and political dispute between adherents of Falun Gong—a Chinese religious group—and a group of their opponents—organized under the umbrella of the Chinese Anti-Cult World Alliance. *See Zhang Jingrong v. Chinese Anti-Cult World All. ("Zhang I")*, No. 15-CV-1046, 2018 WL 1916617, at *1-14, --F.Supp.3d-- (E.D.N.Y. Apr. 23, 2018). The People's Republic of China ("Chinese Government") has allegedly suppressed the practice of Falun Gong in China and is attempting to do so abroad, including in the United States. *Id.* The parties have debated and at times been violent with one another around a temple and tables used by Falun Gong members in Queens, New York for prayer, proselytizing, and protesting against the Chinese Government's position. *Id.*

The tables used by plaintiffs to proselytize have printed materials that are said to come from outside of the state. *See* Decl. of Yuebin Yu ("Yu Decl.") at ¶ 2, ECF No. 171, Ex. 2(f). Parts of tables themselves may flow through commerce. Congregants make substantial donations of time and money to the Falun Gong temple and tables affecting the stream of commerce. *Id.* at ¶ 8.

A prior opinion decided summary judgment motions and set the case for trial. *See Zhang I*, 2018 WL 1916617. That opinion concluded that Falun Gong is a religion for the purposes of the instant case and construed the scope of FACEA. Defendants then contended that FACEA is unconstitutional. Upon examination of the statute, briefing, argument, and research, the court

finds that FACEA is constitutional; it is authorized by Congress' power over interstate and foreign commerce.

FACEA's constitutionality is not obvious. It was passed in 1994—one year before the Supreme Court's Commerce Clause jurisprudential shift—a time when Congress' commerce power was thought to be virtually limitless. *See infra* Section III(C)(1). Defendants make powerful arguments that the statute exceeds Congress' commerce power: (1) "Acts of violence or intimidation at places of worship are not economic activity, and are plainly analogous to the acts of violence covered by the Violence Against Women Act that the Supreme Court expressly held in [*United States v. Morrison*, 529 U.S. 598 (2000)] cannot properly be considered economic activity"; (2) FACEA contains no express commerce-based jurisdictional statement of justification as do other similar statutes, *see, e.g.*, 18 U.S.C. § 247 (requiring as an element a link between a defendant's conduct and commerce); 18 U.S.C. § 249 (same); (3) FACEA contains no legislative findings linking religion and commerce; and (4) the link between religion and commerce is too attenuated to survive scrutiny. Defs.' Br. on Unconstitutionality ("Defs.' Br.") at 2-3, ECF No. 172, May 21, 2018.

A two month jury trial looms—demanding substantial time, effort, and money of the parties, a jury, and the court. Prudence dictates that this case not be tried with a substantial, dispositive question of constitutional law undecided by any appellate court. This opinion, and the prior opinion construing the scope of FACEA, are therefore certified for an interlocutory appeal. *See infra* Part V.

II.     Factual Background

A.  Case Background

A comprehensive recitation of the facts is contained in the court's opinion of April 23, 2018.  *See Zhang I*, 2018 WL 1916617, at *1-14.  A condensed, excerpted version of the facts relevant to this opinion is set out below.

Plaintiffs are members of a group, Falun Gong, developed in the second half of the twentieth century in China.  The Chinese Government, they allege, has acted to suppress this group in both China and abroad, including in the United States, because it deems the group a threat to the hegemony of the Chinese State and Communist Party.

Adherents of Falun Gong live in the United States.  Some are citizens of this country.  It is contended by them as plaintiffs that the Chinese Government has conspired with individuals to harm followers of Falun Gong in the United States by organizing and encouraging the Chinese Anti-Cult World Alliance ("CACWA") and individuals to inflict injuries on those who follow Falun Gong.

Defendants oppose Falun Gong in Flushing, Queens, New York, and elsewhere.  They deny that Falun Gong is a religion.  Following the position of the Chinese Government, their opposition is based upon characterizing Falun Gong as a "cult" indoctrinating its followers with beliefs that are dangerous, unscientific, and offensive.

For purposes of this litigation, Falun Gong is found to be a religion.  *See Zhang I*, 2018 WL 1916617, at *34-35.  Plaintiffs proselytize their religion and protest the Chinese Government's opposition to it from tables on Main Street in Flushing near what they consider to be one of their temples.

Plaintiffs set up the tables in a heavily pedestrian-traveled area. At the tables they verbally and with hand-outs, signs, and literature attacked the Chinese Government politically for, among other things, harvesting human organs. They also use the tables to proselytize for Falun Gong, through informative materials, and for meditation and exercise, forms of their worship.

The parties have clashed with one another around the temple and tables. At times the debates became loud, spirited, and mildly physical, with occasional striking out and hitting. The plaintiffs brought this suit on the theory—in addition to others—that defendants' actions were violent and intimidating at a place of religious worship as prohibited under FACEA.

### B. Prior Opinion on FACEA

The opinion of this court of April 23, 2018 addressed summary judgment motions of the parties and the court's *sua sponte* motion for summary judgment. *See Zhang I*, 2018 WL 1916617. It held that a broad interpretation of FACEA is necessary to avoid a serious constitutional question under the First Amendment.

> The Federal Freedom of Access to Clinic Entrances Act protects plaintiffs "lawfully exercising . . . [their] First Amendment right of religious freedom at a place of religious worship." 18 U.S.C. § 248(a)(2) (emphasis added). This statute is inclusive of all lawful religious practices and of all places it is practiced. Any place a religion is practiced—be it in underneath a tree, in a meadow, or at a folding table on the streets of a busy city—is protected by this and other statutes and the First Amendment to the Federal Constitution. A contrary reading would render the Freedom of Access to Clinic Entrances Act unconstitutional since it would discriminate between religions that use formal temples and those that do not.

*Id.* at *1.

A textual reading of the statute supports this conclusion:

> FACEA's language counsels for an expansive interpretation. Congress used the word "place," meaning a "physical environment" or "space." Webster's Third New International Dictionary 1727 (1993). By contrast, in 18 U.S.C. § 247, referenced in FACEA's legislative history, Congress used starkly different language in

describing religious sites. It outlaws "intentionally defac[ing], damage[ing], or destroy[ing] any religious real property." 18 U.S.C. § 247 (emphasis added). And "religious real property" is defined as "any church, synagogue, mosque, religious cemetery, or other religious real property, including fixtures or religious objects contained within a place of religious worship." *Id*. The difference—between "a place of religious worship" and "religious real property"—suggests congressional intent to protect all places of religious worship and not just fixed structures in FACEA.

*Id*. at *30.

It was concluded that the tables where plaintiffs' proselytize, meditate, and protest against the Chinese Government are protected "place[s] of religious worship" under FACEA. *Id.* at *39.

Falun Gong is a religion for the purposes of the instant case. Many of the incidents of violence and intimidation took place at or around the Falun Gong Temple in Flushing, Queens and at the tables plaintiffs use to proselytize for Falun Gong. Both are places of religious worship for purposes of the present case. The statute protects temporary structures.

Plaintiffs and others proselytize and meditate—both recognized forms of worship—at these tables. Hr'g Tr. 210:5–17 (defendants' expert explaining that the Falun Gong tables contain materials explaining the practice of Falun Gong); *id.* 213:19–214:19 (defendants' expert explaining that he has observed Falun Gong practitioners meditating at the tables); *id.* 251:21–254:9 (director of Falun Gong Spiritual Center in Queens explaining that the tables are used for proselytizing, protesting the Chinese Communist Party, and praying); *see also Murdock v. Com. of Pennsylvania*, 319 U.S. 105 (1943) ("[S]preading one's religious beliefs or preaching the Gospel through distribution of religious literature and through personal visitations is an age-old type of evangelism with as high a claim to constitutional protection as the more orthodox types.").

*Id.* (some internal citations omitted).

### C. Religion and Commerce

Religious activity contributes substantially to the United States economy. *See generally* Brian J. Grim & Melissa E. Grim, *The Socio-economic Contribution of Religion to American Society: An Empirical Analysis*, 12 Interdisc. J. of Res. on Religion 1 (2016); *cf.* 4 Encyclopedia of Religion 2668-69 (2d ed. 2005) (relationship between economic matters and religion); *id.* at

2670 (relationship between religion and capitalism); *id.* at 2671 (linking the scholarly discussion of economic matters to the analysis of religion); *id*. at 2672 (an idealistic interpretation of the case of modern capitalism centered on religious matters); *id*. at 2676 (relationship between economic and religious factors in modern life). Religious organizations participate in a number of income generating sectors including education, health care, and social services.

A recent, peer-reviewed study by Brian and Melissa Grim offers three estimates of the impact of religious activity on the United States economy. The first estimate, $378 billion annually, relies solely on revenue produced by religious organizations. Grim & Grim, *supra*, at 27. A second estimate, advocated as the most reasonable by the authors, places the value at $1.2 trillion; "it takes into account both the value of the services provided by religious organizations and the impact religion has on a number of important American businesses." *Id*. The third estimate of $4.8 trillion includes the value of "personal and social religious dynamics" and is offered as an upper end. *Id*.

There are over 330,000 houses of worship in the United States. *See* C. Kirk Hadaway Penny Long Marler, *How Many Americans Attend Worship Each Week? An Alternative Approach to Measurement*, 44 *J. for the Sci. Study of Religion* 307, 311 (2005). Approximately 53.6 million Americans attend religious services weekly, amounting to 20% of the United States population. *Id.* at 316. The revenue for these congregations is estimated to be $74.5 billion. Grim & Grim, *supra*, at 9. "Total church contributions appear to have remained around 1 percent of [Gross National Product] since at least 1955. Religious giving consistently accounts for about half of all charitable giving in the United States (approximately 64 billion dollars in 1995)." Laurence R. Iannaccone, *Introduction to the Economics of Religion*, 36 J. of Econ. Literature 1465, 1469 (1998). Hundreds of thousands of people are employed by religious

organizations.  *See* U.S. Dep't of Labor, Bureau of Labor Statistics, *Occupational Employment and Wages: Religious Organizations*, May 2017 (last visited May 24, 2018) https://www.bls.gov/oes/current/naics4_813100.htm (estimating that 193,660 Americans are employed by religious organizations across a spectrum of occupations).

"[H]ouses of worship have provided their constituents with a growing array of commercial services."  Michael A. Helfand & Barak D. Richman, *The Challenge of Co-Religionist Commerce*, 64 Duke L.J. 769, 772 (2015).  There are many places of worship that offer commercial services, such as cafes, book stores, and gyms.  *See, e.g.*, Peter J. Reilly, *Megachurch Denied Property Tax Exemption For Gym And Bookstore/Cafe*, Forbes, April 10, 2013; Jesse Bogan, *America's Biggest Megachurches*, Forbes, June 26, 2009.

One example of the relationship of organized religion and commerce is Liberty University.  *See* Alec MacGillis, *How Liberty University Built a Billion-Dollar Empire Online,* N.Y. Times Mag., April 22, 2018, at MM46.  Liberty University created a large and growing online component in its institution:

> By 2016, Liberty's net assets had crossed the $1.6 billion mark, up more than tenfold from a decade earlier. Thanks to its low spending on instruction, its net income was an astonishing $215 million on nearly $1 billion in revenue, according to its tax filing—making it one of the most lucrative nonprofits in the country, based simply on the difference between its operating revenue and expenses, in a league with some of the largest nonprofit hospital systems.

*Id.*; *see also* Jerry Falwell Jr., *Readers Respond to the 4.22.18 Issue*, May 6, 2018, at 10 ("Since 1971, Liberty University has helped more than 250,000 students develop the critical thinking skills necessary to excel in careers and communities outside our classrooms. . . . [T]he university is undergoing constant construction. We are building a new business school and upgrading our football stadium to N.C.A.A. standards, a testament to our belief that we can always improve the experience of our students. . . . We are proud of the institution we have created and the minds we

have expanded, challenged and enlightened, and take matters questioning our dedication to education seriously.").

III.    Law

    A.  Timeliness of Constitutional Challenge

        1.    Pleading Constitutional Challenges

It is not clear whether a party's constitutional challenge to an act of Congress should be pled as an affirmative defense. *Compare Williams v. Paxton*, 559 P.2d 1123, 1132 n.1 (1976) ("The purpose of the rule requiring [affirmative] defenses to be pleaded is to alert the parties concerning the issues of fact which will be tried and to afford them an opportunity to present evidence to meet those defenses. The constitutionality of a statute, however, is not ordinarily an issue upon which evidence must be presented at trial or about which one must be forewarned in order to prepare evidence for trial. . . . [It] is a matter of law."), and *S. Track & Pump, Inc. v. Terex Corp.*, No. CV 08-543-LPS, 2013 WL 5461615, at *2 (D. Del. Sept. 30, 2013), *rev'd on other grounds*, 618 F. App'x 99, 2015 WL 4081493 (3d Cir. 2015) ("Terex has not waived its constitutional challenge. . . . Plaintiff cites no binding authority for the proposition that a constitutional challenge to a statute is waived under Rule 8(c) if not pled as an affirmative defense in the answer."), *with Holland v. Cardiff Coal Co.*, 991 F. Supp. 508, 515 (S.D.W. Va. 1997) ("[Defendant's] Fifth Amendment taking defense is an affirmative defense within the definition of that term because in raising that defense, [Defendant] essentially maintains that even if it is found liable under the terms of the Coal Act, [Defendant] cannot be held liable because the Act, as applied, violates the Constitution."); *cf.* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."); Wright & Miller, 5 Federal Practice and Procedure § 1271 (3d ed.) ("As far as the judicial precedents are

concerned, the following matters have been held by federal courts to be affirmative defenses under Rule 8(c) in nondiversity cases . . . the unconstitutionality of a statute relied upon by the plaintiff."); *Century Indem. Co. v. Marine Grp., LLC*, 848 F. Supp. 2d 1238, 1262 (D. Or. 2012) (noting the "uncertainty of federal law" about whether the defense of unconstitutionality must be pled).

A constitutional challenge to Congress' power to pass a statute may be raised at any time in a litigation. *Cf.* Wright & Miller, 5 Federal Practice and Procedure § 1277 (3d ed.) ("Many courts permit affirmative defenses to be asserted by motion even when the defenses are not available on the face of the complaint. This is especially true as to those affirmative defenses that seem likely to dispose of the entire case or a significant portion of the case and defenses that require no factual inquiry for their adjudication. In situations such as these, the federal courts appear to be wise in overlooking the formal distinctions between affirmative defenses and motions, which have their primary justification in history rather than logic."); Wright & Miller, 15B Federal Practice and Procedure § 3918.7 (2d ed.) (noting in the criminal context that "[t]he arguments that the statute underlying the prosecution is unconstitutional . . . may be so fundamental that a knowing and voluntary waiver will be difficult to establish"); *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 283 (2d Cir. 2000) ("[T]he district court has the discretion to entertain  [an affirmative] defense when it is raised in a motion for summary judgment, by construing the motion as one to amend the defendant's answer.").  Some arguments, such as "[t]he objection that a federal court lacks subject-matter jurisdiction, may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006) (internal citations omitted).

2. Leave to Amend

"Prior to trial, 'a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.'" *DaCosta v. City of New York*, 296 F. Supp. 3d 569 (E.D.N.Y. 2017) (quoting Fed. R. Civ. P. 15(a)(2)), *reconsideration denied sub nom. DaCosta v. Tranchina*, 285 F. Supp. 3d 566 (E.D.N.Y. 2018). Once a scheduling order has been entered it "'may be modified' to allow the amendment 'only for good cause and with the judge's consent.'" *Id.* (quoting Fed. R. Civ. P. 16(b)(4)). The primary "good cause" consideration is whether "the moving party can demonstrate diligence," but the court may also consider other factors including "prejudice" to the non-movant. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).

"The Federal Rules of Civil Procedure are merits oriented." *DaCosta v. Tranchina*, 285 F. Supp. 3d 566, 578 (E.D.N.Y. 2018); *cf.* Fed. R. Civ. P. 1 ("[The Federal Rules of Civil Procedure] should be construed, administered, and employed by the *court and the parties* to secure the *just,* speedy, and inexpensive determination of every action and proceeding.") (emphasis added). "It is . . . entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of [] mere technicalities." *Foman v. Davis*, 371 U.S. 178, 181-82 (1962); *cf. Krupski v. Costa Crociere S.p.A.,* 560 U.S. 538, 550–51 (2010) (noting the "preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits").

B. FACEA

Congress passed FACEA in 1994 after the United States Supreme Court decided *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263 (1993), which restricted claims brought under 42 U.S.C. § 1985(3). *See Zhang I,* 2018 WL 1916617, at *28. *Bray* limited protections for

women seeking abortions; Congress sought to address that issue with FACEA. H.R. Rep. No.

103-488, at 7-8, reprinted in 1994 U.S.C.C.A.N. 724, 724–25 (May 2, 1994) (Conf. Rep.) ("Prior

to the Supreme Court's decision in *Bray* . . . the conduct described in [FACEA] was frequently

enjoined by federal courts in actions brought under 42 U.S.C. 1985(3), but in that case the Court

denied a remedy under such section to persons injured by the obstruction of access to abortion-

related services.").

Introduced into this Act protecting women seeking abortion services was a provision

protecting religion:

> Whoever . . . [1] by force or threat of force or by physical obstruction, [2] intentionally injures, intimidates or interferes with or attempts to injure, intimidate or interfere with [3] any person lawfully exercising or seeking to exercise the First Amendment right of religious freedom [4] at a place of religious worship shall be subject to the penalties provided in . . . the civil remedies provided in subsection (c).

18 U.S.C. § 248(a)(2). Remedies include an award of statutory damages in the amount of $5,000

per violation. 18 U.S.C. § 248(c)(1)(B)

The Senate Report on the bill contains commerce findings about abortion services:

> Congress has clear constitutional authority to enact the Freedom of Access to Clinic Entrances Act under the Commerce Clause, which gives it authority to regulate interstate commerce.

> Commerce Clause authority has been broadly interpreted, and an exercise of it will be sustained if Congress has a rational basis for finding that an activity affects interstate commerce, and it[] acts rationally in addressing the activity. Under the Commerce Clause, in conjunction with the Necessary and Proper Clause, Congress has authority to regulate activity that is purely local if that activity has an effect on interstate commerce. Further, once Congress finds that a class of activities affects interstate commerce, Congress may regulate all activities within that class, even if any of those activities, taken individually, has no demonstrable effect on interstate commerce. It has also been considered important to Commerce Clause analysis that the problem Congress is addressing is national in scope and exceeds the ability of a single state or local jurisdiction to solve. Under these principles, [FACEA] falls easily within the commerce power.

Clinics and other abortion service providers clearly are involved in interstate commerce, both directly and indirectly. They purchase medicine, medical supplies, surgical instruments and other necessary medical products, often from other States; they employ staff; they own and lease office space; they generate income. In short, the Committee finds that they operate within the stream of interstate commerce.

In addition, many of the patients who seek services from these facilities engage in interstate commerce by traveling from one state to obtain services in another. . . .

Clinic employees sometimes travel across State lines to work as well. Like Dr. David Gunn, the physician who was killed in Pensacola, FL, some doctors who perform abortions work in facilities in more than one State.

In addition, as Attorney General Reno noted, the types of activities that would be prohibited by [FACEA] have a negative effect on interstate commerce. As the record before the Committee demonstrates, clinics have been closed because of blockades and sabotage and have been rendered unable to provide services. Abortion providers have been intimidated and frightened into ceasing to perform abortions. Clearly, the conduct prohibited by [FACEA] results in the provision of fewer abortions and less interstate movement of people and goods. This situation is analogous to Congress[] exercise of the commerce power in passing Title II of the Civil Rights Act of 1964, which was premised on the conclusion that restaurants that discriminated served fewer customers, and therefore suppressed interstate commerce. *See Heart of Atlanta Motel v. United States*, 379 U.S. 241 (1964). Here, of course, the very purpose of those engaging in the conduct addressed by [FACEA] is to suppress the provision of abortion services.

S. Rep. No. 103-117, at 31-32, 1993 WL 286699 (July 29, 1993) (Conf. Rep.).

The religious liberty provision was not part of the bill when this report on FACEA was issued.  It was added by an amendment proposed by Senator Orrin Hatch on the floor before the Senate several months after the report.  Senator Hatch explained:

Mr. President, the religious liberty amendment that I am offering is very straightforward. It would ensure that the first amendment right of religious liberty receives the same protection from interference that [FACEA] would give abortion. Simply put, anyone who votes against this amendment or who attempts to dilute it values religious freedom far less than abortion.

Religious liberty is the first liberty guaranteed in the Bill of Rights. As the lead cosponsor, along with Senator KENNEDY, of the Religious Freedom Restoration Act, I have worked to guarantee that religious liberty is protected against Government intrusion. Through this amendment, religious liberty would also be protected against private intrusion-in exactly the same way that [FACEA] would protect abortion.

Make no mistake about it: The right of Americans of various religions to attend their places of worship in peace is under attack throughout the country. Various groups, acting on behalf of various causes, have undertaken an interstate campaign of harassment, physical assaults, and vandalism. Consider, for example, some recent episodes:

Just over a week ago, protesters disrupted Scripture reading at the Village Seven Presbyterian Church in Colorado Springs, CO, and pelted the congregation with condoms. Similar protests have occurred throughout the country, and organizers of the Colorado Springs protest said that they planned further disruptions in the future.

In February of this year, the St. Jude's United Holiness Church in St. Petersburg, FL, was burned to the ground by an arsonist. Another arsonist set fire to at least 17 other churches throughout Florida and to churches in Tennessee and Colorado. . . .

Our Nation was founded on the principle of religious liberty. If any right deserves protection from private interference, it is religious liberty. The amendment that I am offering would do no more than give religious liberty the same protection that [FACEA] would give abortion.

The choice for my colleagues is simple: Do they value religious liberty at least as much as abortion? If so, they should vote for my amendment.

139 Cong. Rec. S15660, 1993 WL 470962 (Nov. 3, 1993).

Senator Kennedy, a sponsor of FACEA responded:

Mr. KENNEDY: As I understand the Senator's amendment, it would simply extend the bill's prohibitions to include the actual or temporary use of force, threat of force, or physical obstruction to intentionally injure, intimidate, or interfere with anyone lawfully exercising or seeking to exercise the first amendment, the right of religious freedom at a place of religious worship and to intentionally damage or destroy property of a place of religious worship.

Am I correct that the amendment would cover only conduct actually occurring or, in the case of an attempt, intending to occur in place of religious worship, such as a church, synagogue or the immediate vicinity of a church?

Mr. HATCH: The Senator is absolutely right.

Mr. KENNEDY: So, to be clear on this, the amendment would cover only conduct actually occurring at *an established place of religious worship, a church or synagogue, rather than any place where a person might pray, such as a sidewalk*?

Mr. HATCH: That is correct.

Mr. KENNEDY: Mr. President, we can accept the amendment. With this understanding, we are prepared to accept the amendment.

*Id.* (emphasis added).

The House adopted the religious liberty amendment with minor adjustments. H.R. Rep. No. 103-488, at 9, reprinted in 1994 U.S.C.C.A.N. 724, 726 (May 2, 1994) (Conf. Rep.) ("The House recedes with an amendment that modifies the Senate language in two respects. First, it inserts 'religious' before 'worship' in the first reference to 'place of worship.' Second, it makes clear . . . that this Act does not create any new remedies for interference with a person engaging, outside a facility that provides reproductive health services, in worship or other activities that are protected by either the free speech or free exercise clause of the First Amendment to the Constitution.").

Commentators have suggested that the religious freedom provision helped alleviate freedom of speech problems that would be raised if FACEA only protected abortion seekers. *See* Michael Stokes Paulsen & Michael W. McConnell, *The Doubtful Constitutionality of the Clinic Access Bill*, 1 Va. J. Soc. Pol'y & L. 261, 287 (1994) ("The Senate adopted a 'religious liberty amendment' proposed by Senator Hatch . . . . This is an important move in the direction of content-neutrality, as the bill no longer targets only pro-life protest. Without this broadening amendment, the bill would very likely not survive First Amendment scrutiny.").

As already explained, "a place of religious worship" in FACEA must be construed broadly to avoid a constitutional issue under the First Amendment: that religions using formal temples are not privileged over those that do not. *See Zhang I*, 2018 WL 1916617, at *30; *supra* Section II(B). Despite the exchange between Senators Kennedy and Hatch suggesting only "established place[s] of religious worship" are protected, FACEA should not, based on statutory

text and constitutional concerns, be given such a limited interpretation. *See Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 15 (1947) ("The 'establishment of religion' clause of the First Amendment means at least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, *or prefer one religion over another*.") (emphasis added). The constitutionality of FACEA will be assessed below based on this broad understanding.

       C.  Commerce Clause

Article I, Section 8, Clause 3 of the United States Constitution, the Commerce Clause, grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3.

       1.        Supreme Court Commerce Clause Jurisprudence

From 1937 to 1995, the Supreme Court of the United States did not find any law unconstitutional as exceeding Congress' power granted by the Commerce Clause. *See* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* 247 (4th ed. 2011). During this period, the Commerce Clause was expansively interpreted by the Court, as it upheld myriad statutes. *Id.* at 268.

Limits have since been placed on Congress' power. Modern Commerce Clause doctrine stems from the Supreme Court's decisions in *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000). Congress has power to regulate: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities that substantially affect interstate commerce." *Morrison*, 529 U.S. at 609. Both *Lopez* and *Morrison* addressed the third category.

In *Lopez*, the Court held that the Gun-Free School Zones Act of 1990, criminalizing possession of a weapon close to a school, was unconstitutional. *Lopez*, 514 U.S. at 551. The Court noted that its prior decisions—upholding regulation of wholly intrastate activity—concerned economic conduct. *Id.* at 559-60. "Where *economic activity* substantially affects interstate commerce, legislation regulating that activity will be sustained." *Id.* at 560 (emphasis added). The Gun-Free School Zones Act, had "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Id.* at 561. Congress did not make any legislative findings tying guns in school zones to interstate commerce and the act did not contain a jurisdictional element, requiring a nexus to interstate commerce in each individual case. *Id.* at 561-63.

The *Lopez* Court concluded:

> These are not precise formulations, and in the nature of things they cannot be. But we think they point the way to a correct decision of this case. The possession of a gun in a local school zone is in no sense an economic activity that might, through repetition elsewhere, substantially affect any sort of interstate commerce. Respondent was a local student at a local school; there is no indication that he had recently moved in interstate commerce, and there is no requirement that his possession of the firearm have any concrete tie to interstate commerce.

*Id.* at 567.

*Morrison*, decided five years later, struck down the civil remedies provision of the Violence Against Women Act ("VAWA"). The Court focused on four factors: (1) whether the regulated activity was economic; (2) whether the statute contained an express jurisdictional element; (3) whether Congress made legislative findings linking the regulated activity to interstate commerce; and (4) whether there was an attenuated link between the regulation and interstate commerce. *Morrison*, 529 U.S. at 610-12.

The Court found that "[g]ender-motivated crimes of violence are not, in any sense of the phrase, economic activity[;] . . . thus far in our Nation's history our cases have upheld Commerce Clause regulation of intrastate activity only where that activity is economic in nature." *Id.* at 613. Congress made significant findings tying the impact of gender-motivated violence to interstate commerce. *Id.* at 613-14. The Court rejected Congress' reasoning:

> Congress' findings are substantially weakened by the fact that they rely so heavily on a method of reasoning that we have already rejected as unworkable if we are to maintain the Constitution's enumeration of powers. Congress found that gender-motivated violence affects interstate commerce by deterring potential victims from traveling interstate, from engaging in employment in interstate business, and from transacting with business, and in places involved in interstate commerce; . . . by diminishing national productivity, increasing medical and other costs, and decreasing the supply of and the demand for interstate products.

*Id*. at 615 (internal quotation marks and citations omitted).

> Basing its decision partially on federalism principles, it declared:

> We accordingly reject the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce. The Constitution requires a distinction between what is truly national and what is truly local. In recognizing this fact we preserve one of the few principles that has been consistent since the Clause was adopted. The regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States. Indeed, we can think of no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims.

*Id.* at 617-18 (internal citations omitted).

In *Lopez* and *Morrison*, the Supreme Court distinguished rather than overturned its expansive Commerce Clause precedents. Cases such as *Wickard v. Filburn*, 317 U.S. 111 (1942)—upholding Congress' power to regulate the intrastate production of wheat—and *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241 (1964)—granting Congress the power to outlaw private discrimination in places of public accommodation because of its affect on

interstate commerce—are still good law. *See Lopez*, 514 U.S. at 557-58 (citing cases

approvingly).

 *Gonzales v. Raich*, reviewing the constitutionality of Congress' power to regulate

intrastate marijuana use and cultivation, established that Congress' commerce powers remains

broad:

> Our case law firmly establishes Congress' power to regulate purely local activities
> that are part of an economic "class of activities" that have a substantial effect on
> interstate commerce. As we stated in *Wickard,* "even if appellee's activity be local
> and though it may not be regarded as commerce, it may still, whatever its nature,
> be reached by Congress if it exerts a substantial economic effect on interstate
> commerce." We have never required Congress to legislate with scientific
> exactitude. When Congress decides that the 'total incidence' of a practice poses a
> threat to a national market, it may regulate the entire class. In this vein, we have
> reiterated that when a general regulatory statute bears a substantial relation to
> commerce, the *de minimis* character of individual instances arising under that
> statute is of no consequence.

*Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (internal citations omitted).

 When Congress regulates an economic class of activities, a trial court's task is not to

answer the empirical question of whether acts, "taken in the aggregate, substantially affect

interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* at

22. "Congress had a rational basis for believing that failure to regulate the intrastate manufacture

and possession of marijuana would leave a gaping hole in the" Controlled Substances Act and

was therefore constitutional. *Id*. at 22. *Gonzales* declared that "[w]hile congressional findings

are certainly helpful in reviewing the substance of a congressional statutory scheme, particularly

when the connection to commerce is not self-evident, . . . the absence of particularized findings

does not call into question Congress' authority to legislate." *Id*. at 21.

 *Gonzales* distinguished *Lopez* and *Morrison*. The Controlled Substance Act, regulated

"quintessentially economic" activity—the production of a commodity—unlike the non-economic

regulation in *Morrison* and *Lopez*. *Id.* 23-25. "[I]n both *Lopez* and *Morrison,* the parties asserted that a particular statute or provision fell outside Congress' commerce power in its entirety," while in *Gonzales* there was only a challenge to a part of an otherwise clearly valid statutory scheme. *Id.* at 23. *Morrison* and *Lopez* both appear to address the constitutionality of acts on their face—*Gonzales* by contrast, appears to address the issue on an as applied basis.

A question posed is: does the court address a commerce clause challenge "as applied" or facially? *See* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209 (2010). Professor Rosenkranz explains:

> [T]he riddle may be solved by focusing on the subject of the clause. The Commerce Clause says: "The Congress shall have power . . . To regulate commerce . . . among the several states . . . ." Like the First Amendment it is written in the active voice and it has a clear subject: Congress. (Unlike the First Amendment, the Commerce Clause is a grant of power rather than a restriction on power, so, strictly speaking, it cannot be "violated" at all; rather, Congress may exceed its power under the Commerce Clause and thus violate the Tenth Amendment.) So, a Commerce Clause challenge, like a First Amendment challenge, is a challenge to an action of Congress. Congress is the subject of the claim and the answer to the who question. And the answer to the when question follows: if Congress makes a law in excess of its power under the Commerce Clause and thus violates the Tenth Amendment, the constitutional violation occurs when Congress makes the law. . . .
>
> [A] Commerce Clause challenge cannot be "as-applied." A Commerce Clause challenge must be a challenge to an action of Congress. In a Commerce Clause challenge, it must be that the violation is visible on the "face" of the statute . . . .

*Id.* at 1273-79. Defendants challenge FACEA on its face. Defs.' Br. at 4 ("[FACEA] should be stricken down as facially unconstitutional.").

### 2. FACEA Commerce Clause Decisions

The Court of Appeals for the Second Circuit has held that Congress possessed the power to pass the abortion segment of FACEA under the Commerce Clause. *United States v. Weslin*, 156 F.3d 292, 296 (2d Cir. 1998). "Congress specifically found that the activities governed by FACE[A] affect interstate commerce." *Id.* Women often travel between states to receive

abortion services, and "because of a shortage of doctors willing to perform abortions, doctors

travel from state to state and often cover great distances to perform abortions." *Id*.

All other circuit courts of appeals to have considered the constitutionality of FACEA's

abortion provision have reached the same conclusion. *See United States v. Gregg*, 226 F.3d 253

(3d Cir. 2000); *Hoffman v. Hunt*, 126 F.3d 575 (4th Cir. 1997); *States v. Bird*, 124 F.3d 667 (5th

Cir. 1997); *Norton v. Ashcroft*, 298 F.3d 547 (6th Cir. 2002); *United States v. Soderna*, 82 F.3d

1370 (7th Cir. 1996); *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir. 1996); *Cheffer v. Reno*,

55 F.3d 1517 (11th Cir. 1995); *Terry v. Reno*, 101 F.3d 1412 (D.C. Cir. 1996).

### 3.      Commerce Clause and Religion

The Supreme Court has recognized that it can be "difficult to determine whether a

particular activity is religious or purely commercial." *Murdock v. Com. of Pennsylvania*, 319

U.S. 105, 110 (1943).

> In many—and perhaps an increasing number of—instances, religion overlaps with
> the commercial sphere and courts are obligated to determine whether or not to adopt
> an entirely hands-off approach simply because the specter of religion lurks on the
> horizon. . . . [T]he U.S. Supreme Court has treated the two spheres as overlapping.
> . . . [T]he Supreme Court appears to view religious value as generated through a
> complex interaction between religious entities and individual adherents.

Bernadette Meyler, *Commerce in Religion*, 84 Notre Dame L. Rev. 887, 912 (2009).

Congress has used its commerce power to justify several other statutes bearing on

religion. For example, the Religious Land Use and Institutionalized Persons Act (RLUIPA)

prohibits federal, state, and local governments from "impos[ing] or implement[ing] land use

regulation in a manner that imposes a substantial burden on the religious exercise of a person,"

42 U.S.C. § 2000cc, and from "impos[ing] a substantial burden on the religious exercise of a

person residing in or confined to an institution," 42 U.S.C. § 2000cc-1. It contains a commerce

linked jurisdictional element. *See* 42 U.S.C. § 2000cc(a)(2)(B) ("This subsection applies in any

case in which . . . the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes."); *id*. § 2000cc-1(b)(2) (same).

The Court of Appeals for the Second Circuit has affirmed congressional power to pass RLUIPA. *Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 354 (2d Cir. 2007) ("[W]here the relevant jurisdictional element is satisfied, RLUIPA constitutes a valid exercise of congressional power under the Commerce Clause."); *cf. Cutter v. Wilkinson*, 544 U.S. 709 (2005) (holding that RLUIPA does not violate the Establishment Clause); *but see* Ada-Marie Walsh, *Religious Land Use and Institutionalized Persons Act of 2000: Unconstitutional and Unnecessary*, 10 Wm. & Mary Bill Rts. J. 189, 190 (2001) ("The RLUIPA is unconstitutional because it violates the Establishment Clause of the First Amendment. In promulgating the RLUIPA, Congress exceeded its power under the Commerce Clause.").

On the facts presented in *Westchester Day School*, the appellate court concluded that the ties to interstate commerce were sufficient to satisfy the jurisdictional element and Commerce Clause analysis.

> [T]he district court found the jurisdictional element satisfied by evidence that the construction of Gordon Hall, a 44,000 square-foot building with an estimated cost of $9 million, will affect interstate commerce. We identify no error in this conclusion. As we have recognized, the evidence need only demonstrate a minimal effect on commerce to satisfy the jurisdictional element. Further, we have expressly noted that commercial building construction is activity affecting interstate commerce.

*Westchester Day School,* 504 F.3d at 354 (internal citations omitted).

Other statutes touching religion have been found to be constitutional exercises of congressional commerce power. *See* 18 U.S.C. § 247 (the Church Arson Prevention Act of 1996, prohibiting "defac[ing], damage[ing], or destroy[ing] any religious real property, because

of the religious character of that property"); 18 U.S.C. § 249 (the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act, criminalizing "willfully caus[ing] bodily injury to any person . . . through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, . . . because of the actual or perceived . . . religion . . . of any person").

Both statutes contain commerce-linked jurisdictional elements. *See* 18 U.S.C. § 247(b) ("[T]he offense is in or affects interstate or foreign commerce."); 18 U.S.C. § 249(a)(2)(B) ("[T]he conduct . . . interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or . . . otherwise affects interstate or foreign commerce."). Courts have relied on these jurisdictional elements in affirming Congress' power to pass them. *See, e.g., United States v. Roof*, 252 F. Supp. 3d 469 (D.S.C. 2017) (denying motion for a new trial or judgment of acquittal under § 247 and § 249 and rejecting a commerce challenge to § 247); *United States v. Mason*, 993 F. Supp. 2d 1308, 1317 (D. Or. 2014) ("[T]he jurisdictional element of [§ 249] . . . is sufficient to satisfy the requirements of the Commerce Clause."); *but see* Jonathan H Adler, *How the Justice Department is using the Commerce Clause to criminalize forcible beard cutting as a federal hate crime*, The Volokh Conspiracy, June 24, 2014 ("[T]he jurisdictional element of [§ 249] is written in such broad terms that many activities satisfy the relevant statutory elements without having any meaningful relationship to commerce . . . [this] makes a mockery of the notion of limited and enumerated powers.").

Congress made findings in passing § 249 about the effects hate crimes have on interstate commerce. As Judge Wynn explained dissenting from a panel opinion of the Court of Appeals for the Fourth Circuit:

> [Section 249's] substantive provisions are preceded by congressional findings regarding the prevalence and impact of violent hate crimes throughout the country, as well as Congress's desire to assist state and local efforts to combat such violence. Distinguishing hate crimes from other violent crimes—which, Congress

emphasized, States continue to be responsible for prosecuting—Congress concluded that violent hate crimes "substantially affect[ ] interstate commerce in many ways." Among these effects, Congress explained that:

(A) The movement of members of targeted groups is impeded, and members of such groups are forced to move across State lines to escape the incidence or risk of such violence.
(B) Members of targeted groups are prevented from purchasing goods and services, obtaining or sustaining employment, or participating in other commercial activity.
(C) Perpetrators cross State lines to commit such violence.
(D) Channels, facilities, and instrumentalities of interstate commerce are used to facilitate the commission of such violence.
(E) Such violence is committed using articles that have traveled in interstate commerce.

*United States v. Hill*, 700 F. App'x 235, 243 (4th Cir. 2017) (Wynn, J. dissenting) (internal

citations omitted).

Findings were similarly made about religion and commerce when Congress passed § 247:

To the extent the legislative history is informative on the specific impact of church attacks on interstate commerce, there are references to a broad range of activities in which churches engage, including social services, educational and religious activities, the purchase and distribution of goods and services, civil participation, and the collection and distribution of funds for these and other activities across state lines. *See, e.g.,* 142 Cong. Rec. S7908–04 at *S7909 (1996) (joint statement of floor managers regarding H.R. 3525, The Church Arson Prevention Act of 1996); 142 Cong. Rec. S6517–04, *S6522 (1996) (statement of Sen. Kennedy); *see also Church Burnings: Hearings on the Federal Response to Recent Incidents of Church Burnings in Predominantly Black Churches Across the South Before the Senate Comm. on the Judiciary,* 104th Cong., 37 (1996) (appendix to the prepared statement of James E. Johnson and Deval L. Patrick).

*U.S. v. Grassie*, 237 F.3d 1199, 1209 (10th Cir. 2001); *see also* 142 Cong. Rec. S7908-04, 142

Cong. Rec. S7909, 1996 WL 396477 (July 16, 1996) (joint statement of Sens. Faircloth and

Kennedy & Reps. Hyde and Conyers) ("Many of the places of worship that have been destroyed

serve multiple purposes in addition to their sectarian purpose. For example, a number of places

of worship provide day care services, or a variety of other social services.").

IV.    Application of Facts to Law

    A.  Timeliness of Constitutional Challenge

Defendants' constitutional challenge has not been waived or forfeited for four reasons. First, defendants did not need to plead unconstitutionality as an affirmative defense and properly raised it by motion.  *See supra* Section III(A).

Second, the court granted defendants leave to file amended answers, *see* April 26, 2018 Order, ECF No. 154, and they did so.  *See* Third Amended Answers, ECF Nos. 157-58. Plaintiffs argue that this was error because the amendment was untimely and without good cause. The decision granting leave to amend was proper.

There has been no showing that defendants were not diligent.  As defendants' counsel represented to the court:  "It was only upon further discussion of [defendants' summary judgment filing] that the [unconstitutionality] point [] occurred to me, and it is one that I believe Your Honor will find worthy of analysis."  *See* Defs.' Ltr. Br. at 1, ECF No. 150, April 21, 2018. Defendants were entitled to rely on the general presumption that an act of Congress was passed in accordance with its constitutionally delegated power.  *Cf. San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 60 (1973) (stating the "first principles of constitutional adjudication [is] the basic presumption of the constitutional validity of a duly enacted state or federal law"); *Beatie v. City of New York*, 123 F.3d 707, 711 (2d Cir. 1997) ("Legislative acts that do not interfere with fundamental rights or single out suspect classifications carry with them a strong presumption of constitutionality.").

The prejudice to plaintiffs is relatively minor.  *See Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (stating "prejudice" to the non-movant may be considered in assessing whether to allow a pleading amendment).  A challenge to Congress' commerce power

may be assessed facially.  *See supra* Section II(C)(1); *Williams v. Paxton*, 559 P.2d 1123, 1132

(1976) ("The constitutionality of a statute, however, is not ordinarily an issue upon which

evidence must be presented at trial or about which one must be forewarned in order to prepare

evidence for trial. . . . [It] is a matter of law.").  Facts necessary to adjudicate this issue may be

recognized by judicial notice.  *See infra* Section IV(D).  Plaintiffs fully briefed and argued the

issue.  Had additional discovery been needed, it would have been allowed.

Third, this challenge bears on the court's subject-matter jurisdiction.  FACEA is the sole

remaining federal cause of action and basis of original jurisdiction.  *Cf.* 28 U.S.C. § 1367(C)(2)

("The district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the

district court has dismissed all claims over which it has original jurisdiction.").  "The objection

that a federal court lacks subject-matter jurisdiction, may be raised by a party, or by a court on its

own initiative, at any stage in the litigation, even after trial and the entry of judgment."  *Arbaugh

v. Y&H Corp.*, 546 U.S. 500, 506 (2006).  This is a quasi-jurisdictional challenge.

Fourth, failure to consider this challenge could lead to a manifest injustice.  Consider the

absurdity if the statute were unconstitutional but the argument forfeited:  defendants would be

subject to a two month trial and the possibility of statutory damages under FACEA—at the rate

of $5,000 per violation—when the sole basis of this court's jurisdiction is a single remaining

federal cause of action that the United States Congress passed without authority.  "It is . . .

entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits

to be avoided on the basis of [] mere technicalities."  *Foman v. Davis*, 371 U.S. 178, 181-82

(1962).

B.  Commerce Clause Analysis

Congress can use its commerce power to regulate: (1) "the use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; or (3) "those activities that substantially affect interstate commerce."  *United States v. Morrison*, 529 U.S. 598, 609 (2000); *see also supra* Section III(C)(1).

FACEA's prohibition on violence and intimidation at places of religious worship does not seem to fall into either of the first two categories.  The question is:  does it substantially affect interstate commerce, the third category?

The first step in the analysis is to ask whether FACEA is regulating an "economic 'class of activity.'"  *Gonzales v. Raich*, 545 U.S. 1, 17 (2005).  The cases offer limited guidance on the meaning of this term.  "These are not precise formulations, and in the nature of things they cannot be."  *United States v. Lopez,* 514 U.S. 549, 567 (1995).  Guns in a school zone and violence against women, the Supreme Court tells us, are not economic.  *Id*. at 561; *Morrison*, 529 U.S. at 613.  Wheat production, marijuana cultivation, and abortion services are economic.  *See Wickard v. Filburn*, 317 U.S. 111 (1942); *Gonzales*, 545 U.S. 1; *United States v. Weslin*, 156 F.3d 292, 296 (2d Cir. 1998).

FACEA's religion provision regulates an economic class of activities.  Four elements are necessary to make out a claim:  (1) force or the threat of force, (2) intent to injure, intimidate or interfere with (3) a person engaged in First Amendment religious activity (4) at "a place of religious worship." 18 U.S.C. § 248(a)(2).  Violence and intimidation, *Morrison* tells us, is not economic.  First Amendment activity is probably not inherently economic either—one can conjure "First Amendment" activities that have nothing to do with commerce.  But the grounding

element in the statute—"a place of religious worship"—transforms the provision into to one tethered to commerce.

Places of religious worship—even interpreted broadly to avoid an issue under the First Amendment—are economic. There are approximately 331,000 formal houses of worship in the United States that have some $74.5 billion in annual revenue. *See supra* Section II(C); Grim & Grim, *supra*, at 9; Hadaway & Marler, *supra*, at 311. This accounts for 1% of gross national product in the United States and half of all charitable giving. Iannaccone, *supra*, at 1469. Many houses of worship operate on a fee-for-service model—congregants pay for memberships or donate in order to sustain the costs of upkeep and pay for clergy. Religion is an important sector of the United States economy; violence and intimidation at places of religious worship can deter people from participating in religious-based, commercial activity.

Against this backdrop—that Congress is regulating an "economic class of activity"— Congress possessed the power under the Commerce Clause to pass FACEA. The inquiry is whether Congress had a "rational basis" for concluding that FACEA could substantially affect interstate commerce. *Gonzales*, 545 U.S. at 22. Based on the evidence and common sense notions about religion, as widely practiced in the United States, religious activity and commerce overlap: Congress had a rational basis for concluding that violence and intimidation at places of religious worship could substantially affect interstate commerce.

That many religious institutions operate as non-profits does not change the religious-economic situation. In *Gonzales*, by way of analogy, the Court held that the cultivation and intrastate sale of marijuana was economic, notwithstanding that the market is illegal. *See also Taylor v. United States*, 136 S. Ct. 2074, 2080 (2016) ("[T]he sale of marijuana, is unquestionably an economic activity. It is, to be sure, a form of business that is illegal under

federal law and the laws of most States. But there can be no question that marijuana trafficking is a moneymaking endeavor—and a potentially lucrative one at that.").

It is of no consequence that FACEA must be interpreted to reach those religious places of worship that take place outside of a formal setting. *See Zhang I*, 2018 WL 1916617, at *1, *28-30. The instant case demonstrates the point. Plaintiffs set up tables on busy streets in Queens where they proselytize, worship, and protest against the Chinese Government's suppression of their religion. They hand out flyers and other materials that are printed in other states and countries and travel through interstate commerce, they set up tables whose parts may do the same, people travel from out of state to participate, and they drive cars that travel through the stream of commerce to get there. Yu Decl. at ¶¶ 2-5. This activity costs money and takes time. *Id*. at ¶ 8. As applied to this case, plaintiffs' activities affect interstate commerce.

### C. Distinguishing *Morrison*

Defendants contend that *United States v. Morrison*, 529 U.S. 598 (2000)—striking down the civil remedies provision of VAWA—controls. VAWA and FACEA are similar in some respects: both prohibit violence and protect groups historically subject to violence. Because outlawing violence against women is not commerce, defendants argue, intimidation at places of religious worship should not be considered economic.

Places of religious worship can be areas of commerce. *Cf. United States v. Ferranti*, 928 F. Supp. 206, 212 (E.D.N.Y. 1996), *aff'd sub nom. United States v. Tocco*, 135 F.3d 116 (2d Cir. 1998) (concluding that arson of a retail dress shop was sufficiently related to interstate commerce because a place of commerce was destroyed). VAWA prohibited "gender-motivated violence *wherever it occur[ed]* (rather than violence directed at the instrumentalities of interstate commerce, interstate markets, or things or persons in interstate commerce)." *Morrison*, 529 U.S.

at 609 (emphasis added).  FACEA, unlike VAWA, inherently requires interference with commerce.  Houses of worship substantially contribute to the United States economy by providing their congregants with goods and services.  *See supra* Section II(C).

Defendants ignore a lesson of *Gonzales*:  the court looks at a specific provision within the context of the statutory scheme.  *Gonzales v. Raich*, 545 U.S. 1, 27 (2005).  The religious freedom provision in FACEA is a small part of the statute that was primarily designed to protect women seeking abortion services.  *See supra* Section III(B) (reviewing legislative history).

Considering the religious freedom provision in isolation ignores the realities of compromising in legislating.  *See generally* Kenneth A. Shepsle, *Congress Is A "They," Not an "It": Legislative Intent As Oxymoron*, 12 Int'l Rev. L. & Econ. 239 (1992).  The religion portion was added as part of an understanding between Senators Kennedy and Hatch.  *See supra* Section III(B).  Some have suggested that it alleviates freedom of speech issues that would be present if the statute only pertained to abortion services.  Michael Stokes Paulsen & Michael W. McConnell, *The Doubtful Constitutionality of the Clinic Access Bill*, 1 Va. J. Soc. Pol'y & L. 261, 287 (1994) ("Without this broadening amendment, the bill would very likely not survive First Amendment scrutiny.").

All circuit courts of appeals, including the Court of Appeals for the Second Circuit, have upheld the constitutionality of the abortion provision of the statute.  *See supra* Section III(C)(2).  That FACEA's religious liberty provision is seldom used in court does not negate constitutionality.  *See* Letter from Assistant Attorney General Peter J. Kadzik to Senators Ted Cruz and Mike Lee, at 4-5 (June 29, 2016), *avalible at* https://www.cruz.senate.gov/files/documents/Letters/20160927_FACEActResponse.pdf (explaining that the Department of Justice had never brought an enforcement action under the

religious liberty portion of FACEA, but "the Department has prosecuted dozens of cases of violence directed at houses of worship and interference with the free exercise of religion under 18 U.S.C. § 247, a statute that is broader in scope than the FACE Act" including (1) "On July 15, 2014, Macon Openshaw was sentenced to five years in prison firing three rounds from a .22 caliber handgun at a synagogue in Salt Lake City, Utah"; and (2) "On April 29, 2011, Brian Lewis, Abel Mark Gonzalez, and Andrew Kerber were sentenced for defacing and damaging a synagogue, a Roman Catholic church, and a Greek Orthodox church in Modesto, California").

    D.  Legislative Findings and Jurisdictional Nexus

        FACEA lacks two legislative indications that Congress has used to ensure constitutionally under the Commerce Clause:  (1) legislative findings, and (2) a commerce-based jurisdictional element.  It is unsurprising that Congress made no findings about religion in passing FACEA—the religious freedom provision was added informally after the Senate's report on commerce was completed.  *See supra* Section III(B).  "While congressional findings are certainly helpful in reviewing the substance of a congressional statutory scheme, . . . the absence of particularized findings does not call into question Congress' authority to legislate."  *Gonzales v. Raich*, 545 U.S. 1, 21 (2005).  Congress has made commerce findings in analogous statutes, such as 18 U.S.C. § 247, prohibiting damage to religious property, and 18 U.S.C. § 249, prohibiting hate crimes.  *See supra* Section III(C)(3).  It is proper to rely on Congress' findings for these statutes.

        In the instant case, where the relationship between commerce and religion is observable through judicial notice, explicit congressional findings are unneeded:

> In deciding jurisdictional, standing and other issues fundamental to the present litigation, the court has engaged in extensive background research, but not on the specific frauds charged. . . . It is appropriate and necessary for the judge to do research required by a case in order to understand the context and background of

> the issues involved so long as the judge indicates to the parties the research and
> conclusions, by opinions and otherwise, so they may contest and clarify.

*Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 230 (E.D.N.Y. 2018)

(citing Abrams, Brewer, Medwed, et al., *Evidence Cases and Materials* (10th Ed. 2017) (Ch. 9

"Judicial Notice")).

Requiring as an express element of the statute an explicit nexus to commerce is

unnecessary when the link to commerce is clear. In the challenges to the abortion clinic portion

of FACEA, courts have not been persuaded that a jurisdictional nexus is necessary because of the

link between abortion services and interstate commerce. *See supra* Section III(C)(2); *cf.* Diane

McGimsey, *The Commerce Clause and Federalism After Lopez and Morrison: The Case for

Closing the Jurisdictional-Element Loophole*, 90 Cal. L. Rev. 1675 (2002) (arguing that the

significance of a jurisdictional element has been overempasized by lower courts and needs

reworking).

V.      Certification of Interlocutory Appeal

Federal practice generally does not permit appeals until final judgment is entered. *See

generally Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc.*, 71 F. Supp. 2d 139

(E.D.N.Y. 1999) (reviewing the history and policy considerations of, and exceptions to, the final

judgment rule). But a district court has discretion to permit an interlocutory appeal:

> When a district judge, in making in a civil action an order not otherwise appealable
> under this section, shall be of the opinion that *such order involves a controlling
> question of law as to which there is substantial ground for difference of opinion
> and that an immediate appeal from the order may materially advance the ultimate
> termination of the litigation*, he shall so state in writing in such order. The Court of
> Appeals which would have jurisdiction of an appeal of such action may thereupon,
> in its discretion, permit an appeal to be taken from such order, if application is made
> to it within ten days after the entry of the order: Provided, however, that application
> for an appeal hereunder shall not stay proceedings in the district court unless the
> district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b) (emphasis added).

The court certifies an interlocutory appeal of this order and its memorandum and order of April 23, 2018, interpreting FACEA as constitutional. *See Zhang I*, 2018 WL 1916617, at *28-30. These two opinions present "controlling question[s] of law as to which there is substantial ground for difference of opinion and . . . an immediate appeal . . . may materially advance the ultimate termination of the litigation." 28 U.S.C § 1292(b).

A trial on liability and damages in this case is estimated to take two months. *See Zhang*, 2018 WL 1916617, at *41. Trying the case will require substantial time, effort, and resources of the parties, a jury, and the court.

As now projected by the court, the jury would have to make some 234 unanimous, individual decisions. The fact that interpreters will be needed almost continuously will increase trial difficulty. Issues to be separately decided are as follows (reproduced from *Zhang I*, 2018 WL 1916617, at *15):

| Plaintiffs' Claims | | | |
|---|---|---|---|
| **Cause of Action** | **Plaintiffs** | **Defendants** | **Number of Issues to be decided** |
| Assault & Battery | Zhang Jingrong; Zhou Yanhua; Zhang Peng; Zhang Cuiping; Wei Min; Lo Kitsuen; Hu Yang; Gao Jinying; Cui Lina; Xu Ting | All Defendants | 50 |
| Bias Related Violence & Intimidation (New York Civil Rights Law § 79-n) | All Plaintiffs | All Defendants | 65 |
| Interference with Religious Freedom (18 U.S.C. § 248) | Zhang Jingrong; Zhou Yanhua; Lo Kitsuen; Wei Min; Hu Yang; Gao | All Defendants | 50 |

| (Clinic Access Statute) | Jinying; Cui Lina; Zhang Peng; Li Xiurong; Cao Lijun | | |
| --- | --- | --- | --- |

| Defendants' Counterclaims | | | |
| --- | --- | --- | --- |
| **Cause of Action** | **Defendants** | **Plaintiffs** | **Number of Issues to be decided** |
| Assault & Battery | All Defendants | All plaintiffs | 65 |
| New York Civil Rights Law § 79-n | Zirou | Bian Hexiang; Zhou Yanhua; Li Xiurong; Xu Ting | 4 |

There is a substantial question as to the constitutionality of FACEA. Passed in 1994—a year before *United States v. Lopez*, 514 U.S. 549 (1995)—the Act does not contain legislative findings or a commerce-based jurisdictional element. The Court of Appeals for the Second Circuit or the United States Supreme Court may well disagree with this court's analysis finding FACEA constitutional. Prudence requires an appeal of this issue *before* a costly two-month jury trial that may result in mistrial or require reversal.

The court noted in its opinion of April 23, 2018 that FACEA requires a broad interpretation to avoid a constitutional issue under the First Amendment. *See supra* Sections II(B), III(B). Based on this expansive reading, the tables plaintiffs use for proselytizing and protest were found to be covered under FACEA. The scope of FACEA and potential constitutional issues under the First Amendment bear on Congress' power to pass it. This issue is also certified for an interlocutory appeal.

The two questions certified for appeal are:

1)    Did the United States Congress possess the power to pass FACEA as it relates to religion?

2)    What is the scope of FACEA as it affects the instant dispute?

An immediate appeal of these issues is certified. The parties have ten days to file a notice of appeal. *See* 28 U.S.C § 1292(b).

VI.     Conclusion

Defendants' motion to declare FACEA unconstitutional is denied. FACEA was passed in accordance with the power Congress is granted under the Commerce Clause.

This order and the portion of this court's order of April 23, 2018, dealing with the constitutionality and scope of FACEA, outlined in Section V, are certified for an interlocutory appeal pursuant to 28 U.S.C § 1292(b).

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   May 30, 2018
        Brooklyn, New York